UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LABORERS DISTRICT COUNCIL PENSION AND DISABILITY TRUST FUND NO. 2, AND GEORGE MALONEY AS CO-CHAIR, <br><br>      Plaintiff, <br><br> v. <br><br> WHITING-TURNER CONSTRUCTION COMPANY, <br><br>      Defendant. | Civil Case No. _____ |

## COMPLAINT TO VACATE ARBITRATION AWARD

Plaintiff Laborers District Council Pension and Disability Trust Fund No. 2 (the "Fund"), by and through its attorneys, and for its Complaint against Defendant Whiting-Turner Construction Company ("WT"), pursuant to 29. U.S.C. §1401(b), states and alleges as follows:

## NATURE OF THE ACTION

1. This Action seeks to vacate a clearly erroneous arbitration award relating to withdrawal liability for unfunded liability incurred by WT over decades as a contributing employer to the Fund, a defined benefit multiemployer pension plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA") 29 U.S.C. § 1001, et. seq., and for related relief.

2. In 1980 Congress amended ERISA and enacted the Multiemployer Pension Plan Amendments Act ("MPPAA"), which requires employers withdrawing from multiemployer pension plans to pay the unfunded vested benefits attributable to the withdrawing employers' participation. *Connolly v. Pension Benefit* Guaranty *Corp.,* 475 U.S. 211, 217 (1986). Specifically, 29 U.S.C. § 1383(a) states that a "complete withdrawal" occurs if there is either: (1)

1

a permanent cessation of an employer's obligation to contribute under the plan, or (2) a permanent cessation of an employer's covered operations under the plan.

3.     The purpose of withdrawal liability is to ensure that an employer withdrawing from a pension plan provides adequate funds to pay the employer's fair share of unfunded liabilities that would otherwise fall on the remaining contributing employers. *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund,* 859 F.2d 808, 811 (9th Cir. 1988) (quoting *Connolly*, 475 U.S. at 215-16). In general, the amount of an employer's withdrawal liability is the employer's share of the plan's unfunded vested benefits. *See* 29 U.S.C. § 1391.

4.     The Fund assessed WT with its allocable share of unfunded withdrawal liability, and WT challenged the Fund's assessment based on a claim that it qualified for an exception to the imposition of withdrawal liability, the "construction industry exception." Ex. 1, January 30, 2018 Assessment of Withdrawal Liability; Ex. 2, April 27, 2018 Request for Review, §1(c).

5.     The arbitrator's award was erroneous as a matter of law with respect to  following: (1) the arbitrator's decision was erroneous because it is contrary to longstanding case law and regulatory precedent that excuses WT's obligations under ERISA by creating a non-existent *de minimis* exception to ERISA's withdrawal liability provisions; (2) the arbitrator's decision was erroneous because it is contrary with longstanding case law and regulatory precedent that multiemployer pension funds are not imputed with knowledge of a local union's day-to-day operations regarding its members; (3) the arbitrator's decision is contrary to longstanding precedent involving basic contract law doctrine that a party may not benefit from their own breach of agreement; and (4) the arbitrator's decision was clearly erroneous because his factual findings are contrary to the irrefutable record evidence, including but not limited to inconsistent false testimony by numerous WT executives and management, extensive violations of WT's own

2

corporate policies and hundreds of hours of video evidence highlighting WT's violation of ERISA.[1]

6.      The parties do not dispute the material facts relevant to these issues.  Therefore, each is a question of law that this Court reviews *de novo*.  In an ERISA withdrawal liability dispute, "the decisions of the arbitrator, like the decisions of a typical administrative agency, are fully reviewable to determine whether the applicable statutory law has correctly been applied and whether the findings comport with the evidence."  *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204, 1207 n.7 (D.C. Cir. 1984) (citing 29 U.S.C. § 1401(a)(3)(A)).

## JURISDICTION AND VENUE

7.      This Court has jurisdiction under 29 U.S.C. §§ 1401(b)(2) and 1451(c).

8.      This Court has jurisdiction to vacate or modify the arbitrator's award upon completion of the arbitration proceedings, under to 29 U.S.C. § 1401(b)(2).

9.      Venue is proper in this Court under 29 U.S.C. § 1451(d) because the Defendant is incorporated and headquartered in the state of Maryland, and additionally the Plan is administered in the state of Maryland.

## PARTIES

10.      Plaintiff Laborers District Council Pension and Disability Trust Fund No. 2 (the "Fund") is a "multiemployer fund" within the meaning of 29 U.S.C. § 1301(a)(5) which administers a multiemployer pension plan within the meaning of 29 U.S.C. § 1002(37) and 1301(a)(3) (the "Plan").  The Fund is administered in Columbia, Maryland.

11.      Defendant WT is a Maryland corporation with its headquarters in Towson, Maryland.  WT is an employer within the meaning of 29 U.S.C. § 1002(5) and as referenced in 29

---

[1] All exhibits were accepted into evidence by the arbitrator at the start of the 5-day hearing.  Ex. 3, Tr. 5-6

U.S.C. § 1301(a)(3). *See Rheem Mfg. v. Cent. S.E. and S.W. Pen. Fund*, 63 F.3d 703, 706 (8th Cir. 1995) (quoting *Seaway Port Auth. v. Duluth-Superior ILA Marine Ass'n Restated Pension Plan*, 920 F.2d 503, 509) (holding that, for purposes of MPPAA liability, an "employer" is an entity that has assumed a contractual obligation to make contributions to a pension fund).

## BACKGROUND

**A.     WT Terminates its Collective Bargaining Agreement and Initiates Arbitration to Avoid Withdrawal Liability**

12.     WT is one of the largest construction companies in the United States, and has and continues to have a huge presence in the construction market in the Baltimore-Washington region.

13.     WT was for decades signatory to collective bargaining agreements ("CBA") with the Laborers International Union of North America, Baltimore/Washington Construction and Public Employees Laborers' District Council, and Local Unions 11 and 657 (and its predecessors) (collectively, the "Union"), regarding its jurisdictional work in specific areas of D.C., Virginia, and Maryland.

14.     WT's CBAs specifically identified every job responsibility at a work site that constituted Laborers jurisdictional work.  Ex. 4, 2014-17 CBA at Appendix A.  Under its CBA, WT was required, among other things, to make contributions to the Fund on behalf of its covered employees performing Laborers jurisdictional work, and did so for decades.

15.     On January 25, 2017, WT sent a letter to the Union abrogating its CBA. As a result, pursuant to 29 U.S.C. § 1383(a), there was a cessation of WT's obligation to contribute to the Fund triggering its complete withdrawal, effective May 31, 2017.  Ex. 5, January 25, 2017 Letter.

16.     On January 30, 2018, the Fund assessed withdrawal liability against WT pursuant to the 29 U.S.C. § 1399 based upon unfunded vested benefits liabilities as of December 31, 2016 (the end of the Plan year immediately preceding the date of the withdrawal), totaling $4,129,147.

Ex. 1, January 30, 2018 Withdrawal Liability Assessment.

17.     On September 20, 2018, WT initiated arbitration with the American Arbitration Association ("AAA") under 29 U.S.C. § 1401, challenging the actuarial assumptions used to calculate the amount of withdrawal liability, and further arguing that it was not subject to *any* withdrawal liability under the "construction industry exemption," 29 U.S.C. § 1383(b) because WT employees did not perform any Laborers jurisdictional work in the area covered by the CBA after its expiration.

18.     The AAA arbitration was assigned case number 01-18-0003-5360, and Ira F. Jaffe, Esq. was assigned as the arbitrator in the matter.

**B.     The Construction Industry Exemption to Withdrawal Liability**

19.     The Fund is a construction industry multiemployer pension plan, and MPPAA contains a special exception for employers that contribute to pension plans for workers performing building and construction industry work. *See* 29 U.S.C. § 1383(b). The building and construction industry exception provides:

(1) Notwithstanding subsection (a) of this section, in the case of an employer that has an obligation to contribute under a plan for work performed in the building and construction industry, a complete withdrawal occurs only as described in paragraph
 (2) if-

(A) substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry, and

(B) the plan-

(i)    primarily covers employees in the building and construction industry, or

(ii)   is amended to provide that this subsection applies to employers described in this paragraph

(2) A withdrawal occurs under this paragraph if-

(A) an employer ceases to have an obligation to contribute under the plan, and

(B) the employer-

> (i)   continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or

> (ii)   resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

20.     If an employer is covered by the building and construction industry exception as defined in 29 U.S.C. § 1383(b)(1) above, the analysis moves to 29 U.S.C. § 1383(b)(2). Under these provisions, employers who have ceased making contributions to pension plans on behalf of building and construction industry employees are subject to withdrawal liability only if they continue to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or if they resume such work within five years after the date on which the obligation to contribute ceased. *See also Elliott,* 859 F.2d at 811 (under building and construction industry exception, withdrawal liability is imposed only when a contractor's obligation to the fund ceased, but the contractor continued doing covered work).

## C.     WT's Original Position Attempting to Evade Withdrawal Liability

21.     WT's position from the beginning was that, after expiration of its CBA, no WT employee performed any Laborers jurisdictional work for which contributions were previously required.  "Whiting-Turner has not performed work in the jurisdiction of the applicable collective bargaining agreement after the expiration of that agreement."  Ex. 2, April 27, 2018 Request for Review, §1(c).

22.     WT knew that if any of its employees performed any Laborers jurisdictional work post-expiration of the CBA it would trigger withdrawal liability, and informed all of its supervisory personnel that after expiration of the CBA no WT employee could perform even a minute of Laborers jurisdictional work.

23. After the expiration of WT's CBA, there were some initial efforts to determine whether WT was, contrary to its claim, performing Laborers jurisdictional work and some video clips were obtained that showed WT employees were, in fact, performing Laborers jurisdictional work.

24. Thereafter, the Fund retained a private investigator and over a period of years hundreds of video clips were taken of numerous WT employees at many different construction sites throughout the area covered by the applicable CBA that regularly performed many duties specifically identified as Laborers jurisdictional work in Appendix A of its expired CBA. Ex. 4, CBA at Appendix A.

25. In a transparent effort to avoid the Fund's withdrawal liability assessment, WT executives took an oath and testified that no WT employees performed any Laborers jurisdictional work after the CBA expired. For example, WT's Chief Labor Officer testified that "we know that we do not have any WT employees performing Laborers work in the jurisdiction" because "we subcontract, we instructed all our salaried employees and managers, superintendents all of those duties to either subcontractor vendors, to perform those services." Ex. 6, Earnst Dep. at 94. Mr. Earnst also testified that he knew no WT employee could perform even a second of Laborers jurisdictional work after expiration of the CBA. Ex. 3, Tr. 481-822, 1920-29.

26. In addition, Arch Jamieson, confirmed in his testimony that the Laborers jurisdictional work specified in Appendix A and that after expiration of the CBA "no direct hire of WT could perform any of the work on a job site" and testified "no other jurisdiction could do that work." (Ex. 7, Jamieson Dep at 66).

27. WT had a Foundations of Excellence which were mandatory company policies that expressly states that "general conditions work must be performed by a subcontractor performing

7

other work on the project or another independent labor contracting company. Earnst Dep at 159-60. Mr. Earnst also testified that "general conditions work in our vernacular is cleanup, site safety, those types of activities." Earnst Dep at 156.

28. Referring to the Foundations of Excellence, Mr. Earst testified "[t]hat's our policy," and there are no "deviations from that policy." Earnst Dep. at 89. Mr. Earnst also testified that "it is our expectation" that WT employees follow the company's mandatory policies. Earnst Dep at 170 Mr. emphasized that there was "absolutely no exception" to WT's Foundations of Excellence, even if it was "performed [] for a minute to a minute and a half." Ex. 8, Earnst 3/14/22 Corporate Representative Dep. at 259-260.

**D.    WT's Transparent Reversal of Position to Evade Withdrawal Liability**

29.    Incredibly, after having asserted for approximately four years that no WT employee had performed any Laborers jurisdictional work, after the Fund produced the video clips it intended to use in the arbitration and having been caught in their employees' false and/or misleading deposition testimony, WT completely shifted its position in the arbitration.

30.    After having been shown the irrefutable evidence that WT employees had, indeed, performed Laborers jurisdictional work after the expiration of the CBA, WT audaciously reversed its defense months before the arbitration hearing claiming that WT employees (including non-bargaining unit supervisors) had always performed Laborers jurisdictional work – before and after expiration of the CBA. In this regard, Mr. Earnst confirmed WT's knowledge that prior to the expiration of the "2014 CBA" that no "salaried Whiting-Turner employee" was permitted to perform any Laborers jurisdictional work before the expiration of the 2017 CBA. Earnst Dep at 286-87. Mr. Earnst also confirmed in his sworn testimony that "no Whiting-Turner employee was permitted to perform any laborers jurisdictional work [] defined in Appendix A of the 2014/2017 CBA after June 1, 2017." *Id.* Ex. 6 at 481-82, 1920-29.

31.     After having testified numerous times that WT employees never performed Laborers jurisdictional work, WT's Chief Labor Officer, Michael Ernst, testified at the arbitration that WT employees had always performed Laborers jurisdictional work both before and after its termination, despite the fact that it was a blatant violation of the CBA.  Ex. 3 at Tr. 615 – 618; 635:6-636:2; 638:4-14; 639; 641 667:9-21; 678:17-681:1.

32.     Having been caught with this irrefutable evidence of it is years-long deception, WT stipulated to facts that unambiguously admit that it performed Laborers jurisdictional work under the CBA after its expiration.  Ex. 9, Joint Stipulations 11-14, 22-32, 51-77.

33.     WT *stipulated* that "[a]fter May 31st, 2017, *no [Whiting-Turner] employees*, *including salaried employees or hourly employees*, were permitted to perform Laborers' jurisdictional work," (Joint Stipulation 38), and that WT employees *performed Laborers' jurisdictional work after May 31, 2017*. Ex. 9, Joint Stipulations 23-32; 57-73.

34.     WT *stipulated* that WT supervisor Jason Marchetti performed Laborers' jurisdictional work at the Catholic University project after the expiration of the CBA. *See* Ex. 9, Joint Stipulations 12-13, 30.

35.     In addition to the testimony of WT employees and these stipulated facts, witness testimony and video evidence from the Fund evidenced the irrefutable fact that WT employees were performing work of the type in the jurisdiction following the termination of the CBA.  *See e.g.* Ex. 3, testimony of Steve Lanning (Tr. 1003:19-1004:5); Raymin Diaz (Tr. 1145:7-21); Jonathan Viera (Tr. 1231:21-1269:17-22); Scott Kucik (Tr. 1317:15-1318:7).

36.     During the course of the arbitration, approximately 200 videos were produced by the Fund, in support of its position that WT was subject to withdrawal liability.

37.     The Fund had no knowledge that WT employees were performing Laborers

jurisdictional work until after expiration of the CBA.

38.     Due to the COVID-19 global pandemic, the arbitration process spanned additional years.

39.     Arbitration hearings were held on April 11-14, 2022, and May 3, 2022.  The parties filed post-hearing briefs, the last of which was filed on August 22, 2022.

40.     For approximately four years of the arbitration, WT maintained that its employees had not performed any Laborers jurisdictional work under the CBA after expiration on May 31, 2017 and, therefore, was entitled to the protection the construction industry exemption under ERISA, 29 U.S.C. § 1383(b), and are not subject to withdrawal liability.

41.     WT maintained this position until faced with irrefutable evidence to the contrary 2022, when the Fund produced approximately 200 videos evidencing WT supervisors and/or managerial employees that clearly performed Laborers jurisdictional work under the CBA of the type that would have led to an obligation to contribute to the Plan under the terms of the CBA.

42.     Presented with evidence of work being performed in the jurisdiction, WT reversed their position and asserted *for the first time* that "limited work" was performed by supervisory and/or managerial employees, and further that work was performed by subcontractors on WT's behalf, and did not constitute work in the jurisdiction of the CBA of the type that would have led to an obligation to contribute to the Fund under the terms of the CBA.  Ex. 3, Tr. 105:6-106:3; 169:21-171:21; 297:5-20; 445; 731:12-732:8.

### E. The Arbitrator's Erroneous Decision

43.  On July 10, 2023, an interim award in favor of WT was issued, finding that WT "did not continue after May 31, 2017 to perform work in the jurisdiction of the 2014 Agreement of the type for which contributions were previously required" and further found that WT "did not resume work in the jurisdiction of the 2014 agreement of the type for which contributions were previously required in the five-year period after May 31, 2017." Ex. 10, Interim Award, at 73.

44.  In support of the decision, the arbitrator found that despite the fact that WT employees *did* regularly perform Laborers jurisdictional work after expiration of the CBA of the type for which contributions were previously required, because he concluded the work performed was minimal or *de minimis*, and thus did not trigger 29 U.S.C. § 1383(b)(2).

45.  The arbitrator based this unsupported *de minimis* exemption on a single case, *Laborers' Pension Fund v. W.R. Weis Company*, 180 F. Supp.3d 540 (N.D. Ill. 2016), aff'd, 879 F.3d 760 (7th Cir. 2018), which involved a company that terminated a collective bargaining agreement, but was held to be covered by the construction industry exception because the work performed was expressly covered by a special collective bargaining agreement and, thus, there was dual jurisdiction – which is simply irrelevant to this case.

46.  On July 3, 2024, a final award consistent with the interim award was issued (the "Award"), overturning the assessment of withdrawal liability, and directing the Fund to refund all withdrawal liability payments made by WT, with interest. The Award calculated the repayment of withdrawal liability payments in the amount of $2,682,477,02. Ex. 11, Final Award.

47.  Performance of "even one second" of jurisdictional work by a WT employee after the end-date of the applicable CBAs constitutes performance of "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required," and is in direct violation of 29 U.S.C. § 1383(b)(2)(B)(i). Tr. 481-482; 1920-1929.

11

### F.    Judicial Review and the Applicable Standard

48.    Withdrawal liability arbitration awards are subject to independent judicial review under 29 U.S.C. § 1401(b)(2).  This Court reviews the legal conclusions of the arbitrator *de novo*, and under a clearly erroneous standard for an arbitrator's findings of fact.

49.    The Court may award costs and expenses, including reasonable attorneys' fees to the prevailing party under 29 U.S.C. § 1451(e).

50.    The arbitrator made numerous erroneous conclusions of law, and accordingly, the award should be vacated.

51.    First, the arbitrator created a "de minimis exemption" to the assessment of withdrawal liability under ERISA where no such exemption exists, finding that the construction industry exemption to withdrawal liability was not defeated by the performance of laborer work in the jurisdiction of the CBA by WT employees because the work was minimal or de minimis.

52.    Second, the arbitrator erroneously concluded that the Fund knew of, and somehow waived, WT's breaches of the CBA in performing laborer work in the jurisdiction of the CBA during the time that the CBA was still in effect – and continued work in the jurisdiction after termination of the CBA - because the CBA did not expressly exclude WT's salaried employees. There is no reason any CBA would have an express statement excluding supervisors when, in fact, they are excluded by the National Labor Relations Act as non-bargaining unit, and there is no basis to find that supervisors were tacitly permitted to do laborers' work.

53.    Third, the arbitrator erroneously imputed purported knowledge of the Union on the Fund, despite the fact that there was no evidence that the Union had any knowledge of WT's breach of its CBA from WT's salaried employees performing Laborers jurisdictional work, the Fund and the Union are two completely legal separate entities, the Fund is governed by ERISA, and the Fund has no obligation to investigate worksites to enforce withdrawal liability assessments.

54.    The arbitrator also made numerous clearly erroneous conclusions of fact, directly contradicted by the record evidence, and accordingly the arbitration award should be vacated.

55.    The arbitrator ignored the record evidence comprised of joint stipulations of fact, witness testimony from both sides, and video evidence clearly showing that the laborer work performed by WT employees was not minimal and had been going on for years, including as recently as 2022 during the pendency of the arbitration.

56.    The arbitrator failed to address WT's complete reversal of its position or its years-long false and/or misleading statements claiming that none of its employees performed any Laborers jurisdictional work after expiration of the CBA.

57.    The arbitrator improperly disregarded the fact that WT witnesses were not credible who falsely and/or misleadingly testified in their depositions stating "[a]ll right. I'm going to cut it a little short. I'm going to allow the question to be posed with the same observation that I've made before, which is I'm not certain that credibility and related opinions with respect to this area are necessarily relevant, never mind dispositive." Ex. 3, Tr. 1919:18-1920:2.  It is submitted that under longstanding precedent that credibility is always relevant.

58.    The arbitrator ignored the sworn testimony of the Union representatives who unequivocally testified that that the Union had no knowledge that WT employees were performing Laborers jurisdictional work, until the Union discovered WT doing so well after expiration of the CBA.

59.    The Fund respectfully requests a judgment vacating the arbitrator's award, and Order WT to promptly pay withdrawal liability payments as calculated by the Fund in arbitration, and pay the Fund's costs and fees in connection with this litigation.

# CLAIMS

## COUNT I: THE AWARD VIOLATES 29 U.S.C. §1383 BY CREATING A *DE MINIMIS* EXEMPTION THAT DOES NOT EXIST AND IS CONTRARY TO ALL PRECEDENT

60.     The Fund incorporates by reference paragraphs 1-59 of the Complaint as if fully set forth herein.

61.     "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability."  29 U.S.C. § 1381(a)

62.     All exemptions to withdrawal liability, including what is known as the construction industry exemption, are contained in 29 U.S.C. § 1383.

63.     A employer does not qualify for the construction industry exemption if the employer "ceases to have an obligation to contribute under the plan" and the employer "continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required" *or* "resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption."  29 U.S.C. § 1383(b)(2).

64.     It is undisputed that WT ceased to have an obligation to contribute under the Plan when its CBA terminated effective May 31, 2017.

65.     Despite its initial years-long deception through its employees false testimony, it is undisputed that WT continued to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required.  Ex. 9, Joint Stipulations.

66.     It is undisputed that WT resumed such work within 5 years after the date on which the obligation to contribute under the plan ceased and did not renew the obligation at the time of the resumption.

67. The arbitrator committed clear error in overturning the Fund's assessment of withdrawal liability by finding that the Laborer's jurisdictional work WT employees continued to perform in the jurisdiction of the CBA for which contributions were previously required was minimal or *de minimis*, and therefore *somehow* did not trigger 29 U.S.C. § 1383(b)(2).

68. In stark contrast to the arbitrator's conclusion, there is no *de minimis* exemption to withdrawal liability in 29 U.S.C. § 1383 or any other part of ERISA or any Federal law.

69. The arbitrator cited a single case as support for his erroneous conclusion, *Laborers' Pension Fund*, 180 F. Supp.3d 540, *aff'd*, 879 F.3d 760. Significantly, the *Weis* case in no way supports the proposition advanced by the arbitrator that a *de minimis* exception exists – the facts are entirely distinguishable, it has never been cited for the proposition advanced by the arbitrator, and does not even contain the phrase "*de minimis*." The arbitrator simply created this *de minimis* exception without any basis, contrary to MPPAA's purpose to protect multiemployer pension funds and their participants and beneficiaries.

70. Courts have rejected the argument that performance of limited, *de minimis* work would not lead to withdrawal liability. *See e.g. H.C. Elliott, Inc.,* 859 F.2d 808.

71. However, even if a *de minimis* exemption *did* apply, the work performed by WT employees was not minimal or *de minimis*, as evidenced by the joint stipulations, witness testimony, and approximately 200 video recordings. Additionally, the work had been occurring for years before discovered.

72. The Court should vacate the arbitrator's award and order withdrawal liability assessment against WT, in addition to Ordering WT to pay the Fund's costs and expenses including reasonable attorneys' fees related to this litigation.

## COUNT II: THE AWARD ERRONEOUSLY CONCLUDES THAT
## WT'S BREACHES OF THE CBA WERE WAIVED

73. The Fund incorporates by reference paragraphs 1-72 of the Complaint as if fully set forth herein.

74. It is undisputed that WT employees performed laborers work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required under 29 U.S.C. § 1383(b)(2)(B)(i) *both subsequent and prior* to the May 31, 2017 termination of the CBA, in breach of the CBA.

75. The arbitrator committed clear error in finding that the Fund had waived WT's numerous breaches of the CBA and purportedly "minimal" (as erroneously characterized by the arbitrator) work after termination of the CBA because the Fund purportedly knew or should have known that the breaches and post-termination work were occurring, and the CBA did not expressly prohibit such activity.

76. The CBA did not contain an express provision prohibiting such activity because there is no reason that any collective bargaining agreement would have an express statement excluding such activity when, in fact, such activity is excluded by Federal law. 29 U.S.C. § 1383(b)(2)(b)(i).

77. There is no factual basis in the record to find that WT supervisors were tacitly permitted to do Laborers work.

78. There is no factual basis in the record supporting any finding that the Union, or the Fund, were on notice that WT supervisors were performing Laborers work prior to termination of the CBAs and, therefore, could not possibly grieve and certainly did not waive WT's unknown violations of its CBA prior to expiration.

79. Even if the members or officers of the Union knew that WT supervisors were

performing laborer's work and failed to file grievances, what the Union did or did not know has no bearing on what the Fund did or did not know – as the Fund is not bound by the failures of the Union officers and members, under ERISA. *See Operating Engineers Pension Trust v. Cecil Backhoe Serv., Inc.,* 795 F.2d 1501, 1507 (9th Cir.1986) ("The primary failing of [the employer's] estoppel argument is that it focuses almost exclusively on what the union or its representatives knew or intended, rather than on what the trust funds knew or intended."); *Trs. of the Oegonr.-Washington Carpenters-Employers Health & Welfare Tr. Fund v. Anders Certified Welding, Inc.,* No. 3:10- CV-01047-KI, 2011 WL 5599579, at *6 (D. Or. Nov. 16, 2011) (citing *Operating Engineers Pension Trust* 795 F.2d at 1507) ("Moreover, a union and its representatives are not agents of a trust fund created under a CBA. Thus, the trust fund cannot be estopped based on the actions of the union or its representatives.").

80.    The Court should vacate the arbitrator's award because the fund was *not* on notice of the work performed by WT supervisors before and after the termination of the CBAs in violation of the CBAs, and therefore, did not and could not have waived this conduct.

## COUNT III: THE AWARD ALLOWS AND ENCOURAGES WT TO BENEFIT FROM ITS NUMEROUS BREACHES IN CONTRADICTION OF LONGSTANDING CONTRACT LAW DOCTRINE

81.    The Fund incorporates by reference paragraphs 1-80 of the Complaint as if fully set forth herein.

82.    It is undisputed that WT employees performed laborers work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required under 29 U.S.C. § 1383(b)(2)(B)(i) *both subsequent and prior* to the May 31, 2017 termination of the CBA, in breach of the CBA.

83.    The arbitrator's ruling ignores volumes of record evidence that the work performed was substantial and occurred during even during the time the CBA was in effect, in breach of the

CBA, and without the Union or the Funds knowledge.

84.     The Award, therefore, essentially rewards WT for its numerous breaches of the CBA, and encourages WT to conduct itself in this manner in the future.

85.     As noted, *supra*, WT is one of the largest construction companies in the United States, and this decision could have widespread consequences should WT and other construction companies that contribute to defined benefit multiemployer pension plans be emboldened by this decision to breach their collective bargaining agreements elsewhere.

86.     By essentially giving WT a pass on its breaches of the CBA, the Award is in complete contravention to longstanding precedent of contract law doctrine.

87.     It is also axiomatic that a party cannot benefit from its own breach.  *See Assaf v. Trinity Medical Center*, 696 F.3d 681, 686 (7th Cir.2012) ("[A] classic rule of contract law, is that a party should be prevented from benefitting from its own breach.") (quoted by *Montgomery Cty. v. Managed Care Innovations*, LLC, 261 F. Supp. 3d 567, 576-77 (D. Md. 2017); *Gencorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 817 (6th Cir. 1999) ("it is also axiomatic that a party cannot benefit from its own breach."); *Pac. Indem. Co. v. Deming*, 140 F. Supp. 3d 152, 161 (D. Mass. 2015) (same) (citing *P.R. Tel. Co. v. Telecomm Regulatory Bd. of P.R.*, 15 F. Supp. 3d 162, 171 (D.P.R. 2014); *see also Pac. Indem. Co. v. Deming*, 140 F. Supp. 3d 152, 161 (D. Mass. 2015) ("Finally, allowing Pacific to recover from another Unit Owner (or in this case a tenant), because its insured breached his or obligation to obtain insurance containing a waiver of subrogation, would frustrate the clear intent of the condominium By-laws and allow Pacific to benefit from its insured's breach, an untenable result.").

88.     The Court should vacate the arbitrator's award because allowing a party to benefit from its own breaches of contract (here, the CBA) is untenable and contrary to United States

jurisprudence. Thus, the Award should be vacated.

## COUNT IV: THE AWARD IS MAKES CLEARLY
## ERRONEOUS FINDINGS OF FACT

89. The Fund incorporates by reference paragraphs 1-88 of the Complaint as if fully set forth herein.

90. The arbitrator made numerous, unsupported and erroneous findings of fact in reaching his decision.

91. The erroneous findings of fact include, but are not limited to, ignoring inconsistent false testimony by numerous WT executives and management, ignoring the extensive violations of WT's own corporate policies, and ignoring hundreds of hours of video evidence highlighting WT's violation of ERISA, which was neither minimal nor *de minimis*.

92. The Award should be vacated because these clearly erroneous findings of fact are material, and form the basis for the arbitrator's erroneous legal conclusions.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Fund respectfully requests that this Court enter judgment against WT and in favor of the Fund, and:

1. Vacate the arbitrator's award overturning the assessment of withdrawal liability;

2. Order WT to promptly pay all withdrawal liability payment amounts owed;

3. Order WT to pay the Fund's costs and expenses incurred in this action, including reasonable attorneys' fees; and

4. Grant other relief that this Court deems just and proper.

Respectfully Submitted,

Dated: <u>August 2, 2024</u>

<u>/s/ *Jonathan G. Rose*</u>
Jonathan G. Rose (MD Bar #15138)
William F. Kiniry, III (MD Bar # 30240)
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Tel: 202-799-4310
Fax: 202-799-5310
jonathan.rose@us.dlapiper.com
william.kiniryiii@us.dlapiper.com

*Counsel for the Fund*

# EXHIBIT 1

# *Laborers' Trust Funds*

7130 Columbia Gateway Drive, Suite A
Columbia, MD 21046

Telephone 410-872-9500              Toll-Free 866-553-6559                    Fax 410-872-1275

January 30, 2018

VIA UPS OVERNIGHT DELIVERY

Michael F. Ernst
The Whiting-Turner Contracting Company
300 East Joppa Road
Baltimore, MD  21286

Re:    Laborers' District Council Pension & Disability Trust Fund No. 2 Assessment of
       Withdrawal Liability

Dear Mr. Ernst:

In connection with Whiting-Turner Contracting Company's ("Whiting") termination of its
collective bargaining agreements with the Laborers' Local Unions 11 and 657, effective May 31,
2017, the Laborers' District Council Pension & Disability Trust Fund No. 2 (the "Fund") has
completed its assessment of Whiting's withdrawal liability in accordance with the Employee
Retirement Income Security Act of 1974, as amended ("ERISA").   It is understood that
Whiting's final month of contribution obligation to the Fund was for the month of May, 2017.
The termination of Whiting's participation in the Fund has resulted in a complete withdrawal
pursuant to ERISA § 4203(a).

Based on employer contribution and hours data provided by Carday, the Fund's actuary, The
Segal Company ("Segal"), has calculated the withdrawal liability payment options for Whiting,
based upon Whiting's participation ending during the Plan Year beginning January 1, 2017.   As
a result, Segal's calculations are based on factors and assumptions contained in the withdrawal
liability report as of December 31, 2016, the last Plan Year ended prior to the withdrawal date.

The withdrawal liability payable by Whiting is **$4,129,147**.  Details of the withdrawal liability
calculations are shown in the attachment to this letter.   The available payment options for
Whiting are as follows:

    (1) A single lump sum payment of $4,129,147, or
    (2) 69 quarterly payments of $99,453, plus one final payment of $14,919.

The quarterly payment schedule is based on an interest rate of 7.25%, the rate used by the Fund
for funding purposes. The maximum contribution rate to determine the payment schedule was

$2.83, the contribution rate in effect as of December 31, 2014. Under the Multiemployer Pension Reform Act of 2014 non-benefit-bearing contribution rate increases after December 31, 2014 pursuant to a Funding Improvement Plan are disregarded in the determination of withdrawal liability and withdrawal liability payment schedules. This calculation assumes that the employer is not a member of a controlled group of which other members have participated in the Fund.

Please be advised that any request for review or objection to this withdrawal liability assessment must be made in writing and submitted to the undersigned within 90 days of your receipt of this notice and demand for payment.

Finally, please note that the time restrictions contained in ERISA § 4221 in regards to requesting any arbitration concerning the Fund are triggered by this notice and demand for payment.

Sincerely,

R. Renee Parenti
Administrative Agent

Enclosures

c:      Jonathan Rose, Esq.
        37-22-000-2 (w/enc)
        Note file 22P

2

LABORERS' DISTRICT COUNCIL PENSION & DISABILITY TRUST FUND NO. 2
WITHDRAWAL LIABILITY DETERMINATION FOR

# Whiting-Turner Contracting Company
WITHDRAWAL DATE: 01/25/2017

### A. DETERMINATION OF EMPLOYER'S UNFUNDED POOL SHARES

| (1) Contribution Period | (2) 5-Year Employer Contributions[1] | (3) 5-Year Adjusted Total Plan Contributions[1] | (4) Date Pool Established | (5) Unfunded Vested Benefit Plus Reallocated Pools (Total Plan) | (6) = (2) ÷ (3) x (5) Employer's Pool Share |
|---|---|---|---|---|---|
| 2005 | $138,521 | $4,173,284 | 12/31/2005 | $17,705,757 | $587,695 |
| 2006 | 280,457 | 8,523,643 | 12/31/2006 | (5,805,815) | (191,031) |
| 2007 | 416,419 | 12,677,203 | 12/31/2007 | 8,595,848 | 282,355 |
| 2008 | 556,297 | 16,867,816 | 12/31/2008 | 8,433,844 | 278,146 |
| 2009 | 710,612 | 20,637,097 | 12/31/2009 | 18,443,069 | 635,063 |
| 2010 | 721,826 | 21,382,771 | 12/31/2010 | 5,583,566 | 188,486 |
| 2011 | 847,430 | 22,136,620 | 12/31/2011 | 12,196,381 | 466,900 |
| 2012 | 896,403 | 22,784,326 | 12/31/2012 | 8,922,780 | 351,049 |
| 2013 | 1,010,996 | 23,083,792 | 12/31/2013 | (2,557,650) | (112,017) |
| 2014 | 1,318,954 | 24,723,363 | 12/31/2014 | 12,815,175 | 683,670 |
| 2015 | 1,588,566 | 27,371,668 | 12/31/2015 | 9,367,433 | 543,657 |
| 2016 | 1,620,853 | 31,674,831 | 12/31/2016 | 8,113,357 | 415,174 |
| | | | | Total: | $4,129,147 |

[1] Beginning with Fresh Start as of 12/31/2005. Excludes contributions from employers known to be withdrawn as of the end of the five-year period.

# Whiting-Turner Contracting Company
### WITHDRAWAL DATE: 01/25/2017

## B. DETERMINATION OF EMPLOYER'S ANNUAL AMOUNT

| | | |
|---|---|---:|
| 1) | Net Withdrawal Liability | $4,129,147 |
| 2) | Highest hourly contribution rate (capped at rate in effect on December 31, 2014) | $2.83 |
| 3) | Highest three year average contribution base units   (hours) | 140,570 |
| 4) | Required annual amount = (2) x (3) | $397,813 |
| 5) | Amortization ratio = (1) ÷ (4) | 10.379618 |
| 6) | Largest Value less than (5) in Table I, Column I | 10.292143 |
| 7) | Number of full annual payments | 17 |
| 8) | Amount amortized in item (7) years = (4) x (6) | $4,094,348 |
| 9) | Amount left to amortize = (1) - (8) | 34,799 |
| 10) | Amount left to be amortized in final year = (9) x Table I, Column II for item (7) years | 114,372 |
| 11) | Quarterly payment = (4) ÷ 4 | 99,453 |

## C. DETERMINATION OF EMPLOYER'S QUARTERLY PAYMENT SCHEDULE

| | | |
|---|---|---:|
| 12) | Number of full quarters to pay in final year = (10) ÷ (11), truncate to an integer | 1 |
| 13) | Amount to pay in final quarter = (10) - [(11) x (12)] | 14,919 |

TABLE I

**LABORERS' DISTRICT COUNCIL PENSION & DISABILITY TRUST FUND NO. 2**
**WITHDRAWAL LIABILITY DETERMINATION FOR**
# Whiting-Turner Contracting Company
**WITHDRAWAL DATE: 01/25/2017**

| | Column I | | Column II |
|---|---|---|---|
| Number of Years | Present Value of $1 Per Year | Number of Years | Accumulation of $1 |
| 0 | 0.000000 | 0 | 1.000000 |
| 1 | 1.000000 | 1 | 1.072500 |
| 2 | 1.932401 | 2 | 1.150256 |
| 3 | 2.801772 | 3 | 1.233650 |
| 4 | 3.612375 | 4 | 1.323089 |
| 5 | 4.368182 | 5 | 1.419013 |
| 6 | 5.072897 | 6 | 1.521892 |
| 7 | 5.729974 | 7 | 1.632229 |
| 8 | 6.342633 | 8 | 1.750566 |
| 9 | 6.913877 | 9 | 1.877482 |
| 10 | 7.446505 | 10 | 2.013599 |
| 11 | 7.943128 | 11 | 2.159585 |
| 12 | 8.406180 | 12 | 2.316155 |
| 13 | 8.837930 | 13 | 2.484076 |
| 14 | 9.240495 | 14 | 2.664172 |
| 15 | 9.615846 | 15 | 2.857324 |
| 16 | 9.965824 | 16 | 3.064480 |
| 17 | 10.292143 | 17 | 3.286655 |
| 18 | 10.596404 | 18 | 3.524937 |
| 19 | 10.880097 | 19 | 3.780495 |
| 20 | 11.144612 | 20 | 4.054581 |

7.25% annual rate of interest

## Basic Pools

The Plan's unfunded vested liability for withdrawal liability purposes for each of the past 12 plan years is detailed below.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

## BASIC POOLS AS OF DECEMBER 31, 2016

| Plan Year Ended December 31 | Total Vested Liability | Assets | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|---|---|
| 2005 | $190,922,664 | $151,576,537 | $39,346,127 | $39,346,127 | $17,705,757 |
| 2006 | 182,475,892 | 156,708,700 | 25,767,192 | -11,611,629 | -5,805,815 |
| 2007 | 198,697,394 | 158,688,114 | 40,009,280 | 15,628,814 | 8,595,848 |
| 2008 | 168,680,537 | 116,783,015 | 51,897,522 | 14,056,407 | 8,433,844 |
| 2009 | 194,043,809 | 116,643,320 | 77,400,489 | 28,373,952 | 18,443,069 |
| 2010 | 200,824,490 | 119,737,163 | 81,087,327 | 7,976,523 | 5,583,566 |
| 2011 | 199,141,353 | 106,480,694 | 92,660,659 | 16,261,841 | 12,196,381 |
| 2012 | 207,078,395 | 108,765,861 | 98,312,534 | 11,153,475 | 8,922,780 |
| 2013 | 205,266,973 | 116,022,716 | 89,244,257 | -3,009,000 | -2,557,650 |
| 2014 | 208,422,510 | 110,847,995 | 97,574,515 | 14,239,083 | 12,815,175 |
| 2015 | 205,180,516 | 104,366,325 | 100,814,191 | 9,860,456 | 9,367,433 |
| 2016 | 211,965,333 | 110,151,588 | 101,813,745 | 8,113,357 | 8,113,357 |
| Total | | | | | $101,813,745 |

**ACTUARIAL ASSUMPTIONS FOR**
**LABORERS' DISTRICT COUNCIL PENSION & DISABILITY TRUST FUND NO. 2**
**UNFUNDED VESTED BENEFITS FOR WITHDRAWAL LIABILITY PURPOSES**
**AS OF DECEMBER 31, 2016**

In the absence of PBGC assumptions, the Trustees are using the Fund actuary's "best estimate" assumptions, as follows:

1.  Investment Return

    (a)   To the extent benefits are matched by the market value of assets on hand: Interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 CFR, Ch. XL, Part 4044, Appendix B, which are in effect for the applicable withdrawal liability valuation date. As of December 31, 2016, this rate was 1.98% for the first 20 years and 2.67% thereafter.

    (b)   The portion of the vested benefits that is not matched by plan assets will be valued on the interest assumption used for plan funding, as of the applicable withdrawal liability valuation date. As of December 31, 2016, this rate was 7.25%.

    (c)   The portion of the vested benefits that is matched by assets will be determined by comparing the total present value of benefits — at PBGC rates — with the total market value of assets; each vested benefit will be treated as covered by assets to the same extent as all other vested benefits.

2.  Mortality

    Non-disabled lives: The unprojected experience rates (as of 2006) for the RP-2014 Blue Collar Mortality Table for males and females, projected generationally with Scale MP-2016 from 2010.

    Disabled lives: The unprojected experience rates (as of 2006) for the RP-2014 Disabled Life Retiree Table for males and females, projected generationally with Scale MP-2016 from 2010.

3.  Expenses

    Calculated as prescribed by PBGC formula (29 CFR, Ch. XL, Part 4044, Appendix C).

4.  Retirement Age

    Active employees are assumed to retire according to the following rates: 7.5% at ages 55 through 59, 15% at ages 60 and 61, 30% at age 62, 15% at ages 63 and 64, 40% at ages 65 through 67, and 100% at ages 68 and older.

    Inactive vested employees are assumed to retire according to the following rates: 25% at age 55, 10% at ages 56 through 59, 15% at age 60, 25% at ages 61 and 62, 20% at ages 63 and 64, 40% at ages 65 through 67, and 100% at ages 68 and older.

5.  Assets

    Valued at fair market value as reported in the Plan's audited financial statements.

# EXHIBIT 2



VENABLE® LLP

8010 TOWERS CRESCENT DRIVE   SUITE 300   TYSONS CORNER, VA 22182
**T** 703.760.1600   **F** 703.821.8949   www.Venable.com

April 27, 2018

Gregory J. Ossi
**T 703.760.1957**
**F 703.821.8949**
gjossi@venable.com

Via Email and Overnight Delivery

R. Renee Parenti, Administrative Agent
Laborers' District Council
Pension & Disability Trust Fund No. 2
7130 Columbia Gateway Drive, Suite A
Columbia, MD 21046
rparenti@cardayassociates.com

Re:    Whiting-Turner Contracting Company Request for Review of Withdrawal
       Liability

Dear Ms. Parenti:

By this letter and pursuant to ERISA § 4219(b)(2)(A), Whiting-Turner Contracting Company ("Whiting-Turner") requests a review of the Laborers' District Council Pension & Disability Trust Fund No. 2 (the "Fund") notice and assessment of withdrawal liability for Whiting-Turner dated January 30, 2018 ("Demand Letter"). Specifically, Whiting-Turner requests a review of the following:

1.    Withdrawal Pursuant to the Construction Industry Rules

Whiting-Turner contests whether it has incurred a withdrawal pursuant to ERISA Section 4203(b).  Section 4203(b) provides that a complete withdrawal occurs only if an employer ceases to have an obligation to contribute under the plan, and such employer continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required.  Whiting-Turner argues that Section 4203(b) applies because:

a.    The Fund is a construction industry plan under the requirements of 4203(b)(1) because it primarily covers employees in the building and construction industry.

b.    Whiting-Turner is a construction industry employer under the requirements of 4203(b)(1) because substantially all the employees with respect to whom it had an obligation to contribute under the Fund perform work in the building and construction industry.

c.    Whiting-Turner has not performed work in the jurisdiction of the applicable collective bargaining agreement after the expiration of that agreement.

Accordingly, Whiting-Turner did not incur a complete withdrawal and should not have been assessed any withdrawal liability.



Renee Parenti, Administrative Agent
Laborers' District Council
Pension & Disability Trust Fund No. 2

April 27, 2018


2. <u>The Interest Rate Assumption Used to Calculate Withdrawal Liability</u>

Even if there was a withdrawal, Whiting-Turner contests the Fund's calculation of withdrawal liability. As such, Whiting-Turner requests that the Fund review the actuarial assumptions underlying the determination of the amount of the Fund's unfunded vested benefits, within the meaning of ERISA § 4213(c), as of the last day of the plan year relevant to its calculation of withdrawal liability, and to review whether such assumptions comply with the requirements of ERISA § 4213(a) and (b).

The Fund's actuarial assumptions and methods used may be unreasonable in the aggregate for several reasons. First, we believe the use of the "Segal Blend" actuarial interest rate assumption applied by the Fund in computing unfunded vested benefits and in computing the asserted withdrawal liability claim in the Demand Letter is unreasonable in light of the recent opinion from the Southern District of New York in the case of *The New York Times Company v. Newspaper and Mail Deliverers'-Publishers' Pension Fund*, No. 1:17-cv-06178-RWS, 2018 U.S. Dist. LEXIS 49813 (S.D.N.Y. Mar. 26, 2018). In *New York Times*, the court relied on Supreme Court precedent to find that it is unreasonable for a multiemployer plan to employ the "Segal Blend" interest rate assumption for withdrawal liability when it is different from its funded rate assumption, absent a showing that such discount rate assumption was the actuary's "best estimate" of the plan's "anticipated experience" as required by ERISA § 4213(a)(1). We are unable to determine whether the blended interest rate basis as set forth in the actuarial assumptions document that the Fund included in the Demand Letter is a policy adopted by the trustees or a reflection of the actuary's "best estimate of anticipated experience" as required by ERISA.

In addition, the Fund's actuarial assumptions may be unreasonable in the aggregate because, among other things, the Fund may have changed them in recent years without adequate underlying experience studies, and because certain assumptions do not reasonably reflect the actual demographics and experience of the Fund.

In light of the above, should it be determined at any time that Whiting-Turner has withdrawn from the Fund, then Whiting-Turner requests that the Fund issue a revised withdrawal liability assessment applying the higher interest rate assumption that it has relied upon for minimum funding purposes under ERISA and the Code as the best measurement of the Fund's liability for vested benefits.



Renee Parenti, Administrative Agent
Laborers' District Council
Pension & Disability Trust Fund No. 2

April 27, 2018

**Requests for Information**

Whiting-Turner, in accordance with ERISA § 101(k) and 101(l) also requests relevant Fund documents for purpose of further review and explanation of the withdrawal liability assessed. Please provide us with the following:

a. Copies of any participation agreements signed by Whiting-Turner or members of its controlled group.

b. Copies of any withdrawal liability reports, actuarial reports, evaluations and certifications for Plan years 12/31/2013 through 12/31/17.

c. Any changes to the assumptions and methods for calculating withdrawal liability during the Plan years 12/31/2013 through 12/31/17.

d. The current Plan and Trust document, including any amendments.

e. Any rules or regulations adopted by the Fund and any required arbitrator forum for withdrawal liability disputes.

f. All arbitration decisions regarding withdrawal liability as required by PBGC Regulation § 4221.8.

This letter is sent without waiver, and with the express reservation, of any and all legal rights and defenses that Whiting-Turner may have in this matter.

Please let me know if you have any questions.

Sincerely,

Gregory J. Ossi

# EXHIBIT 3

Page 1

```
 1   In the Matter of Arbitration

 2
     ---------------------------
 3   WHITING-TURNER CONTRACTING  :
     COMPANY                     :    AAA Case Number:
 4                               :    01-18-0003-5360
             and                 :
 5                               :    Withdrawal Liability
     LABORERS' DISTRICT COUNCIL  :
 6   PENSION & DISABILITY TRUST  :    Arbitrator:
     FUND NO. 2                  :    Ira F. Jaffe
 7                               :
     ---------------------------
 8
 9                A R B I T R A T I O N
10                     VOLUME 1
11
     DATE:           April 11, 2022
12
     TIME:           9:30 a.m. to 5:57 p.m.
13
     LOCATION:       Alston & Bird LLP
14                   950 F Street, Northwest
                     Washington, D.C. 20004
15
     REPORTED BY:    Felicia A. Newland, CSR
16                   Reporter, Notary
17
18
19
20            Veritext Legal Solutions
            1250 Eye Street, NW, Suite 350
21              Washington, D.C. 20005
22
```

Page 5

1                  P R O C E E D I N G S

2                     * * * * * * *

3               ARBITRATOR JAFFE:  Good morning,

4      everyone.  I would like to note that we have

5      received into the record a number of exhibits.

6      Joint Exhibits 1 through 40 are in evidence.

7      Employer Exhibits 1 through 26 are in evidence with

8      the exception of Employer Exhibits 8 through 16,

9      which are the pending subject of a motion in limine

10     and essentially a preliminary objection to entry by

11     the Fund.

12               I've indicated after having

13     reviewed the motion that essentially I was going

14     to defer it.  In all likelihood it'll be probably

15     be denied and it will go away, but in point of

16     fact, there's no benefit to having extensive

17     argument on the record.  The basis for the motion

18     is noted in the motion itself, as well as the

19     opposition and the Employer's responsive e-mail

20     this morning.

21               I promised that I would allow

22     Counsel when it gets to be their turn to add

1    anything they want to add on the record, but the

2    bottom line is we saved, I think, about a half an

3    hour of back and forth before we would wind up at

4    the same spot.

5                MR. ROSE:  Can I just make one point,

6    with respect to the Fund's exhibits, I understand

7    that you have an issue with respect to the

8    videotape.  Are the Fund's documents --

9                ARBITRATOR JAFFE:  They're all in.  I

10   was getting there next.

11               MR. ROSE:  I'm sorry.

12               ARBITRATOR JAFFE:  That's okay.

13   You're not a mind reader, Mr. Rose.  It's not a

14   problem.  We had to discuss it.

15               Fund Exhibits 1 through 35 are

16   similarly admitted subject to the exhibits that

17   either are videos or pictures.  And those will be

18   admitted conditionally essentially after there's

19   appropriate verification.  If there's any

20   problem, the Employer will note it absent such

21   objection, they will be deemed admitted as well.

22               The parties also handed me this

Page 331

1    In the Matter of Arbitration

2

     ----------------------------
3    WHITING-TURNER CONTRACTING :
     COMPANY,                   :    AAA Case Number:
4                               :    01-18-0003-5360
             and               :
5                               :    Withdrawal Liability
     LABORERS' DISTRICT COUNCIL :
6    PENSION & DISABILITY TRUST :    Arbitrator:
     FUND NO. 2,                :    Ira F. Jaffe
7                               :
     ----------------------------
8

9                  A R B I T R A T I O N

10                      VOLUME 2

11

     DATE:             April 12, 2022
12

     TIME:             9:37 a.m. to 9:28 p.m.
13

     LOCATION:         Alston & Bird LLP
14                     950 F Street, Northwest
                       Washington, D.C. 20004
15

     REPORTED BY:      Felicia A. Newland, CSR
16                     Reporter, Notary

17

18

19              Veritext Legal Solutions
             1250 Eye Street, NW, Suite 350
20               Washington, D.C. 20005

21

22

Page 480

1    an e-mail, something along these lines, memo like

2    this, there was nothing preventing you from sending

3    something like this if you deemed it important,

4    correct?

5           A     That was nothing preventing me,

6    that's correct.

7           Q     Okay.  Thank you.

8                 So just to be clear, we've talked

9    about what was -- what Whiting-Turner did, you

10   know, before the expiration of the agreement to

11   prevent -- I'm sorry, to ensure -- to take measures

12   to try and prevent Whiting-Turner from being

13   assessed withdrawal liability.

14                I just want to be clear, after the

15   expiration, you didn't follow up with any other

16   communication or any other official action,

17   correct --

18          A     That's correct.

19          Q     -- in '17?

20                What about in 2018, was anything sent

21   out to APMs and above in the -- or project managers

22   and superintendents in the Baltimore/Washington

Page 481

1    area reminding them that the laborers' agreement --

2    union laborers' agreement had been terminated and

3    that no Whiting-Turner employee, salaried or

4    otherwise, could perform any laborers'

5    jurisdictional work within the area covered by the

6    collective bargaining agreement?

7          A     Nothing was sent in 2018.  And I'll

8    help you, Mr. Rose, to date nothing has been sent.

9          Q     Well, I was going to say --

10         A     I'm just trying to kept it shorter.

11         Q     Thank you very much for going ahead.

12   We can skip over this.

13               The bottom line is nothing had been

14   done?

15         A     That's correct.

16         Q     Okay.  I guess I just want to be

17   clear, you testified a short while ago that you

18   didn't feel it was necessary to follow up with the

19   superintendents, project managers in the

20   Baltimore/Washington area, other than the Holland

21   e-mail and the laborer guideline, correct?

22         A     That's correct.

```
 1       IN THE MATTER OF THE ARBITRATION BEFORE
           THE AMERICAN ARBITRATION ASSOCIATION
 2
    ------------------------------:
 3  WHITING-TURNER CONTRACTING    :
    COMPANY,                      :
 4                                :
                Claimant,         :
 5                                :
           vs.                    : Case No.:
 6                                : 01-18-0003-5360
    LABORERS' DISTRICT COUNCIL    :
 7  PENSION & DISABILITY TRUST    : Arbitrator:
    FUND NO. 2,                   : Ira F. Jaffe
 8                                :
                Respondent.       :
 9  ------------------------------:
10
11              A R B I T R A T I O N
12                  VOLUME 3
13
14
    DATE:           April 13, 2022
15
    TIME:           9:00 a.m.
16
    LOCATION:       Alston & Bird LLP
17                  950 F Street, Northwest
                    Washington, D.C. 20004
18
    REPORTED BY:    Shari R. Broussard, RPR, CSR
19                  Reporter, Notary
20
21            Veritext Legal Solutions
            1250 Eye Street, NW, Suite 350
22              Washington, D.C. 20005
```

Page 1003

1      Q    And there's also "Heavy & Highway
2    Rates," right?
3      A    Yes.
4      Q    In the Building Laborer rate there was
5    the, you know, "includes but not limited to."
6           What other types of things might be
7    included in building laborer?
8      A    Building laborer, I mean, so a lot of
9    that is going to be on the production side related
10   to, let's say, placement of concrete, mason
11   tending where the laborer is tending to brick
12   masons to make sure they can perform their duties
13   properly.  When you have drywall carpenters
14   hanging drywall, they're tending to the drywall,
15   the carpenters, make sure they have materials in
16   place to keep them moving efficiently.
17     Q    Okay.  Thank you.
18          Okay.  Let's go back to my prior
19   question, which was did there come a time that you
20   were asked to observe Whiting-Turner construction
21   sites to determine whether Whiting-Turner salaried
22   employees were performing laborers' jurisdictional

Page 1004

1    work on its jobs?

2         A    Yes.

3         Q    Okay.  And around approximately when was

4    that?

5         A    Approximately late summer 2018.

6         Q    And what did you do in response to that

7    request?

8         A    As director, you know, the request was

9    made is it possible to devote organizer time to

10   monitor Whiting-Turner job sites and based upon

11   completing certain assignments, we then -- I

12   assigned staff, myself to attempt to do so.

13        Q    Okay.  And who on your staff did you

14   enlist in this effort as well as yourself?

15        A    Organizers who reported to me, Raymin

16   Diaz, Jonathan Viera and there may have been one

17   or two others.

18        Q    Was Mr. Barber?

19        A    Yes, Michael Barber.

20        Q    Mr. Rodriguez?

21        A    Mr. Felix Rodriguez, yes.

22        Q    Okay.  Okay.  So do you have a

Page 1145

1        Mr. Diaz, do you recognize this job site

2   from this still image?

3        A    Yes.  This is also from the 17th and

4   Rhode Island, Northwest, Washington, D.C. job

5   site.

6        Q    And did you take this video?

7        A    Yes, I did, I took this video.

8             MR. CROHAN:  Ellie, go ahead and play

9   it, please.

10            Will you play it one more time, Ellie,

11  please.

12  BY MR. CROHAN:

13       Q    Mr. Diaz, will you please describe what

14  we're seeing in this video?

15       A    So just to give you context because it's

16  kind of hard to tell, right, there's a pickup

17  truck there.  What -- and mind you, a lot of these

18  videos you're just catching a snippet of what I

19  was visually able -- able to see, which was -- a

20  lot of it was just continuous -- continuous work

21  throughout.  I'm catching snippets because, you

22  know, this gentleman -- or other individuals are

Page 1231

1      A     I took the video.

2      Q     And where was this video taken?

3      A     American University.

4      Q     And where is American University

5  located?

6      A     In D.C.  If I'm not mistaken, it's off

7  of Massachusetts Avenue.

8      Q     And do you know approximately when this

9  video was taken?

10     A     It seems to be in the winter, but I

11 don't recall.

12     Q     Would this video have been taken after

13 May 31st, 2017?

14     A     Yes.  2018 for sure.

15     Q     I'm sorry, can you repeat that?

16     A     It was 2018 for sure.

17     Q     Great.

18           MS. STUDDARD:  You can go ahead and

19 play.  Pause.

20 BY MS. STUDDARD:

21     Q     Mr. Viera, what does this video show?

22     A     It shows a Whiting-Turner employee

```
                                        Page 1232

 1    shoveling -- probably scraping ice off of the

 2    sidewalk.

 3         Q    And why do you believe this is a

 4    Whiting-Turner employee?

 5         A    He had a Whiting-Turner jacket.  If it

 6    wasn't the jacket, it was the hardhat.

 7         Q    And what about the hardhat?

 8         A    It has a WT on it.

 9         Q    And, Mr. Viera, is what this

10    Whiting-Turner employee doing laborers'

11    jurisdictional work?

12         A    Yes, it is.

13         Q    And was that video we just played an

14    accurate representation of what you personally saw

15    and filmed?

16         A    Yes.

17              MS. STUDDARD:  If we can go to Laborers'

18    116.  Go ahead and pause.

19    BY MS. STUDDARD:

20         Q    Mr. Viera, do you recognize this video?

21         A    Yes, I do.

22         Q    And how do you recognize the video?
```

1      A     I took that video.

2      Q     And where was this video taken?

3      A     Catholic University.

4      Q     And do you know approximately when this

5  video was taken?

6      A     It was 2018.

7      Q     Okay.

8            MS. STUDDARD:  Go ahead and play it.

9  BY MS. STUDDARD:

10      Q     Mr. Viera, do you recognize the person

11  in this video?

12      A     If you keep on playing it.

13            I think that's good enough.  It's Jason

14  Marchetti.

15      Q     And how do you know that that is Jason

16  Marchetti?

17      A     I approached him and I spoke to him.

18  You know, I'm -- I'm young, I'm always seeking for

19  opportunities.  I asked him if they were hiring

20  and he said not at the moment, but his name was

21  Jason Marchetti.  It was on the hardhat.

22      Q     And, Mr. Viera, what is it that we see

Page 1234

1    Mr. Marchetti do in this video?

2        A    He is hanging a detour sign.

3        Q    And is hanging a detour sign laborers'

4    work?

5        A    Yes, it is.

6        Q    And, Mr. Viera, is this video an

7    accurate representation of what you saw and

8    filmed?

9        A    Yes, it is.

10       Q    Okay.

11            MS. STUDDARD:   Can we go to Laborers'

12   182.

13   BY MS. STUDDARD:

14       Q    Mr. Viera, do you recognize this video?

15       A    Yes, I do.

16       Q    And how do you recognize this video?

17       A    I took that video.

18       Q    And where was this video taken?

19       A    Catholic University.

20       Q    Is this the same spot at Catholic

21   University of the previous video?

22       A    It's the same location, yes.

Page 1235

1      Q    And do you recognize the person in this

2   video?

3      A    It's the same fellow from the previous

4   video, Jason Marchetti.

5      Q    And what is it that we see Mr. Marchetti

6   doing in this video?

7      A    Hanging another detour sign.

8      Q    Is this the same sign as the previous

9   video?

10     A    No, it is not.

11     Q    Approximately how many signs did you see

12  this person hang?

13     A    Just on that trip it was two.

14          MS. STUDDARD:  You can pause it.

15  BY MS. STUDDARD:

16     Q    So this video was taken the same day as

17  the previous one?

18     A    Yes, it was.

19     Q    Approximately how long were you at the

20  site taking video that day?

21     A    About 10 to 15 minutes at the most.

22     Q    So is that 10 to 15 minutes total?

1      A     Yes.

2      Q     And is this video an accurate

3   representation of what you saw and filmed that

4   day?

5      A     Yes.

6      Q     Let's go to Laborers' 118.

7            Mr. Viera, do you recognize this video?

8      A     Yes, I do.

9      Q     And how do you recognize this video?

10     A     I recorded that video.

11     Q     And where was this video taken?

12     A     Catholic University.

13     Q     Do you recall what part of Catholic

14  University this is?

15     A     That is a little section where

16  Whiting-Turner has its yard where all contractors

17  park or just contractors show up there.  I think

18  they have their -- their office there.

19     Q     And approximately when was this video

20  taken?

21     A     It was in 2018.  I don't recall the

22  month, but it was probably between October and

1    November.

2        Q    Okay.

3            MS. STUDDARD:  And we can go ahead and

4    play.  You can pause it.

5    BY MS. STUDDARD:

6        Q    Mr. Viera, you can look at it closer,

7    please, but do you see an individual in the video

8    where it's paused right there?

9            MR. ROSE:  You can move up.

10           THE WITNESS:  I can see from here.  Yes,

11   I do see the fellow.

12   BY MS. STUDDARD:

13       Q    And do you recognize that individual?

14       A    Not from this angle, but if you keep on

15   playing the clip, I'm able to identify.

16           So that -- that's Jason Marchetti.

17           MS. STUDDARD:  You can pause it.

18   BY MS. STUDDARD:

19       Q    Okay.  And what is it that this video

20   shows Jason Marchetti do?

21       A    He is doing traffic control.  If not

22   traffic control, he's just doing flaggers work,

Page 1238

```
1   which is pretty much traffic control, helping the
2   truck back up.
3        Q    And is traffic control laborers' work?
4        A    Yes, it is.
5        Q    Is flagging laborers' work?
6        A    Yes, it is.
7        Q    Is helping a truck back up laborers'
8   work?
9        A    Yes, it is.
10       Q    Is this video taken on the same day as
11   the previous video?
12       A    No, that's another day.
13       Q    That's another day.
14            And, Mr. Viera, can you tell me what
15   we're seeing Mr. Marchetti do now?
16       A    He's helping that truck back up from the
17   site.
18       Q    And, Mr. Viera, does a person have to
19   have a flag to be performing flagging?
20       A    He doesn't need a flag.  In this given
21   case you can see that the opposing traffic is shut
22   one way.  But, you know, the laborer tends to, you
```

1  know, make a trucker's job -- or life easier

2  backing up from the project, so -- but they tend

3  to do have a stop sign.

4      Q    And is this video an accurate

5  representation of what you saw and filmed that

6  day?

7      A    Yes.

8      Q    Okay.

9           MS. STUDDARD:  If you could go to

10  Laborers' 160, please.

11  BY MS. STUDDARD:

12      Q    Mr. Viera, do you recognize this video?

13      A    Yes, I do.

14      Q    And how do you recognize this video?

15      A    It -- it was from the same day as the

16  previous clip.

17      Q    And can you remind us, where was this

18  video taken?

19      A    Catholic University.

20      Q    And from this shot do you recognize the

21  person in the orange vest in this video?

22      A    Yes, I do.

Page 1240

1    Q    And who is that?

2    A    Jason Marchetti.

3    Q    Okay.

4         MS. STUDDARD:  Wait.  Can you go back a

5    little bit.  Go back.

6    BY MS. STUDDARD:

7    Q    Mr. Viera, what is it that this video

8    shows Mr. Marchetti do?

9    A    He's prepping up to unload a toolbox.

10   Q    And can you tell me what it was that he

11   had in his hands?

12   A    It's too hard to say, but it looks like

13   he's adjusting the rail probably, but -- he's

14   probably adjusting it just to get that toolbox

15   unloaded.

16   Q    Okay.

17        MS. STUDDARD:  You can keep playing.

18   BY MS. STUDDARD:

19   Q    And, Mr. Viera, do you know what that

20   brown rectangle is?

21   A    That's the toolbox.  They tend to put,

22   let's say, chop saws in there, any tool that needs

Page 1241

1   to be used to work on the job site.

2              MS. STUDDARD:  You can pause.

3   BY MS. STUDDARD:

4       Q    And do you see the individual in the

5   yellow jacket on the right?

6       A    Yes, I do.

7       Q    Do you recall seeing the individual

8   wearing Whiting-Turner gear?

9       A    No, I do not recall neither, I don't

10  recall them wearing any Whiting-Turner --

11      Q    So was that individual wearing a

12  Whiting-Turner vest?

13      A    No.  The fellow wearing the yellow rain

14  jacket, no Whiting-Turner gear at all.

15      Q    And was he wearing a Whiting-Turner

16  helmet?

17      A    No.

18      Q    What would that indicate to you?

19      A    Probably a subcontracted out worker

20  helping Jason do some laborer work, or unload the

21  truck better said.

22              MS. STUDDARD:  You can keep playing.

1    Keep playing.

2    BY MS. STUDDARD:

3        Q    Mr. Viera, what is it that Jason

4    Marchetti is doing now?

5        A    He's helping unload the truck with

6    another toolbox.

7        Q    And is helping unload another toolbox

8    laborers' jurisdictional work?

9        A    Yes.  It's prepping up the job site.

10       Q    Approximately how long were you at the

11   job site that day?

12       A    That day probably about 30 minutes, 40

13   minutes tops.

14       Q    And is that video an accurate

15   representation of what you saw and filmed that

16   day?

17       A    Yes.

18       Q    Okay.  Let's go to 175.  Thank you.

19            Do you recognize this video?

20       A    Yes, I do.

21       Q    And did you take this video?

22       A    Yes, I did.

Page 1243

1      Q      Where was this video taken?

2      A      Catholic University.

3      Q      And when was this video taken?

4      A      The same day as the previous clips.  In

5   2018.  Probably October, November.

6             MS. STUDDARD:  Play the video.  You can

7   pause.

8   BY MS. STUDDARD:

9      Q      Mr. Viera, do you recognize the person

10  in the orange vest in this video?

11     A      Yes, I do.

12     Q      And who is that person?

13     A      That is Jason Marchetti.

14            MS. STUDDARD:  Play the video.

15  BY MS. STUDDARD:

16     Q      And what is it that this video shows

17  Mr. Marchetti doing?

18     A      He is adjusting the rails on the truck.

19     Q      And -- go ahead.

20     A      It seems he's adjusting it either

21  because he's about to load or he's already done

22  unloading.

Page 1244

1      Q     Do you recall seeing Mr. Marchetti load

2   or unload?

3      A     On the previous videos he was unloading.

4   On this it looks like he's just either prepping it

5   up to unload or load, I don't recall.

6      Q     And is this laborers' jurisdictional

7   work that Mr. Marchetti is doing?

8      A     Yes, it is.

9      Q     And is this video an accurate

10  representation of the events filmed that day?

11     A     Yes.

12     Q     Okay.

13           MS. STUDDARD:  Yeah, play it.  Great.

14  Pause.

15  BY MS. STUDDARD:

16     Q     Mr. Viera, do you recognize this job

17  site?

18     A     Yes, I do.

19     Q     And what job site is that?

20     A     That is Catholic University.

21     Q     Okay.

22           MS. STUDDARD:  Please play it.

1  BY MS. STUDDARD:

2      Q    Okay.  Mr. Viera, do you recognize the

3  person in the black jacket on the screen?

4      A    That is me, yeah.

5      Q    And can you tell me what you were doing

6  in this video?

7      A    I was seeking for opportunities, you

8  know, and I spoke to the guy.  His name is Nick

9  Carneglia.  I don't know how to pronounce his last

10  name, but his name is Nick.  I know that for a

11  given fact.  And I just approached him and spoke

12  to him, short words.  That's about it.

13      Q    How did you learn his name was Nick

14  Carneglia?

15      A    The name on his hardhat.  And we

16  exchanged names as well.  I introduced myself, he

17  introduced himself too.

18      Q    Let's go to Laborers' 119.

19           Is this video an accurate representation

20  of what happened that day?

21      A    Yes.

22      Q    Do you recognize this video?

Page 1246

1      A     Yes, I do.

2      Q     And how do you recognize this video?

3      A     I took that video.

4      Q     Okay.  Where was this video taken?

5      A     Catholic University.

6      Q     And approximately when was this video

7  taken?

8      A     It was somewhere 2018, it was in the

9  fall, about to be winter.

10     Q     Fall of 2018?

11     A     Yes.

12           ARBITRATOR JAFFE:  And, I apologize, I

13  missed the number on this one.  What number is

14  this that's up on the screen?

15           MS. STUDDARD:  Laborers' 119.

16           ARBITRATOR JAFFE:  119.  Thank you very

17  much.

18  BY MS. STUDDARD:

19     Q     And do you recognize the individual

20  shown in this video?

21     A     Yes, I do.

22     Q     And who is that?

Page 1247

1       A      That is Nick Carneglia.

2       Q      And what is it that this video shows

3  Nick Carneglia doing?

4       A      He's using a stripping bar or a wrecking

5  bar to get a platform from the ground to strip it

6  with the wrecking bar.

7       Q      And is using a stripping bar laborers'

8  work?

9       A      Yes.  Yes, it is.  General cleanup.

10       MS. STUDDARD:  You can pause it.

11  BY MS. STUDDARD:

12       Q      Mr. Viera, approximately how long were

13  you on the job site the day you filmed this?

14       A      That day probably -- probably in and out

15  five minutes most, probably ten minutes.

16       Q      Can you explain what you mean by in and

17  out a little bit more?

18       A      I am an organizer.  We tend to have

19  requests from certain workers in certain

20  industries.  There's a lot of work going on.  So,

21  you know, depending on the request, I'll look for

22  a comp report (ph), skilled labor.  And since it

Page 1248

1    is a Whiting-Turner, if I come across, you know, a

2    supervisor doing laborers' work, I'll take the

3    clip.  That day I was going about my day, so I was

4    there probably about ten minutes.

5         Q    And is this video an accurate

6    representation of what you saw and filmed that

7    day?

8         A    Yes, it is.

9         Q    Okay.  This is going to be Laborers'

10   120.

11             MS. STUDDARD:  Pause.

12   BY MS. STUDDARD:

13        Q    Do you recognize this video?

14        A    Yes.

15        Q    And how do you recognize this video?

16        A    Because it's at Catholic University.

17        Q    And did you take this video?

18        A    Yes, I did.

19        Q    And approximately when was this video

20   taken?

21        A    2018 as well.

22        Q    And from this still, do you recognize

Page 1249

1   the individual in this video?

2        A     Yes, I do.

3        Q     Who is that?

4        A     It's Nick.

5              MS. STUDDARD:  You want to skip to 38

6   seconds.

7   BY MS. STUDDARD:

8        Q     And what does it appear to you that

9   Mr. Carneglia is doing?

10       A     He is hanging up signs for detour for

11  the pedestrians.

12       Q     And is hanging up signs laborers'

13  jurisdictional work?

14       A     Yes, it is.

15       Q     Did you see Mr. Carneglia hang other

16  signs that day?

17       A     I don't recall.

18       Q     And approximately how long were you at

19  Catholic the day you filmed that?

20       A     That day probably a good 20 minutes, 30

21  minutes, but he was there for a while hanging that

22  sign up.

```
                                        Page 1250

 1        Q    So did you see Mr. Carneglia hanging the
 2   sign outside of what we have just seen on this
 3   video?
 4        A    Yes.
 5        Q    And is this video an accurate
 6   representation of the events you saw that day?
 7        A    Yes, it is.
 8        Q    Okay.  We're going to go to Laborers'
 9   121.
10             And do you recognize this video?
11        A    Yes, I do.
12        Q    And how do you recognize this video?
13        A    It's the same -- same day, same
14   location, just a different angle.
15        Q    And do you recognize the person in this
16   video?
17        A    Yes, I do.
18        Q    And who is that in the orange vest?
19        A    That is Nick.
20        Q    Okay.  And what is it Nick Carneglia is
21   doing in this video?
22        A    He's hanging up a sign.
```

Page 1251

1      Q    And is hanging up a sign laborers'

2  jurisdictional work?

3      A    Yes, it is.

4      Q    And can you tell me what kind of sign

5  this is?

6      A    It's a detour sign.

7      Q    So is hanging up a detour sign

8  specifically laborers' jurisdictional work?

9      A    In this given case, yes.

10     Q    Okay.

11          ARBITRATOR JAFFE:  Would you pardon a

12  brief interruption.

13          MS. STUDDARD:  Please.

14          ARBITRATOR JAFFE:  How were you able to

15  get two different videos with two different angles

16  of the same event as it's going on?

17          THE WITNESS:  It's with the phone.  It's

18  with the phone and I had it zoomed in and, you

19  know, probably my phone died at the moment, so I

20  had to go put it -- no, not put it on charge, but

21  I had to use another phone.

22          ARBITRATOR JAFFE:  Ah.

```
 1              MS. STUDDARD:  I can clarify it.

 2              ARBITRATOR JAFFE:  That's fine.  That

 3    will work.  It was just counterintuitive.  I was

 4    just trying to understand it.

 5              MS. STUDDARD:  Yes.

 6              THE WITNESS:  But -- but in this given

 7    case I think it was just zoomed in, as you can see

 8    there.  It's the same angle as the previous video,

 9    it's just zoomed in.

10              ARBITRATOR JAFFE:  Fair enough.

11    BY MS. STUDDARD:

12       Q    How long did you see Mr. Carneglia

13    hanging that sign?

14       A    It was a while.  Like I said, probably 5

15    to 15 minutes just hanging that sign.

16       Q    And was that video that we just played

17    an accurate representation of what you saw and

18    filmed that day?

19       A    Yes.

20       Q    We're going to go to Laborers' 122.

21              Do you recognize this video?

22       A    Yes, I do.
```

1       Q       And how do you recognize this video?

2       A       I took the video.

3       Q       And where was this video taken?

4       A       Suburban Hospital.

5       Q       And where is Suburban Hospital?

6       A       Off of Georgetown Road.  Georgetown

7    Road.

8       Q       And approximately when was this video

9    taken?

10      A       Early 2018.

11      Q       Mr. Viera, what is it that you see on

12   this person's sweatshirt?

13              You can go closer if you need to.

14      A       I think it gets clearer as you play it.

15              When I took the video, it had WT on it.

16      Q       So you --

17      A       It still does, but it's just -- but it

18   does have WT on it.

19      Q       Great.  And what is this person holding

20   in the WT sweatshirt?

21      A       A flagger's pole.  Flagger sign.

22      Q       And what are flagger signs used for?

Page 1254

```
 1      A    Traffic control.

 2      Q    And is traffic control laborers'

 3  jurisdictional work?

 4      A    Yes, it is.

 5      Q    Mr. Viera, what is this person doing

 6  right now in the yellow sweatshirt?

 7      A    He is stopping traffic, ongoing traffic.

 8      Q    Mr. Viera, you may need to get closer,

 9  but can you tell me what is on the yellow vest on

10  the person in the background?

11      A    I see WT.

12      Q    Do you recall seeing a WT on this

13  person's vest?

14      A    Yes, I do.

15      Q    Okay.  And what would that indicate to

16  you?

17      A    It's a Whiting-Turner employee.

18      Q    Okay.

19           MS. STUDDARD:  Please, keep playing.

20  BY MS. STUDDARD:

21      Q    Mr. Viera, what is it that we see the

22  individual in the yellow Whiting-Turner vest
```

Page 1255

1   doing?

2        A    He's backing up a dump truck into the

3   project.

4        Q    And is backing up a dump truck into the

5   project laborers' jurisdictional work?

6        A    Yes, it is.

7        Q    And is this video an accurate

8   representation of what you saw and filmed that

9   day?

10       A    Yes, it is.

11       Q    Okay.  If we can go to Laborers' 138.

12            MS. STUDDARD:  Pause.

13  BY MS. STUDDARD:

14       Q    Do you recognize this video?

15       A    Yes, I do.

16       Q    And how do you recognize this video?

17       A    I took the video.

18       Q    And where was this video taken?

19       A    Suburban Hospital.

20       Q    And approximately when was this video

21  taken?

22       A    Early 2018.

```
                                        Page 1256

 1       Q    And what do you see on the back of that

 2   person's yellow vest?

 3       A    WT.

 4       Q    And what does that indicate to you?

 5       A    It's a Whiting-Turner employee.

 6       Q    And what is the person in the WT vest

 7   holding?

 8       A    A traffic control sign.

 9       Q    Okay.

10            MS. STUDDARD:  You can play it.  Pause.

11   BY MS. STUDDARD:

12       Q    What do you see this person in the WT

13   vest doing?

14       A    Guiding traffic.

15       Q    And is guiding traffic laborers' work?

16       A    Yes, it is.

17       Q    Okay.  And is this video an accurate

18   representation of what you saw and filmed that

19   day?

20       A    Yes, it is.

21       Q    Okay.  Do you recognize this video?

22       A    Yes, I do.
```

1    Q    And how do you recognize this video?

2    A    I took that video.

3    Q    Where was this video taken?

4    A    Suburban Hospital.

5    Q    And when was this video taken?

6    A    Early 2018.

7    Q    Okay.  What do you see on the back of

8  this person's yellow vest?

9    A    A WT.

10    Q    And what color helmet is this person

11  wearing?

12    A    A white helmet.

13    Q    And what does that indicate to you?

14    A    He's an employee for Whiting-Turner just

15  by the vest.

16    Q    Okay.

17         MS. STUDDARD:  Play the video.

18  BY MS. STUDDARD:

19    Q    What is that we see this person in the

20  Whiting-Turner vest doing?

21    A    He's guiding the dump truck out of the

22  project.

Page 1258

1            ARBITRATOR JAFFE:  Were all three of the

2    last videos done on the same visit or were there

3    multiple visits to Suburban?

4            THE WITNESS:  They were taken at

5    different angles.  I was coming from the end and I

6    went around and that's how I got -- so they're

7    probably not in the right order, but you see the

8    fellow right there?

9            ARBITRATOR JAFFE:  Yeah.

10           THE WITNESS:  That was the previous

11   video.  That was the first angle that I was at.

12           ARBITRATOR JAFFE:  So it was the same

13   day?

14           THE WITNESS:  Same day.

15           ARBITRATOR JAFFE:  That's all that I was

16   trying to clarify.  Thank you.

17   BY MS. STUDDARD:

18       Q    And, Mr. Viera, approximately how long

19   were you at Suburban taking videos this day?

20       A    That day 30 minutes, 30 minutes is --

21   yeah, 30 minutes.

22       Q    If we can go to Laborers' 188.

Page 1259

 1              Do you recognize this video?
 2              MR. CROHAN:  Give me one second.
 3              ARBITRATOR JAFFE:  Of course.
 4              MS. STUDDARD:  Let's go off.
 5              (Brief recess 6:07 p.m. to 6:18 p.m.)
 6              ARBITRATOR JAFFE:  Back on, please.
 7              At your convenience, Ms. Studdard.
 8      BY MS. STUDDARD:
 9          Q    Great.  So just for the record, this is
10      Laborers' 188.
11              Mr. Viera, do you recognize this video?
12          A    Yes, I do.
13          Q    And how do you recognize this video?
14          A    I took it.  I took the video.
15          Q    And where was this video taken?
16          A    Catholic University.
17          Q    Okay.  Approximately when was this video
18      taken?
19          A    I don't remember.
20              MS. STUDDARD:  Pause.
21      BY MS. STUDDARD:
22          Q    And please get closer if you need to.

Page 1260

1  Can you tell me what you see on the back of this

2  person's jacket in the foreground of this video?

3       A    You have to keep on playing.  It's more

4  visible.

5            It clearly says WT.

6       Q    Okay.  And what does that indicate to

7  you?

8       A    It's a WT or Whiting-Turner employee.

9       Q    Okay.  What color helmet is that

10 individual wearing?

11      A    It's a white Whiting-Turner helmet.

12      Q    Okay.  And you recall it being a

13 Whiting-Turner helmet?

14      A    Yes.

15      Q    Can you tell me what is it these

16 individuals are doing in this video?

17      A    They're doing laborers' work.  They're

18 applying some -- some type of mesh to prevent mud

19 to go out into the pavement or the street.

20      Q    And applying mesh to the ground is

21 laborers' work?

22      A    Yes, general cleanup.

1      Q     Approximately how long were you at the

2  site when you took this video?

3      A     That day it was no more than five

4  minutes.  Five minutes and --

5      Q     So that you were at the site for five

6  minutes total?

7      A     Yeah, I just swung by to see if it was

8  active and it was active.

9      Q     And can you tell me from this still what

10 you see on the back of the individual on the left

11 orange jacket?

12     A     WT.

13     Q     And what color helmet is that person

14 wearing?

15     A     White.

16     Q     And is this video an accurate

17 representation of what you saw and filmed that

18 day?

19     A     Yes.

20     Q     All right.  We are going to be pulling

21 up the file WT 152, which is going to be marked

22 Laborers' 189.

1           MR. WILLIAMS:  Laborers' -- I'm sorry.

2           MS. STUDDARD:  189.

3           MR. WILLIAMS:  Thank you.

4           MS. STUDDARD:  Absolutely.

5    BY MS. STUDDARD:

6        Q    Do you recognize this video?

7        A    Yes, I do.

8        Q    And how do you recognize this video?

9        A    I took that video.

10       Q    Where was this video taken?

11       A    Alexandria, Virginia.

12       Q    And approximately when was this video

13   taken?

14       A    I don't recall what month, but it was in

15   2018.

16       Q    Can you tell me what do you see on the

17   back of the orange vest of this person shown in

18   the video?

19       A    I can't see.  It's kind of blurred, but

20   it's WT.

21       Q    Do you recall seeing a WT on this

22   person's vest when you were filming?

1     A     Yes, I do.

2     Q     And what is the person wearing the WT

3   vest doing in this video?

4     A     Prepping up the site.

5     Q     Do you see anything in his hands?

6     A     I think -- you won't be able to tell

7   through the video, but it seems to be a pump,

8   water pump.

9     Q     Do you recall seeing him carrying a

10   water pump when you were filming?

11     A     Yes.

12     Q     How would you describe the weather that

13   day?

14     A     It was pouring that day, the day before

15   and also that day.

16     Q     And did you see other individuals on the

17   job site that day?

18     A     No.

19     Q     Do you believe the job site was

20   operating that day?

21     A     No, it seemed to be a rainout day.

22   Probably there was more Whiting-Turner employees

Page 1264

1    on the job site, but at that moment it was just

2    that supervisor on the site.

3         Q    How long were you at the job site that

4    day before you started filming?

5         A    Probably an hour, an hour and 30 minutes

6    tops.

7         Q    And why did you go to the job site that

8    day?

9         A    It was a rainout day.  Just from what I

10   captured when I swung by the project, he was

11   hesitant to stay active on a rain day.  It didn't

12   look like anything was going on, so I stayed for a

13   bit and he did general -- general cleanup.

14        Q    And is this video an accurate

15   representation of what you saw and filmed that

16   day?

17        A    Yes.

18        Q    Okay.  Let's go to Laborers' 190.  This

19   is Whiting-Turner 153, which is marked Laborers'

20   190.

21             MS. STUDDARD:  Pause.

22   BY MS. STUDDARD:

1    Q    Do you recognize this video?

2    A    Yes, I do.

3    Q    How do you recognize this video?

4    A    I took the video.

5    Q    And where is this video taken?

6    A    Alexandria, Virginia.

7    Q    Do you recognize the person in this

8  video?

9    A    Yes, I do.

10    Q    And who is the person in this video?

11    A    Jim Morton.

12    Q    And how do you know that this individual

13  is Jim Morton?

14    A    One of my colleagues confirmed his name.

15    Q    And you can get closer if you need to,

16  but can you tell me what you see on the back of

17  his orange vest?

18    A    I can't see on the video, but I recall

19  it's WT.

20    Q    You recall seeing WT on the back of his

21  orange vest?

22    A    Okay.

1          MS. STUDDARD:  Go ahead and play.

2    BY MS. STUDDARD:

3          Q    And what is it that this video shows

4    Mr. Morton doing?

5          A    He's -- general cleanup, prepping up.

6          Q    Do you know what he was prepping up for?

7          A    Possible day of work for the next day.

8          MS. STUDDARD:  Go back to the beginning.

9    BY MS. STUDDARD:

10         Q    What do you see Mr. Morton doing right

11   there?

12         A    I believe he's lowering -- he's lowering

13   something.  It's a hose.

14              If it's not the hose, it's the

15   extension.  It's been awhile.

16         Q    And is this video an accurate

17   representation of what you saw and filmed that

18   day?

19         A    Yes, it is.

20         Q    Okay.  We're going to go to, it's

21   Whiting-Turner 157 and this is marked Laborers'

22   192.

Page 1267

```
 1          MS. STUDDARD:  Did we not do 157?
 2          MR. CROHAN:  Uh-uh.
 3          MS. STUDDARD:  Okay.  We're going to
 4    Whiting-Turner 165, Laborers' 191.
 5          You can pause.
 6    BY MS. STUDDARD:
 7       Q    Mr. Viera, do you recognize this video?
 8       A    Yes, I do.
 9       Q    Is this video a different angle of the
10    same site of the previous video?
11       A    Yes, it is.
12       Q    Do you recognize the individual in this
13    video?
14       A    Yes, I do.
15       Q    And who is the individual in this video?
16       A    Jim Morton.
17       Q    Okay.
18          MS. STUDDARD:  You can play it.
19    BY MS. STUDDARD:
20       Q    What is it that Mr. Morton is doing in
21    this video?
22       A    He is lowering a -- a hose down into the
```

Page 1268

1    foundation of the project.

2         Q     And I just want to ask is lowering a

3    hose laborers' work?

4         A     It's general cleanup.

5         Q     And you testified earlier that

6    Mr. Morton had been preparing the site.  Is that

7    laborers' work?

8         A     I believe so.  Yes, it was.

9         Q     And is the video we just watched an

10   accurate representation of what you saw and filmed

11   that day?

12        A     Yes.

13        Q     Okay.  We're going to go to now

14   Whiting-Turner 157.  This is Laborers' 192.

15             Mr. Viera, do you recognize this video?

16        A     Yes, I do.

17        Q     And how do you recognize this video?

18        A     I took that video.

19        Q     And is this a different view of the

20   video we just saw?

21        A     Can you play that video?

22             Yes, it's a different video.  He's

Page 1269

1    lowering the hose.

2        Q    And who is the individual in this video?

3        A    Jim Morton.

4            MR. WILLIAMS:  Objection.  Hearsay.

5            He's basing his knowledge on something

6    that somebody told him.

7            ARBITRATOR JAFFE:  I understand.

8            MR. WILLIAMS:  All right.

9            ARBITRATOR JAFFE:  And you can probe it

10   on cross if, in fact, you believe that the

11   identification is in error.  It's not a problem,

12   Mr. Williams.

13           MR. WILLIAMS:  Okay.

14   BY MS. STUDDARD:

15       Q    And what is it you see this individual

16   doing?

17       A    He is lowering a hose into the

18   foundation.

19       Q    And is lowering a hose laborers' work?

20       A    It's pumping water out of it, so yes,

21   general cleanup.

22       Q    So pumping water out is general cleanup?

Page 1287

1   IN THE MATTER OF THE ARBITRATION BEFORE
   THE AMERICAN ARBITRATION ASSOCIATION

2

 ------------------------------:

3 WHITING-TURNER CONTRACTING :
 COMPANY         :

4            :

     Claimant     :

5            :

    vs.      : Case No.:

6            : 01-18-0003-5360

 LABORERS' DISTRICT COUNCIL :

7 PENSION & DISABILITY TRUST  : Arbitrator:
 FUND NO. 2        : Ira F. Jaffe

8            :

     Respondent   :

9 ------------------------------:

10

11     A R B I T R A T I O N

12      VOLUME 4

13

14

 DATE:     April 14, 2022

15

 TIME:     9:06 a.m.

16

 LOCATION:   Alston & Bird LLP

17        950 F Street, Northwest
        Washington, D.C. 20004

18

 REPORTED BY:  Shari R. Broussard, RPR, CSR

19        Reporter, Notary

20

21     Veritext Legal Solutions

    1250 Eye Street, NW, Suite 350

22     Washington, D.C. 20005

1   law, are you?

2        A    No.

3        Q    And you're not an expert in laborers'

4   jurisdictional work, are you?

5        A    No.

6        Q    What is your understanding of laborers'

7   work?

8        A    Sweeping, drilling, using a tool,

9   cleanup, spotting, traffic direction, flagging,

10  things of that nature.

11       Q    Okay.  And these were the things that

12  you would look for when you were out at

13  Whiting-Turner job sites?

14       A    Yes.

15       Q    Okay.  And approximately over what

16  period of time -- let me ask it differently.

17            Did you do surveillance and obtain a

18  video of individuals who appeared to be

19  Whiting-Turner employees performing laborers' work

20  in 2019?

21       A    Yes.

22       Q    Same question for 2020?

Page 1318

1    A    Yes.

2    Q    And the same question for 2021?

3    A    Yes.

4    Q    And was this video taken in 2019, 2020

5    and 2021, were these at various job sites at

6    Whiting-Turner?

7    A    Yes, various sites.

8    Q    Okay.  And how did you become familiar

9    with what laborers' work is?

10   A    Well, I met with you and I met with

11   Steve Lanning and Raymin Diaz of the union who

12   taught me essentially and then Ray sat down with

13   me a few times on surveillances to point things

14   out.

15   Q    Okay.  And do you recall approximately

16   when that was?

17   A    August of 2019.

18   Q    Okay.  Okay.  We're good.

19        Okay.  We are pulling up Laborers'

20   Exhibit 36.

21        Mr. Kucik, do you recognize this video?

22   A    Yes.

Page 1669

1    In the Matter of Arbitration

2

     ---------------------------
3    WHITING-TURNER CONTRACTING :
     COMPANY,                    :   AAA Case Number:
4                                :   01-18-0003-5360
            and                  :
5                                :   Withdrawal Liability
     LABORERS' DISTRICT COUNCIL :
6    PENSION & DISABILITY TRUST :    Arbitrator:
     FUND NO. 2,                 :   Ira F. Jaffe
7                                :
     ---------------------------
8

9                  A R B I T R A T I O N
10                      VOLUME 5
11

     DATE:           May 3, 2022
12

     TIME:           9:06 a.m. to 5:40 p.m.
13

     LOCATION:       Alston & Bird LLP
14                   950 F Street, Northwest
                     Washington, D.C. 20004
15

     REPORTED BY:    Felicia A. Newland, CSR
16                   Reporter, Notary
17
18
19              Veritext Legal Solutions
            1250 Eye Street, NW, Suite 350
20               Washington, D.C. 20005
21
22

Page 1920

1 to this area are necessarily relevant, never mind

2 dispositive, on the 4203(b) question --

3                MR. ROSE:  I understand.  And I

4 appreciate that.

5                ARBITRATOR JAFFE:  -- but I'm going

6 to allow the record to be developed.

7                MR. ROSE:  I appreciate that.  We'll

8 get there very quickly.

9                Can you read that question back,

10 please?

11            (The reporter read as requested.)

12                THE WITNESS:  I'm sorry, could you

13 just read me the end part of that again?

14            (The reporter read as requested.)

15                THE WITNESS:  Correct.  So in my

16 opinion -- in my -- from my perspective, a salaried

17 employee was not to do a second of laborers' work,

18 but I view a second of laborers' work as digging

19 ditches for eight hours a day.  That's not what we

20 have our salaried employees do.

21 BY MR. ROSE:

22                Q     How is a second --

1          A     De minimus worked before and after

2     the -- after the agreement is same thing, waving a

3     truck back before we terminated the agreement our

4     employees did, no grievance, after we terminated

5     the agreement, it would immediately trigger it.

6     That's my testimony.

7               MR. ROSE:  Can you reread the

8     question because the answer was not responsive.

9     And if there's something about my question that you

10    don't understand a word or words, just let me know

11    and I'll try to rephrase it?

12              (The reporter read as requested.)

13              THE WITNESS:  Could you rephrase the

14    question?  You have two questions in there or two

15    statements, a lot of statements and not a question

16    that I can answer.

17    BY MR. ROSE:

18         Q     Why not?  Why you can't you answer?

19         A     Please restate it.

20         Q     Why is it that you're unable to

21    answer this question?

22         A     I'll be happy to answer your

1   question, Mr. Rose, if you can restate it for me,

2   please.

3          Q       Just to be clear -- okay.  You have

4   testified that Whiting-Turner -- you knew before

5   the expiration of the agreement that no

6   Whiting-Turner employee could perform a second of

7   laborers' jurisdictional work without risking the

8   imposition of withdrawal liability, isn't that a

9   fact?

10         A       No, that's not a fact because while

11  we still had an agreement, we would never have

12  withdrawal liability.

13         Q       Mr. Ernst, did you not understand --

14         A       Yes.

15         Q       Do you not understand -- okay.  Let

16  me try this again, just let me know if there's a

17  word or words that you don't understand.

18                 Isn't it a fact that you testified

19  under oath that you were -- you knew at the time

20  that you abrogated the agreement with the laborers

21  that no Whiting-Turner employee could perform a

22  second of laborers' jurisdictional work after its

Page 1923

1    expiration, isn't that a fact?

2         A    Yes.

3         Q    And you also testified --

4         A    Yes.

5         Q    And you also testified under oath

6    that you knew Whiting-Turner employees performed,

7    what you call, de minimis laborers' jurisdictional

8    work before the expiration and you thought it was

9    okay for them to continue to do laborers'

10   jurisdictional work de minimis amounts after the

11   expiration of the agreement, isn't that a fact?

12        A    I got lost a little bit at the end.

13   And I want to answer your question in a one-word

14   answer, so could you please reread the question one

15   more time.

16        Q    Of course.

17            (The reporter read as requested.)

18            THE WITNESS:  That is correct.

19   BY MR. ROSE:

20        Q    Can you explain to me how long a de

21   minimis laborers' jurisdictional task is?

22            When you said de minimis laborers'

Page 1924

1    jurisdictional task that you had witnessed with
2    your own eyes and that you were aware of, how long
3    would that be, that de minimis laborers'
4    jurisdictional work for a salaried employee to
5    perform?
6            A    I can't quantify the time.
7            Q    Well, was it --
8            A    I would say that I -- I would
9    classify like this, if you want me to define de
10   minimus, I believe that's your question really.
11   And I would answer it like this:  If that employee
12   was doing something very minor that is not taking a
13   job or an hour of work or half hour's work or half
14   hour's you know -- we pay in quarter hours, half
15   hour's of work from one of our union employees,
16   then you could consider that as de minimis.
17           Q    So just to be clear --
18           A    Oh, I would consider that.
19           Q    Just to be clear, your definition of
20   de minimis would allow a Whiting-Turner salaried
21   employee to perform up to maybe a half hour of
22   laborers' jurisdictional work.  Is that your

Page 1925

1    testimony?

2         A     Yes, that's one, unless it was an

3    emergency, like the thing that was discussed at the

4    MGM where water was pouring in the floor, that may

5    have been longer than a half hour.

6         Q     Okay.  So I'm going to try and ask

7    this again and hopefully you'll understand it, and

8    if you don't, just let me know.

9              You just testified that you -- your

10   definition of de minimis could be up to 30 minutes

11   of a salaried employee performing a task.  How is

12   it that you believe that was okay after the

13   expiration of the agreement when you testified

14   under oath that you knew that no Whiting-Turner

15   employee was able to perform a second of laborers'

16   jurisdictional work after the expiration of the

17   agreement?

18        A     I don't know why I would think that

19   was okay.

20        Q     Okay.

21              MR. ROSE:  All right.  Can we please

22   pull up Joint Exhibit 8?

Page 1926

1    BY MR. ROSE:

2         Q    Mr. Ernst, I'm showing you a document

3    that's been marked Joint Exhibit 8.  It's a letter

4    from your counsel and his prior firm, dated

5    April 27th, 2018.

6              Do you see that?

7         A    I do.

8         Q    And you've seen that letter before,

9    right?

10        A    You'll have to scroll down and let me

11   see more of it, Mr. Rose.

12        Q    Yeah, we'll just scroll down then.

13        A    Whoa, whoa, whoa.  Hold on.  Could

14   you scroll down some more?  I believe I recall this

15   letter.  Keep scrolling.  I may have been cc'd on

16   it.  Could you go to the end?  Could you just go to

17   the end and then I will see the cc?  I'm sorry,

18   maybe that was the end.

19              Yeah, my counsel sent that after he

20   sent it.

21        Q    So you received a copy of that after

22   your counsel sent it out or did you -- I'm sorry.

1          Did you review this before it was

2    sent out by your counsel?

3          A     No.

4          Q     Do you know whether or not in-house

5    counsel at Whiting-Turner, Mr. China, reviewed it?

6          A     I don't know.

7          Q     Okay.  Well, I'd like to go back to

8    the first page, please, towards the bottom.  I'd

9    like to direct your attention to C.  It states your

10   attorney, it states, "Whiting-Turner argues that

11   4203(b) applies", and you'll see C, "Whiting-Turner

12   has not performed work in the jurisdiction of the

13   applicable collective bargaining agreement after

14   the expiration of that agreement."

15          Do you see that?

16          A     I do.

17          Q     Okay.  But that's a false statement,

18   isn't it?

19          MR. OSSI:  Objection to the extent

20   that he's asking him to provide a legal conclusion

21   to a legal letter, asking for a legal opinion on a

22   legal letter sent by --

Page 1928

 1          MR. ROSE:  I'm not asking for a legal
 2    opinion, I'm just saying that statement in C.
 3    BY MR. ROSE:
 4          Q     Based on your sworn testimony is
 5    false, isn't it?
 6          ARBITRATOR JAFFE:  If you can answer
 7    it.
 8          THE WITNESS:  I can't answer -- I
 9    have an opinion, I can't answer definitely what
10    Mr. Ossi was thinking when he wrote that letter.
11    BY MR. ROSE:
12          Q     Okay.  But I want to look at these
13    words in C.  Okay.  It says, "Whiting-Turner has
14    not performed work in the jurisdiction of the
15    applicable collective bargaining agreement after
16    the expiration of that agreement."
17          Do you see that?
18          A     I do.
19          Q     And isn't it a fact you testified
20    under oath, as did numerous other Whiting-Turner
21    employees in this arbitration, that, in fact,
22    Whiting-Turner has performed laborers'

# EXHIBIT 4

AGREEMENT

Effective: June 01, 2014

Expires:

May 31, 2017

between

Construction Contractors Council
AGC Labor Division

and

Baltimore/Washington Construction & Public Employees
Laborers' District Council, LIUNA
Local 657 and Local 11



For: The Whiting-Turner Contracting Co.

CONFIDENTIAL

TABLE OF CONTENTS

| ARTICLE | DESCRIPTION | PAGE |
|---------|-------------|------|
| I | Purpose | 3 |
| II | Parties to the Agreement | 3 |
| III | Scope of Agreement | 4 |
| IV | Referral of Employees | 4-5 |
| V | Apprenticeship | 5-6 |
| VI | Hours of Work, Overtime, Shifts and Holidays | 6-7 |
| VII | Management Rights | 7 |
| VIII | Wage and Fringe Benefits | 7-8 |
| IX | Grievance Procedure | 8 |
| X | Jurisdictional Disputes | 9 |
| XI | General Working Conditions | 9-10 |
| XII | Work Stoppages and Lockouts | 10 |
| XIII | Pay Procedure | 11 |
| XIV | Union Representation | 11-12 |
| XV | Subcontracting Notification | 12 |
| XVI | General Savings Clause | 12 |
| XVII | Duration | 13 |
| XVIII | Signatory Contractors | 13 |
| XIX | Acceptance of Agreement | 14 |
| | Appendix A — Wage Rates and Fringe Benefits | 15-18 |

2

CONFIDENTIAL

## ARTICLE I
### PURPOSE

Section 1. It is the intent and purpose of the parties hereto to promote harmonious economic and industrial relationships between The Construction Contractors Council – AGC Labor Division and the Employers and the Union; and to set forth therein the basic agreement concerning rates of pay, hours of work and conditions of employment between the parties to this agreement; and the parties mutually agree to perform dutifully the obligations imposed by this agreement.

## ARTICLE II
### PARTIES TO THE AGREEMENT

The Construction Contractors Council-AGC Labor Division, Inc. is recognized by the Baltimore/Washington Construction & Public Employees Laborers' District Council and its Local 657 and Local 11, collectively referred to as "The Union" as the appropriate representative for establishing the area-wide collective bargaining agreement for the areas covered by this agreement.

The Construction Contractors Council and the Employers bound by this Agreement (referred to collectively as either the "CCC" or where the obligations of this agreement apply to all the Employers who employ members of the Union covered by this Agreement, as "Employers", or where reference is made to a specific one of the Employers, as "Employer") recognize the Union as the exclusive collective bargaining representative of all employees covered by this Agreement.

As a result, the Union recognizes the Construction Contractors Council as the representative of its member Employers, all other Employers who have authorized the Council in writing to represent them, and all other Employers which become signatory to this agreement. The names and addresses of the Employers who have authorized the Council to represent them, as of the effective date of this agreement are attached hereto. In addition, the Council will notify the Union, in writing, of any Employer which authorizes the Council to represent it, subsequent to the effective date of this Agreement, within a reasonable time after such action is taken.

The Union will notify the Construction Contractors Council, in writing of any Employer who becomes signatory to this agreement after the effective date within ten (10) days after the Employer becomes a signatory.

3

CONFIDENTIAL

## ARTICLE III
### SCOPE OF AGREEMENT

Section 1.   Agreement shall cover all projects in the vicinity of Washington DC and the counties of Prince Georges, Montgomery, Charles, Calvert, and St. Mary's in the State of Mary land and the counties of Faulquier, Loudoun, Warren, Culpepper, Stafford, Spottsylvania, Caroline, Essex, Green, Orange, Frederick, Clark, Fairfax, Arlington, Alexandria, Shenandoah, Page, Rappahannock, Rockingham, Madison, King George, Westmoreland, and Prince William in the state of Virginia.

## ARTICLE IV
### REFERRAL OF EMPLOYEES

Section 1. The Employer shall have the right to select and hire directly all supervisors it considers necessary and desirable.  All Employees covered by the Agreement hired by an Employer on their project shall be referred to the Employer by the Union.   The Employers shall have the right to determine the competency of all employees, the right to determine the number of employees required, and the sole responsibility for selecting the employees to be laid off, discharged, suspended or disciplined for proper cause.  The Employers shall also have the right to reject any applicant referred by the Union and/or its respective Local Unions.

Section 2.  The Union represents that Laborers' Local Union 657 and Local 11 administer and control their referrals and it is agreed that these referrals will be made in a nondiscriminatory manner and in full compliance with Laborers' International Union of North America Hiring Hall Procedures; as well as Federal, state and local laws and regulations which require equal employment opportunity and nondiscrimination.

Section 3.  In the event Laborers' Local Union 657 and/or Local 11 does not refer the employees as requested by one of the Employers within a forty-eight (48) hour period after such request is made by the Employer (Saturdays, Sundays and Holidays excluded), the Employer may employ applicants from any source including, but not limited to, other sites at which the Employer, its parents, subsidiaries or affiliates, may be performing work.  However, employees recruited from other sources will be required to join the Union within seven (7) days, except as otherwise prohibited by law.

4

CONFIDENTIAL

Section 4. The Employer agrees to be bound by the hiring referral rules in a local area not inconsistent with the terms of this Agreement. Where the hiring referral rules that prevail in a local area are on other than an exclusive basis, such rules shall be applicable if not in violation of either state or federal law.

Section 5. Laborers' Local Union 657 and Local 11 will exert its utmost efforts to recruit a sufficient number of skilled and certified craftsmen to fulfill the manpower requirements of the Employer. The Union agrees to engage in active recruitment of minority, female, disabled, and covered veteran applicants and to make every effort to refer to the Employer sufficient numbers of such applicants to assist in meeting required affirmative action goals, where applicable.

Section 6. Where government agencies impose affirmative action on the Employer's project, referral procedures shall be subordinate to such obligations.

Section 7. Upon notification to the Union, the Employer shall have the right to recall to employment within six (6) months of layoff employees previously assigned to work covered by this Agreement.

Section 8. In referring to employees in this Agreement, the masculine gender is used for convenience only and shall refer both to males and females.

### ARTICLE V

#### APPRENTICESHIP

Section 1. New applicants for membership who cannot provide reasonable proof of 3,200 or more hours of employment as a Construction Craft Laborer, or alternatively, cannot demonstrate equivalent skills in a placement examination administered by the Joint Apprenticeship and Training Committee (JATC)) shall enter the Apprenticeship program. Any person entering but failing to maintain and complete his or her Apprenticeship shall not be employed by the Employer as a Journey Worker under this Agreement. The failure of any Apprentice to maintain his or her Apprenticeship status shall obligate the Employer to discharge such person upon notice from the Union.

Section 2. Apprentice wage rates are as provided in Appendix A.

Section 3. The Employer may pay a higher rate at its option. However, the Apprentice must meet his or her commitments to the Joint Apprenticeship Committee regardless of the level being paid.

5

CONFIDENTIAL

Section 4. The Employer may not employ an Apprentice until at least one Journeyworker is employed and thereafter may not employ more than one (1) Apprentice for every additional three (3) Journeyworkers. Apprentices will be referred to an Employer by the Union

Section 5. An Apprentice shall not be penalized for taking off from work to attend offsite training (though time off for training is unpaid).

## ARTICLE VI
### HOURS OF WORK, OVERTIME, SHIFTS AND HOLIDAYS

Section 1. The standard workweek shall consist of forty (40) hours per week with one-half hour *each shift* designated as an unpaid period for lunch. Nothing herein shall be construed as guaranteeing any employee eight (8) hours of work per day or forty (40) hours of work per week.

Section 2. All time worked in excess of forty (40) hours a week or ten (10) hours per workday and approved by the Employer in advance shall be paid at a rate of time and one half. Sundays will be paid at double time.

Section 3. It will not be a violation of this Agreement when the Employer considers it necessary to shut down to avoid the possible loss of human life because of an emergency situation that could endanger the life and safety of an employee. In such case, employees will be compensated only for the actual time worked. In the case of a situation described above whereby the Employer requests employees to wait in a designated area available for work, the employees will be compensated for the waiting time.

Section 4. Shifts may be established when considered necessary by the Employer.

Section 5. It is recognized by the parties to this Agreement that the standard work week may not be desirable or cost effective for some projects, and other arrangements for hours of work could be necessary. On projects where job conditions require a change in the work day, work week, and/or shifts the Employer will implement the change upon notification to the Union.

6

CONFIDENTIAL

Section 6. The recognized holidays shall be as follows:

| | | |
|---|---|---|
| New Years Day | Fourth of July | Thanksgiving Day |
| Christmas Day | Memorial Day | Labor Day |
| Day after Thanksgiving | Martin Luther King's Birthday | Veteran's Day |

Recognized holidays will be on the same day as designated by the Federal Government for said holiday.

Under no circumstances shall any work be performed on Labor Day except in cases of emergency involving life or property. There shall be no paid holidays. If employees are required to work on a holiday, they shall receive double the straight time rate.

### ARTICLE VII
### MANAGEMENT RIGHTS

The Employer retains and shall exercise full and exclusive authority and responsibility for the management of its operations.

### ARTICLE VIII
### WAGE AND FRINGE BENEFITS

Section 1. The classification of employment and minimum wage rates and fringe benefits shall be accordance with the wage Appendix (see Appendix A) attached hereto and made part of this agreement. Wage rates becomes effective the first payroll period following the effective date of the agreement.

Section 2. The Employer will be furnished appropriate trust documents by the Union covering funds into which contributions shall be made. The Employer will contribute to and be bound by bona fide trust funds covering employees under this Agreement. Trust Funds into which contributions shall be made are listed in Appendix A.

Section 3. If payments for contributions as defined above are not received from an Employer by the fund offices by the date prescribed by the appropriate trust fund documents for hours worked the previous month, the Fund office will notify the Employer of such delinquency. If after five (5) working days from such notice, all delinquencies have not been paid in full, it is agreed that the Union may take appropriate action it deems necessary in order to collect such delinquent contributions, and the Union will not be considered in violation of Article XII should a work stoppage occur.

7

CONFIDENTIAL

Section 4. The Union shall provide active notice to CCC and all Employers within three (3) working days of every agreement that contains wage, benefit or fund contribution rates or any other modifications that vary from the conditions of this Agreement. All Employers may at their sole discretion utilize these variances as if they constitute an amendment to this Agreement.

## ARTICLE IX
## GRIEVANCE PROCEDURE

Section 1. It is specifically agreed that in the event any disputes arise out of the interpretation or application of this Agreement, excluding questions of jurisdiction of work, the dispute(s) shall be settled by means of the procedure set forth herein. No such grievance shall be recognized unless called to the attention of the Employer by the Union or to the attention of the Union by the Employer within ten (10) calendar days after the alleged violation was committed.

Section 2. A grievance shall be settled according to the following procedure:

STEP 1: The dispute shall be referred to the Steward of Laborers' Local Union 657 or Local 11 or his designated representative and the Project Superintendent and/or the Employer's representative at the project.

STEP 2: In the event that the Steward of Laborers' Local Union 657 or Local 11 and the Project Superintendent and/or the Employer representative at the project site cannot reach agreement within ten (10) calendar days after a meeting is arranged and held, the matter shall be referred to the Business Manager of Laborers' Local Union 657 and/or Local 11 and the Labor Relations Representative of the responsible Employer.

STEP 3: If the dispute is not resolved within ten (10) calendar days after completion of Step 2, the Employer and the Union shall choose a mutually agreed upon Arbitrator for final and binding arbitration. The impartial Arbitrator shall be selected from a panel of arbitrators submitted by and in accordance with the rules and regulations of the Federal Mediation and Conciliation Service. The decision of the Arbitrator shall be binding upon all parties. The Arbitrator shall have no authority to change, amend, add to, or detract from any of the provisions of this Agreement. The expense of the impartial Arbitrator shall be borne equally by the Employer and the involved Union.

8

CONFIDENTIAL

## ARTICLE X
### JURISDICTIONAL DISPUTES

Section 1. There will be no strikes, no work stoppages or slowdowns, or other interferences with the work because of jurisdictional disputes.

Section 2. Project conditions do not always justify strict adherence to craft lines which in itself does not establish precedent or change the appropriate jurisdiction of the crafts involved. Periodic review of the work assignments shall be made for the purpose of adjusting such assignments as appropriate to take care of changing needs.

Section 3. In the event of a jurisdictional dispute, the International Unions shall promptly assign International Representatives to meet with the Employer and attempt a settlement in the event of questions of assignment.

Section 4. If the International Representatives cannot reach agreement on the dispute, they shall jointly prepare and sign a complete statement of the facts and circumstances involved in the dispute, which shall be submitted to the respective General Presidents for final resolution.

## ARTICLE XI
### GENERAL WORKING CONDITIONS

Section 1. The selection of craft foremen and/or general foremen and the number of foremen required shall be entirely the responsibility of the Employer, it being understood that in the selection of such foremen and/or general foremen the Employer will give primary consideration to qualified individuals available in the local area. After giving such consideration, the Employer may select individuals from other areas. All foremen and/or general foremen shall take orders from the designated Employer representatives. Craft foremen shall be designated working foremen at the discretion of the Employer.

Section 2. The Local Union shall not coerce or in any way interfere with the Owner's personnel, operation or facilities at the project site. The Owner's right to contract directly with other companies for work at the project site shall not be limited, and the Union shall cooperate and not interfere with that Owner's operations.

Section 3. Slowdowns, standby crews, and featherbedding practices will not be tolerated.

9

CONFIDENTIAL

Section 4. Individual seniority shall not be recognized or applied to employees working on projects under this Agreement.

Section 5. The Employer shall establish such reasonable project rules as the Employer deems appropriate. These rules will be discussed at the pre-job conference and posted at the project site by the Employer; any proposed changes to these rules after the pre-job conference have to be presented to Local 657 and/or Local 11 prior to amendment.

Section 6. Employees required to wear protective clothing, other than hardhats, goggles or boots, will be given sufficient time to go through the required procedures for dressing, undressing and decontamination and this shall be considered time worked. Employees that lose their issued personal protective equipment will be required to purchase his or her own equipment, subject to the supervisor's approval of the equipment.

Section 7. The Alcohol and Drug Abuse Policy previously in effect shall continue to be used by the Employers.

### ARTICLE XII
### WORK STOPPAGES AND LOCKOUTS

Section 1. During the term of this Agreement there shall be no strikes, picketing, work stoppages, or slowdowns for any reason by the Union, or Local Unions affiliated with the Union, or by any employee, and there shall be no lockout by an Employer.

Section 2. The Union shall not sanction, aid or abet, encourage or continue any work stoppage, strike, or picketing at an Employer's project site and shall undertake all reasonable means to prevent or to terminate any such activity. No employee shall engage in activities that violate this Article. Any employee who participates in or encourages any activity that interferes with the normal operation of the project shall be subject to discharge.

Section 3. The Union shall not be liable for acts of employees for which it has no responsibility. The Union and Laborers' Local Union 657 and/or Local 11 will immediately instruct, order, and use the best efforts of the office to cease any violations of this Article. The principal officer or officers of The Union and Laborers' Local Union 657 and/or Local 11 will immediately instruct, order, and use the best efforts of their office to cause the employees whom the Local Union represents to cease any violations of this Article. The Union and Laborers' Local Union 657 and Local 11 complying with this obligation shall not be liable for unauthorized acts of the employees it represents. The failure of the Employer to exercise its right in any instance shall not be deemed a waiver of its right in any other instance.

10

CONFIDENTIAL

## ARTICLE XIII
### PAY PROCEDURE

Laborers are to be paid weekly on the job, during working hours in legal United States currency or may be paid by check.  The Employer shall not withhold more than five (5) working days pay unless mutually agreed upon by both parties. In cases where the delay in delivering the payroll is beyond the Employer's control, the laborers will accept their regular pay at the time of delivery, and sign a time receipt.

When an employee is laid off, he shall be paid immediately.  Should the employee not receive all monies due him within one half (1/2) hour of the designated time of his layoff, and the employer had told the employee to wait for his pay, he shall be entitled to additional compensation for the time he waits at the prescribed basis rate.  The additional money due the employee for waiting or pay correction shall be delivered to the Union hall the following day, or at the employee's request, it may be mailed to his place of resident.

When an employee is discharged, he shall leave the job at the request of the Employer and his paycheck will be mailed to the Union hall after the normal payroll process.    If due to circumstances beyond the employer's control, the employee does not receive monies due at the designated time of discharge, the employee shall leave the job at the request of the employer and monies due shall be forwarded to the union hall.

In the event of payroll errors an employee must notify the Employer within three (3) working days of receipt of the paycheck in order to be subject to the grievance procedure.

Upon voluntary termination, employees must receive pay within (5) five working days of the normal pay period.

## ARTICLE XIV
### UNION REPRESENTATION

Section 1.  Authorized representatives of the Union shall have access to the project, provided they do not interfere with the work of the employees and further provided that such representatives fully comply with the visitor and security rules established for the particular project.

11

CONFIDENTIAL

Section 2. Laborers' Local Union 657 and/or Local 11 shall have the right to refer or designate a working journeyman as a Steward. Such designated Steward shall be a qualified worker performing the work of the craft and shall not exercise any supervisory functions. The Steward shall be concerned with the employees of the Steward's employer and not with the employees of any other employer.

Section 3. Where the Owner's personnel may be working in close proximity to the construction activities, the Union agrees that under any and all conditions Union representatives, Stewards, and individual workmen will not interfere in any manner with the Owner's personnel or with the work which is being performed by the Owner's personnel.

## ARTICLE XV
### SUBCONTRACTING NOTIFICATION

Section 1. The Employer agrees that in order that all monies and payments due to the Funds under this Agreement are properly paid, the Employer will notify the Union of each and all of its subcontractors employing members of the Union on all of its jobs.

## ARTICLE XVI
### GENERAL SAVINGS CLAUSE

If any Article or provision of this Agreement shall be declared invalid, inoperative, or unenforceable by any competent authority of the executive, legislative, judicial or administrative branch of the Federal or any State government, the Employer and the Union shall suspend the operation of such Article or provision during the period of its invalidity and shall substitute by mutual consent, in its place and stead, an Article or provision which will meet the objections to its validity and which will be in accord with the intent and purpose of the Article or provisions in question.

If any Article or provision of this Agreement shall be held invalid, inoperative, or unenforceable by operation of law or by any of the above mentioned tribunals of competent jurisdiction, the remainder of this Agreement or the application of such article or provision to persons or circumstances other than those to which it has been held invalid, inoperative or unenforceable shall not be affected thereby.

12

CONFIDENTIAL

## ARTICLE XVII
### DURATION

This agreement shall be in full force and effect from June 01, 2014 to and including May 31, 2017, and shall continue in full force and effect from year to year thereafter unless written notice of desire to terminate or modify this agreement is served by either party upon the other at least sixty (60) days prior to May 31, 2017, or any subsequent anniversary date thereafter.

Such notice shall be deemed to have been given when properly addressed to the CCC or the Union and deposited into the federal mail service by certified return receipt.

Negotiations shall commence on a new agreement or an agreement containing proposed modifications to this agreement at least forty-five (45) days prior to the termination date of this agreement as set forth in the first paragraph of this Article.

## ARTICLE XVIII
### SIGNATORY CONTRACTORS
Associated Builders, Inc
Buch Construction, Inc.
Helix Construction Services, Inc.
James G. Davis Construction Corporation
Steele Foundation, LLC
Performance Contracting
Tuckman-Barbee Construction Co., Inc.

13

CONFIDENTIAL

## ARTICLE XIX

### ACCEPTANCE OF AGREEMENT

between the CCC, AGC Labor Division, the BWCPE, LDC and The Whiting-Turner Contracting Co.

SIGNED THIS __12__ DAY OF __September__ , 2014.

Baltimore-Washington Construction & Public    Signatory Contractor:
Employees, Laborers' District Council

Signed By: _Orlando A. Bonilla_

Print:
    Orlando A. Bonilla

Title:
    Business Manager

Signed By: _M. Ernst_

Print:
    Michael F. Ernst

Title:
    Senior Vice President

Name of Employer:
    The Whiting-Turner Contracting Co.

City:
    300 E. Joppa Road

Date: __9/15/14__

State & Zip: __Baltimore, MD 21286__

Phone: __410.337.5852__

Date: _____

Construction Contractors Council, Inc. –
AGC Labor Division:

Signed By: _____

Print: _____

Title: _____
Date: _____

14

CONFIDENTIAL

APPENDIX A
## WAGE RATES AND FRINGE BENEFITS
Effective June 15, 2014 - May 31, 2017

| | 06/15/14 | 06/01/15 | 06/01/16 |
|---|---|---|---|
| Building Laborer Rate | $22.28 | * | * |

Work classifications include but are not limited to the following: Potmen, power tool operator, small machine operator, signalmen, laggers, laser beam operator, waterproofer, open caisson, test pit, underpinning, pier hole and ditches, laggers, operator of hand derricks, pipe layers, or tile layers, operators of jackhammers, paving breakers, spaders or any machine that does the same general type work, carpenter tenders, scaffold builders, operators of townmasters, scootcretes, buggymobiles and other machines of similar character, operators of tampers and rammers, and other machines that do the same general type of work, whether powered by air, electric, gasoline, or other types of fuels, builders of trestle scaffolds over one tier high and sand blaster, power and chain saw operators used in cleaning, installers of well point, wagon drill operators, acetylene & other types of burners, licensed powdermen, tool room clerk, water person, stake jumper, demolition; cement finisher, come-along crew, vibrator operators, concrete bucket or hose man, stripping of shored forming, hoisting & rigging, waterproofing, operator of forklifts, hand derricks, sand blasters, chipping of concrete, stripping of all edges, top of slab and bulkhead material, and spreading of gravel; asbestos and lead abatement; concrete laborer

All Journey Worker Laborers must have at least 3,200 hours of experience in the construction industry.

Foreman shall be paid at a rate of $1.50 above the existing journeyman rate.

General Foreman responsible for more than two foremen will receive $2.50/hour above the basic rate of pay.

| | 06/15/14 | 06/01/15 | 06/01/16 |
|---|---|---|---|
| General Laborer Rate | $14.73 | * | * |

General and maintenance cleanup, sweepers, janitors, cleaning of structures prior to the turnover to the owner, material handlers, fire watchmen, flagmen, dumpmen, spotters, landscape laborers, and truck checkers, laying of vapor barrier, removal of reshores, cleaning, stacking, banding & handling of stripped materials, light demolition (drywall walls), spraying concrete (water curing), and water person

### Hazardous Waste Workers Rate

| | 06/15/14 | 06/01/15 | 06/01/16 |
|---|---|---|---|
| Level A | $22.57 | * | * |
| Level B | $20.84 | * | * |
| Level C | $19.95 | * | * |
| Level D | $19.95 | * | * |

### Heavy & Highway Rates

| | 06/15/14 | 06/01/15 | 06/01/16 |
|---|---|---|---|
| Group 1 | $23.30 | * | * |
| Group 2 | $23.68 | * | * |
| Group 3 | $23.88 | * | * |
| Group 4 | $24.07 | * | * |
| Group 5 | $24.58 | * | * |

15

CONFIDENTIAL

| Group 6 | $25.24 | * | * |
| Group 7 | $25.87 | * | * |
| Group 8 | $26.72 | * | * |

Foreman will receive $1.50/hour above the basic rate of pay.

**Group 1**
Carloaders, choker setter, concrete crewman, crushed feeder, demolition laborers, including salvaging all material, loading, cleaning up, wrecking, driller helper, dumpmen, flagmen, fence erector and installer, including installation and erection of fence, guard rails, median rails, reference posts, guide posts and right-of-way markers, from strippers, general laborers, railroad track laborers, riprap man, scale man, stake jumper, structure mover, includes foundation, separation, preparation, cribbing, shoring, jacking and unloading of structures, water nozzleman, timber bucker, and faller, truck loader, water boys, tool room men.

**Group 2**
Combined air and water nozzleman, cement handler, dope pot fireman, non-mechanical, form cleaning machine, mechanical railroad equipment, includes spiker, puller, tie cleaner, tamper, pipe wrapper, power driven wheelbarrows, operators of hand derricks, towmasters, scootcretes, buggymobiles and similar equipment. Tamper or rammer operator, trestle scaffold builders over one tier high. Power tools operator, gas, electric or pneumatic sandblast or gunnite tailhose man, scaffold erector, steel or wood, vibrator operator up to four feet, asphalt cutter, mortarmen, shorer and lagger, creosote material handler, corrosive enamel or equal, paving breaker and jackhammer operator.

**Group 3**
Multi-section pipe layer, non-metallic clay and concrete pipe layer, including caulker, collarman, jointer, rigger and jacker, thermit welder and corrugated metal culvert pipe layer.

**Group 4**
Asphalt block pneumatic cutter, asphalt roller, walker chainsaw operator, with attachment, concrete saw, walking; high scalers, jackhammer operator (using over 6 feet of steel), vibrator operator feet and over, well point installer, air trac operator.

**Group 5**
Asphalt screeder, big drills, cut of the hole drills, 1 ½ inch piston or larger, down the hole drills, 3 ½ inch piston or larger, gunnite or sandblaster nozzleman, asphalt raker, asphalt tamper, from setter, demolition torch operator, shotcrete nozzleman and potman.

**Group 6**
Powderman, master form setters.

**Group 7**
Brick Paver (asphalt block paver, asphalt block sawman, asphalt block grinder, hasting block or similar type).

**Group 8**
Licensed powdermen.

Tunnel Raises and Shaft Rates
(Including Water and Sewer)

| | 06/15/14 | 06/01/15 | 06/01/16 |
| --- | --- | --- | --- |
| Group 1 | $24.15 | * | * |
| Group 2 | $24.91 | * | * |
| Group 3 | $26.85 | * | * |
| Group 4 | $27.68 | * | * |

Foreman will receive $1.50/hour above the basic rate of pay.

16

CONFIDENTIAL

General Foreman responsible for more than two foremen will receive $2.50/hour above the basic rate of pay.

| Group 1 | Brakeman, bull gang, dumper, trackman, concrete man. |
| Group 2 | Chuck tender, powderman in prime house, form setters and movers, nippers, cableman, horseman, groutmen, bell or signalman, top or bottom vibrator operator, caulkers helpers. |
| Group 3 | Miners, rodmen, re-bar underground, concrete or gunnite nozzleman, timberman and re-timberman wood steel including liner plate or any other support, material, motorman, caulkers, diamond drill operators, riggers, cement finishers-underground, welders and burners, shield driver, air trac operator, shotcrete nozzleman and potman. Effective December 11, 1972, the miners shall be paid for work performed in underpinning pits. |
| Group 4 | Mucking machine operator (air) |

<u>Compressed Air Rates</u>

| | 06/15/14 | 06/01/15 | 06/01/16 |
|---|---|---|---|
| 1-14 Pounds (7 Hours work) | $222.79 | * | * |
| 14-18 Pounds (6 Hours Work) | $224.71 | * | * |

<u>Mason Tender Rates</u>

| | | | |
|---|---|---|---|
| Mason tender | $16.31 | * | * |
| Scaffold Builder, Motorman | $17.28 | * | * |

Foreman will be $1.50 over the journeyman level.

**Apprentice Rates**
(no previous work experience)

All entry-level apprentices must work at least 320 hours before they will be enrolled in the Laborers' rate apprentice program at a minimum of 60% of the Master Laborers' rate.

The apprentice wage scale is based on the Journey Worker Laborers' rate and is determined by the accumulation of school and work hours, as follows below:

<u>Apprentice Wage Scale</u>

| Step | School Hours | Work Hours | Percentage |
|---|---|---|---|
| 1 | 144 pr/yr | 0-800 | 60% of Journey Worker |
| 2 | | 801-1600 | 70% of Journey Worker |
| 3 | 144 pr/yr | 1601-2400 | 80% of Journey Worker |
| 4 | | 2401-3200 | 90% of Journey Worker |
| Journey Worker | 288 total | 3201 | 100% of Journey Worker |

17

CONFIDENTIAL

#### Fringe Benefits Contribution

| | Master, Journey Laborers | | Apprentice Laborer | |
|---|---|---|---|---|
| | 06/15/14 | 06/01/15 | 06/15/14 | 06/01/15 |
| Death Benefit | $0.02 | * | $0.02 | * |
| Pension | $2.83 | * | $0.00 | * |
| Health and Welfare | $3.94 | * | $3.94 | * |
| Training | $0.30 | * | $0.30 | * |
| LECET | $0.14 | * | $0.14 | * |
| CCC Industry Fund | $0.19 | * | $0.19 | * |
| Total | $7.42 | TBD | $4.59 | TBD |

#### Annual Increases

The 2% total package increase for 2014 will be effective June 15, 2014.

*2015 Wage Rates and Fringe Benefits will be allocated by the Union 30 days prior to June 1, 2015. The 2015 total package increase will be 2%.

*2016 Wage Rates and Fringe Benefits will be allocated by the Union 30 days prior to June 1, 2016. The 2016 total package increase will be 2%.

*Up to 60 days prior to June 1, 2017, the Employer & the Union will re-open negotiations over wages and benefits.

#### Union Administrative Dues/Voluntary Deductions

Upon presentation of a proper authorization by the individual employee, the Employer agrees to deduct the following, as well as other authorized deductions from the net pay after taxes, and remit same to the appropriate Local Union:

| Union Dues | 5% of Gross Wages |
|---|---|
| MALPL | $0.05 |

The Employer will transmit dues to the Local Union in the manner and at the time established by local practice.

Trust Fund contributions and administrative check-off shall be sent to: Laborers' Trust Funds, Carday & Associates, 7130 Columbia Gateway Drive, Suite A, Columbia, MD 21046.

18

CONFIDENTIAL

# EXHIBIT 5

37-22-000-2

G. W. C. WHITING
(1883-1974)

WILLARD HACKERMAN
(1918-2014)

TIMOTHY J. REGAN
PRESIDENT AND CEO

FOUNDED 1909

## THE WHITING-TURNER CONTRACTING COMPANY

### ENGINEERS AND CONTRACTORS

CONSTRUCTION MANAGEMENT
GENERAL CONTRACTING
DESIGN-BUILD
SPECIALTY CONTRACTING
PRECONSTRUCTION
BUILDING INFORMATION MODELING
INTEGRATED PROJECT DELIVERY

300 EAST JOPPA ROAD
BALTIMORE, MARYLAND 21286
410-821-1100

INSTITUTIONAL
COMMERCIAL
CORPORATE
TECHNOLOGY
INDUSTRIAL PROCESS
INFRASTRUCTURE
SUSTAINABILITY

WRITER'S DIRECT NUMBER IS
410-337-5852

January 25, 2017

**VIA CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**
**PRIVILEGED AND CONFIDENTIAL**

Baltimore/Washington Construction & Public Employees
 Laborers' District Council, LIUNA, Local 657 and Local 11
ATTN Secretary/Treasurer
5201 1st Place NE
Washington, DC 20011

> Re: Termination of Collective Bargaining Agreements between Whiting-Turner and the
>     Baltimore/Washington Construction & Public Employees Laborers' District Council,
>     LIUNA, Local 657 and Local 11

Dear Sir or Madam:

The Whiting-Turner Contracting Company ("Company") is signatory to a labor agreement ("Adoption Agreement") with the Baltimore/Washington Construction & Public Employees Laborers' District Council, LIUNA, Local 657 and Local 11 ("Union") that adopted the terms and conditions of the Agreement Effective: June 01, 2014 Expires May 31 2017 between Construction Contractors Council AGC Labor Division and Baltimore/Washington Construction & Public Employees Laborers' District Council, LIUNA Local 657 and Local 11 ("CCC Agreement"). Any and all such agreements were made pursuant to Section 8(f) of the National Labor Relations Act as the Company has never recognized the Union as a majority representative of its employees pursuant to Section 9(a).

The Company is not renewing its Adoption Agreement with the Union and terminates its current labor agreement and any and all other agreements, understandings and obligations with the Union as of May 31, 2017. The Company is repudiating and terminating all bargaining relationships with the Union effective as of May 31, 2017.

In addition, Whiting-Turner has not delegated its bargaining authority to any multi-employer association, including the Construction Contractors Council AGC Labor Division. The Company is neither signatory to the CCC Agreement nor has it ever agreed to become a member of any multi-employer collective bargaining unit as may be established by the CCC Agreement between the Union and any multi-employer association. Therefore is not now, nor ever has it ever been a member of any multi-employer collective bargaining unit as established by any agreement between the Union and a multi-employer bargaining association. If you contend that Whiting-Turner has an agreement or has delegated its bargaining authority to any multi-employer association or other third

WWW.WHITING-TURNER.COM



OFFICES NATIONWIDE

party, this letter also serves to revoke such delegation of bargaining authority. Accordingly, Whiting-Turner will not be bound to any negotiations, re-negotiations, amendment, extension or renewal of any agreements negotiated by the Union and any multi-employer association.

    If you have any questions, please contact me.

                Sincerely,

          THE WHITING–TURNER CONTRACTING COMPANY

          Michael F. Ernst
          Senior Vice President

cc:    Federal Mediation and Conciliation Service (via Certified Mail)
        Dennis Desmond, Business Manager (via Certified Mail)



# EXHIBIT 6



Deposition of:

# Michael Ernst

*June 23, 2021*

In the Matter of:

# Laborers Pension Fund of Washington DC vs. Turner

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

1    jurisdiction.

2           It's up to the subcontractor who we

3    subcontract the work to if we -- if we -- if and when

4    we -- we subcontract work to a sub, as a part of their

5    scope of work, they are responsible for doing all of

6    their own cleanup, et cetera, which could be construed

7    laborers work.

8       Q.   Okay.  So just to be clear, it's your

9    testimony that no Whiting-Turner employee has

10   performed any laborer jurisdictional work.  All of

11   that has been subcontracted out.

12          Is that your testimony here today?

13      A.   That is my testimony.

14      Q.   And how is it that you know that to be a

15   fact?

16      A.   'Cause we don't have any hourly people

17   working for us in the D.C. marketplace.

18      Q.   I just want to be clear.  Is it your

19   understanding that after the termination of the

20   collective bargaining agreement with the laborers that

21   we just went through that no Whiting-Turner employee

22   could perform any laborer jurisdictional work included

23   in the building laborer and general laborer

24   descriptions that we went through?

25          Is that your understanding?

```
 1          calls for speculation.
 2                  MR. ROSE:  That's correct.
 3                  And I am asking you to speculate,
 4          Mr. Ernst.
 5                  Lisa, please read the question again.
 6                  THE COURT REPORTER:  Yes, sir.
 7                          (Read back.)
 8                  THE WITNESS:  It's not inconceivable.
 9      BY MR. ROSE:
10          Q.   What would you expect the project manager on
11      such a site to do in such an instance?
12                  MR. OSSI:  Again, calls for speculation.
13                  MR. ROSE:  It does.
14                  I am specifically asking you to speculate.
15                  What would you do, Mr. Ernst, under those
16          circumstances?
17                  THE WITNESS:  Under those circumstances I
18          am sure, if I was the person running the job, I
19          would call another subcontractor to come in and
20          perform that work.
21      BY MR. ROSE:
22          Q.   And let's say it's four o'clock at a
23      construction site in Washington, D.C., and there's no
24      laborers subcontractor on the site and laborer
25      jurisdictional work needs to be done, what would you
```

Page 142

```
 1    expect of a project manager who works for you to do in
 2    that instance?
 3         A.    Pick up the phone and find somebody who can
 4    do it.
 5         Q.    And if they can't, what would you expect
 6    them to do?
 7         A.    I have never come across an instance when we
 8    could not man a job.
 9         Q.    Okay.  So just to be clear, if, in fact, a
10    contractor who had entered into, let's say, a short
11    form contract like the kind we just looked at, did not
12    show up, would the project manager on such a site have
13    to get another subcon- -- short form subcontract
14    entered into to get that other subcontractor on the
15    job?
16         A.    Hypothetically, yes.
17         Q.    Why hypothetically?
18         A.    Because he may already be under contract
19    with us on another job so we could give them a change
20    order.
21         Q.    Okay.  So a change order would have to be
22    created; is that correct?
23         A.    That's fair.
24         Q.    Okay.  So there would be some administrative
25    work involved for the project manager to do that --
```

# EXHIBIT 7

Page 1

1              AMERICAN ARBITRATION ASSOCIATION

2         ------------------------------:

      WHITING-TURNER CONTRACTING      :

3         COMPANY                         :

                                      :

4                   Claimant           :

                                      :

5              vs.                     : Case No.:

                                      : 01-18-0003-5360

6         LABORERS' DISTRICT COUNCIL    :

      PENSION & DISABILITY TRUST     :

7         FUND NO. 2, et al.             :

                                      :

8                   Respondent         :

      ------------------------------:

9

10

11              DEPOSITION OF ARCH JAMIESON

12

13       DATE:            February 26, 2021

14       TIME:            10:46 a.m.

15       LOCATION:        Fort Myers, Florida

16       REPORTED BY:     Shari R. Broussard, RPR, CSR
                          Reporter, Notary

17

18

19

20

21              Capital Reporting Company
            1250 Eye Street, NW, Suite 350
22              Washington, D.C. 20005

Page 66

1    required after this date, but our current plan is

2    to get support staff from Commercial Interiors,

3    Inc. as needed."

4              Do you see that?

5         A    Yes.

6         Q    Do you know whether or not that plan was

7    actually executed?

8         A    I believe that it was.

9         Q    Why do you say that?

10        A    Because I was in the loop on all that to

11   make sure that -- that people would terminate

12   their -- their laborers and that if there were any

13   services required after that date, that they would

14   contract out -- that out to subcontractors.

15        Q    Okay.  So just so I'm clear from what

16   your answer is, it's your understanding that no

17   direct hire of Whiting-Turner could perform any of

18   the work on a job site of the jurisdictional work

19   we just went through in the Collective Bargaining

20   Agreements; is that correct?

21        A    Absolutely correct.  They could not --

22   no other jurisdiction could do that work.

# EXHIBIT 8

Page 1

1          IN THE MATTER OF THE ARBITRATION BEFORE

             THE AMERICAN ARBITRATION ASSOCIATION

2                Case No. 01-18-0003-5360

    --------------------------------x

3   WHITING-TURNER CONTRACTING          :

4   COMPANY,                            :

5          Claimant,                    :

6   vs.                                 : Case No.

7   LABORERS' DISTRICT COUNCIL          : 01-18-0003-5360

8   PENSION & DISABILITY TRUST          :

9   FUND NO. 2,                         :

10         Respondent.                  :

11  --------------------------------x

12     VIDEO CONFERENCE DEPOSITION OF MICHAEL ERNST

13  DATE:          MONDAY, MARCH 14, 2022

14  TIME:          9:30 A.M.

15  LOCATION:      WHITING-TURNER CONTRACTING

16                 COMPANY

17                 300 EAST JOPPA ROAD

18                 TOWSON, MARYLAND  21286

19  REPORTED BY:  SUZANNE MARIE ALONA ENDERSON

                   Reporter, Notary

20              Veritext Legal Solutions

             1250 Eye Street, NW, Suite 350

21               Washington, D.C.  20005

Page 259

1    individual.  After this.  Okay.  Slowly, slowly.

2    That's good.  Let's go back a second with the hand

3    tool.  There we go.

4    BY MR. ROSE:

5         Q    Mr. Ernst, you've just seen this exhibit.

6              MR. ROSE:  What exhibit are we up to,

7    Clint?  17?

8              VERITEXT CONCIERGE:  We are on 17.

9    BY MR. ROSE:

10        Q    This is video clip Exhibit 17.  If this

11   was a Whiting-Turner employee, were they

12   performing laborers' jurisdictional work under

13   Appendix A of the CBA you negotiated and executed?

14        A    If this was a Whiting-Turner employee, he

15   was performing work under the jurisdiction of the

16   laborers' work for under one minute or a minute

17   and a half.

18        Q    I didn't ask how long.  It doesn't

19   matter.  There's no de minimis exception under the

20   principles of the Foundations of Excellence.

21   Isn't that a fact?

Page 260

1      A    My testimony was that he performed it for

2   a minute to a minute and a half.  There's --

3      Q    I asked a different question.  Isn't it a

4   fact under the Foundations of Excellent, there's

5   absolutely no exception?

6      A    That's correct.

7           MR. ROSE:  Thank you.  We're going to

8   take a five-minute break and see what else we

9   have.

10          (A recess was taken from 5:00 p.m. to

11   5:07 p.m.)

12          MR. ROSE:  Mr. Ernst, thank you very much

13   for your testimony today.  I greatly appreciate

14   your cooperation.  And I have no further questions

15   at this time.

16          MR. OSSI:  We have no questions.  He'll

17   read and sign.

18          (Signature not waived.)

19          (Whereupon, at 5:08 p.m., the

20          proceedings were concluded.)

21                    *     *     *     *

# EXHIBIT 9

## IN THE MATTER OF ARBITRATION BEFORE
## THE AMERICAN ARBITRATION ASSOCIATION

WHITING-TURNER CONTRACTING
COMPANY,

                Employer,

   v.

LABORERS' DISTRICT COUNCIL
PENSION & DISABILITY TRUST FUND
NO. 2,

                Fund.

AAA Case No. 01-18-0003-5360

Arbitrator: Ira F. Jaffe

## JOINT STIPULATIONS

1. Documents[1] produced to a party to this action by another party or a third party in response to compulsory process (i.e., subpoena) or a document request served upon a party in the course of discovery shall be deemed authentic for the purposes of this arbitration only, absent good cause. Good cause would include issues relating to the completeness of the document (e.g., missing or incomplete pages) or any conditions in the actual document or the manner in which it was produced that brings into question whether the document was actually generated by the relevant party or third-party. To the extent a document would be considered authentic and admissible under this stipulation, both parties retain the right to argue that a particular document contains hearsay within hearsay that is not admissible.

**Relevant Parties**

2. Whiting-Turner Contracting Company ("Whiting-Turner") is a construction company incorporated and headquartered in the state of Maryland.

3. Laborers' District Council Pension & Disability Trust Fund No. 2 (the "Fund") is a multiemployer pension plan located in Columbia, Maryland. A true and correct copy of the plan documents are provided as the Parties' Joint Exhibit No. 1.

4. The Fund primarily covers employees in the building and construction industry.

5. The Baltimore/Washington Construction & Public Employees Laborers' District Council, LIUNA Local 657 and Local 11 ("Union") is an unincorporated labor union.

---

[1] For the purposes of these stipulations, "Documents" does not include videos, still images, or photographs.

1

6. Substantially all the employees of Whiting-Turner with respect to whom the employer had an obligation to contribute under the Fund performed work in the building and construction industry.

**Collective Bargaining Agreements**

7. Whiting-Turner was a party to Collective Bargaining Agreements with the Laborers' District Council of Washington D.C., and its successor, the Baltimore/Washington Laborers' District Council, and its Locals, Local 657 and Local 11.

8. The Laborer's District Council Pension & Disability Trust Fund, No 2. (the "Fund") is a third-party beneficiary under the Collective Bargaining Agreements between Whiting-Turner and the Laborers' District Council of Washington D.C., and its successor, the Baltimore/Washington Laborers' District Council, and its Locals, Local 657 and Local 11.

9. Michael Ernst, on behalf of Whiting-Turner, negotiated and executed the Collective Bargaining Agreement with the Laborers effective June 01, 2014, through May 31, 2017 (hereinafter the "CBA").

10. Prior to June 1, 2017, Whiting-Turner employed members of the Union ("Laborers") pursuant to a labor agreement entered into under Section 8(f) of the National Labor Relations Act.

   a. A true and correct copy of the agreement effective September 5, 2011 through May 31, 2014 ("2011 CBA") is provided as the Parties' Joint Exhibit No. 3.

   b. A true and correct copy of the agreement effective June 1, 2014 through May 31, 2017 ("2014 CBA") is provided as the Parties' Joint Exhibit No. 4.

11. The Union's geographic jurisdiction was defined in Article III of the relevant agreements.

12. The following Whiting-Turner Projects are located in Washington, D.C.: CUA Energy Project located at Catholic University, City Ridge, Ingleside at Rock Creek Creekside, 1701 Rhode Island Ave at the intersection of 17th St NW and Rhode Island Ave NW, East Capitol St. & 42nd St NE, Riggs Hotel, Kennedy Center, and American University Hall of Sciences project.

13. Whiting-Turner Projects in Washington D.C. were within the geographic jurisdiction of the CBA.

14. The following Whiting-Turner Projects are located in Alexandria, VA: Sunrise Senior Living Old Town at 400 N. Washington St., the project at N. Henry St., The Array @ West Alex (also called Gateway).

15. Whiting-Turner Projects in Alexandria, VA were covered by the geographic jurisdiction of the CBA.

16. Whiting-Turner's West Rosslyn Project is located at 1555 Wilson Blvd in Arlington County, Virginia.

17. Whiting-Turner Projects in Arlington County, VA were covered by the geographic jurisdiction of the CBA.

18. Whiting Turner's Brendan Iribe Center job site is part of the University of Maryland, located in the city of College Park, Maryland in Prince George's County.

19. Whiting-Turner Projects in Prince George's County, Maryland fell within the geographic jurisdiction of the CBA.

20. Whiting-Turner's Suburban Hospital job site is located in Bethesda, Maryland in Montgomery County.

21. Whiting-Turner job sites in Montgomery County, Maryland fell within by the geographic jurisdiction of the CBA.

22. The Union's trade work jurisdiction was defined in Appendix A of the relevant agreements.

23. The jobs listed under the Building Laborer rate of Appendix A of the CBA are all work that falls within Laborers' jurisdictional work.

24. The jobs listed under the General Laborer rate of Appendix A of the CBA are all work that falls within Laborers' jurisdictional work.

25. Flagging is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

26. Signaling is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

27. Sweeping is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

28. Moving materials is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

29. Clean up and cleaning are jobs that fall within Laborers' jurisdictional work pursuant to Appendix A of the CBA.

30. Installing signs is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

31. Refastening the gate of a stake body truck is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

32. Spotting is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

**Whiting-Turner Operations**

33. In February and March 2017, Whiting-Turner employed members of the Union ("Laborers") in the geographic jurisdiction of the 2014 CBA. The Laborers were responsible for performing jobs described in Joint Stipulations Nos. 25 – 32 at Whiting-Turner jobsites in the geographic jurisdiction of the 2014 CBA.

34. Whiting-Turner has continued to perform construction services in the geographic jurisdiction of the 2014 CBA since May 31, 2017.

**The Abrogation**

35. On January 25, 2017, Whiting-Turner sent a letter to the Union stating that Whiting-Turner intended to abrogate the 2014 CBA effective upon its expiration on May 31, 2017. A true and correct copy of the letter is provided as Parties' Joint Exhibit No. 5.

36. On January 31, 2017, the Fund sent a letter to Whiting-Turner stating the Fund "will issue an official letter of notification of withdrawal." A true and correct copy of the letter is provided as Parties' Joint Exhibit No. 6.

37. After May 31st, 2017, no Whiting-Turner employees, including salaried employees or hourly employees, were permitted to perform Laborers' jurisdictional work.

38. After May 31st, 2017, Whiting-Turner employees did not possess flagging certifications issued by Maryland, Virginia, or Washington D.C.

39. Whiting-Turner's 30(b)(6) witness testified under oath that the only actions taken by Whiting-Turner to ensure that its employees knew that no Whiting-Turner employee could perform any laborers' jurisdictional work following the expiration of the CBA was the call with Whiting-Turner employees at project sites still employing laborers occurring prior to March 1st, 2017, and the email from Kim Holland on March 1, 2017.

40. After March 2017, Whiting-Turner executives based in the corporate office did not schedule or have any calls, or send or otherwise issue any written notifications, to ensure that Whiting-Turner was not performing any laborers' jurisdictional work within the geographic scope of the CBA after the expiration of the CBA.

41. It is Whiting-Turner's policy that all general conditions work (i.e. safety, clean-up, etc.) that is not subject to a pre-existing collective bargaining agreement must be performed by a subcontractor or another independent labor contracting company under a Whiting-Turner subcontract form (short form or long form, as appropriate) which includes a scope of work and a requirement to provide full-time supervision, direction and control of their workforce.

42. Whiting-Turner's 30(b)(6) witness testified that Whiting-Turner's policy under the Foundations of Excellence is to have "any general conditions and laborer-type work to either be subcontracted by subcontractors and/or by third-party laborer services." Whiting-Turner's Subcontracts and Purchase Orders Corporate Policies, contained in the Foundations of Excellence are Whiting-Turner policies that employees are required to follow and is provided as Parties' Joint Exhibit No. 10.

43. Whiting-Turner's 30(b)(6) witness testified under oath that Whiting-Turner's Subcontracts and Purchase Orders Corporate Policies contained in the Foundations of Excellence provides no exceptions to the requirement that general conditions work must be performed by a subcontractor or an independent labor contracting company.

44. There is no written Whiting-Turner policy that states any exceptions permitting a Whiting-Turner employee to perform Laborers' work following the expiration of the CBA.


**The Withdrawal Liability Assessment**

45. The Fund assessed Whiting-Turner for withdrawal liability on January 30, 2018 in the amount of $4,129,147. The assessment set a payment schedule of 69 quarterly payments of $99,453 plus one final payment of $14,919. A true and correct copy of the assessment is provided as Parties' Joint Exhibit No.7 .

46. The Fund and its enrolled actuary calculated Whiting-Turner's withdrawal liability using the Segal Blend method. Specifically, the Segal Blend method was used to determine the interest rate assumption used to calculate the Fund's unfunded vested benefits.

47. As of March 18, 2022, Whiting-Turner has made sixteen quarterly payments to the Fund totaling $1,591,248.

48. Whiting-Turner timely requested review of the withdrawal liability assessment on April 27, 2018. A true and correct copy of the request for review is provided as Parties' Joint Exhibit No. 8.

49. The Fund sent a response to Whiting-Turner's request for review on July 24, 2018. A true and correct copy of the response is submitted as Joint Exhibit No. 9.

50. Whiting-Turner timely initiated this arbitration.


**Whiting-Turner Employees**

51. Jason Marchetti began working for Whiting-Turner as a salaried Field Engineer in July 2017 and currently is employed by Whiting-Turner as a salaried Superintendent.

52. Jason Marchetti worked as a Whiting-Turner employee at the Catholic University project site after the expiration of the CBA.

53. Kyle Jennings began working for Whiting-Turner in November 2013 as a salaried Field Engineer and is currently employed by Whiting-Turner as a salaried Superintendent.

54. Mr. Jennings worked as a Whiting-Turner employee at the West Rosslyn project site after the expiration of the CBA.

55. Nick Carneglia is a former salaried Whiting-Turner employee who worked at the Catholic University project site after the expiration of the CBA.

56. Jake Gallagher is currently a salaried employee of Whiting-Turner who worked at the West Rosslyn project site after the expiration of the CBA.

57. Jim Morton is a former salaried employee of Whiting-Turner.

58. Rob Ferrara began working for Whiting-Turner in June 2016 as a salaried Project Engineer. He is currently employed in a salaried position at Whiting-Turner.

59. Rob Ferrara worked as a Whiting-Turner employee at Whiting-Turner's Gateway project site before and after the expiration of the CBA.

60. Kevin Higgins is a former salaried employee of Whiting-Turner.

**Sworn Testimony**

61. Jason Marchetti testified under oath that he installed a sign on a fence at the Catholic University project site after the expiration of the CBA.

62. Jason Marchetti testified under oath that installing signs is a task that falls within Laborers' jurisdictional work.

63. Jason Marchetti testified under oath that he has unloaded a truck on a Whiting-Turner project site.

64. Jason Marchetti testified under oath that he refastened the gate of a stake body truck.

65. Jason Marchetti testified under oath that the video file WT006 shows Nick Carneglia using a crowbar at Whiting-Turner's Catholic University project site.

66. Jason Marchetti testified under oath that using a crowbar would be a task for a Laborer.

67. Rob Ferrara testified under oath that the video file WT047 shows a person flagging and signaling, and that signaling and flagging are Laborers' jurisdictional work.

68. Kyle Jennings testified under oath that the video file WT047 shows a person holding a "slow" sign for the purpose of controlling traffic and that controlling traffic is a general Laborers' job.

69. Kyle Jennings testified under oath that the video file WT125 shows an individual in a Whiting-Turner yellow vest waving a truck back and that this task is general Laborers' jurisdictional work.

70. Rob Ferrara testified under oath that the video file WT105 shows an individual signaling and that signaling is Laborers' jurisdictional work.

71. Kyle Jennings testified under oath that the video file WT105 shows an individual escorting a truck out of a site and that this task is general Laborers' jurisdictional work.

72. Kyle Jennings testified under oath that the video file WT015 shows a person wearing Whiting-Turner yellow vest backing up a truck and that task falls within general laborers' work.

73. Rob Ferrara testified under oath that the video file 20191031_120216 shows a person wearing Whiting-Turner PPE moving materials and that moving materials on a jobsite is general Laborers' work.

74. Rob Ferrara testified under oath that the video file 20200709_135455 shows a person helping signal and that signaling is general Laborers' work.

75. Kevin Higgins testified under oath that the video file 20210513_121926 shows a person wearing Whiting-Turner PPE guiding a truck which is Laborers' jurisdictional work.

76. Whiting-Turner's 30(b)(6) witness testified under oath that salaried employees are not allowed to perform the responsibility of cleanup and cleaning on Whiting-Turner project sites.

77. Whiting-Turner's 30(b)(6) witness testified under oath that in the video file WT172 a "person is sweeping, which is jurisdictional work of the laborers under the CBA."

# EXHIBIT 10

In the Matter of Arbitration:

WHITING-TURNER CONSTRUCTION COMPANY | 

                         and | AAA Case No. 01-18-0003-5360

| 

LABORERS DISTRICT COUNCIL PENSION | Withdrawal Liability
AND DISABILITY TRUST FUND NO. 2 | 

| 

Before: Ira F. Jaffe, Esq., Impartial Arbitrator

APPEARANCES:

    For the Employer:

        Gregory J. Ossi, Esq.
        Christopher R. Williams, Esq.
        (Faegre Drinker Biddle & Reath LLP)

    For the Fund:

        Jonathan G. Rose, Esq.
        R. Blake Crohan, Esq.
        Ellie Studdard, Esq.
        (Alston & Bird LLP)

## **BACKGROUND**

The arbitration in this matter arises under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") amendments to the Employee Retirement Income Security Act ("ERISA") and concerns a challenge to an assessment of withdrawal liability issued by the Laborers' District Council Pension & Disability Trust Fund No. 2 ("Fund") to Whiting-Turner Construction Company ("Company" or "Employer" or "Whiting-Turner").

Arbitration hearings were held on April 11, 12, 13, and 14, 2022, and on May 3, 2022. Thereafter, the Parties filed post-hearing briefs and reply briefs, the last of which was received on August 22, 2022. The Parties waived the time limits applicable to the issuance of the ruling

Case 1:24-cv-02525-RFR Document 10-1 Filed 08/02/24 Page 140 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund    Page 2 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

in this matter.

<u>The Notice and Demand for Withdrawal Liability</u>

The Fund issued a Notice and Demand for withdrawal liability on January 30, 2018 ("Demand"), asserting that the Employer had completely withdrawn from the Fund, effective May 31, 2017, when its collective bargaining agreements with Laborers International Union of North America ("Laborers Union" or "LIUNA" or "Union"), Baltimore/Washington Construction and Public Employees Laborers' District Council ("District Council"), Local Unions 11 and 657, terminated. With the termination of those Agreements, the Employer no longer had an obligation to contribute to the Fund. The Fund demanded withdrawal liability based upon the unfunded vested benefits liabilities of the Fund as of December 31, 2016 – the end of the Plan Year immediately preceding the date of the claimed withdrawal. The Demand claimed withdrawal liability in the amount of $4,129,147 payable as a lump sum or in the form of 69 quarterly payments of $99,453, and a final payment of $14,919. The payment schedule was based upon the provisions of Section 4219 of ERISA and used a 7.25% interest rate – the rate used by the Fund in 2016 for funding purposes.

The Employer timely filed a Request for Review on April 27, 2018. In the Request for Review, the Employer asserted only two challenges to the Demand: 1) that the "construction industry" provisions of Section 4203(b) of ERISA precluded the Fund from determining that a complete withdrawal had occurred; if this assertion is correct, then no withdrawal liability would be due from the Employer as a result of its April 2017 cessation of contributions; and 2) a challenge to the calculation of the withdrawal liability related to a challenge to the Fund Actuary's use of the "Segal blend" interest rate assumption to determine the unfunded vested benefits liabilities of the Fund for withdrawal liability purposes.

Case 1:24-cv-02254-RRR  Document 10-10  Filed 08/02/24  Page 141 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 3 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

On July 24, 2018, the Fund issued a Response to the Request for Review rejecting both contentions of the Employer.  The rejection of the Section 4203(b) claim was based in the Fund's determination that the Employer continued to perform covered work in the jurisdiction of the collective bargaining agreement for which contributions were due under the collective bargaining agreement after the Employer's obligation to contribute to the Fund ceased.  The rejection of the challenge to the Segal blend was based upon the assertion that the assumptions used by the Fund Actuary, including the interest rate assumption, represented the best estimate of anticipated experience under the Fund and further that there was no showing sufficient to overturn the presumption of correctness set forth in Section 4221(a)(3)(A) of ERISA.  The Fund also noted that the selection of the interest rate was properly the province of the Fund Actuary and that the Trustees are not permitted to direct the Fund Actuary to use a particular interest rate.

On September 20, 2018, the Employer timely filed its Notice of Intent to Arbitrate.  Thereafter, the undersigned was selected by the Parties to serve as Impartial Arbitrator.  There are no issues of arbitrability and the Parties are in agreement that the underlying dispute is presented for decision on the merits.

Relevant Provisions of MPPAA

Section 4203 of ERISA, 29 U.S.C. § 1383, Complete withdrawal, provides in pertinent part that:

> (a) Determinative factors. For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer  –
>
> > (1) permanently ceases to have an obligation to contribute under the plan, or
> >
> > (2) permanently ceases all covered operations under the plan.
>
> (b) Building and construction industry.
>
> (1) Notwithstanding subsection (a), in the case of an employer that has an obligation to contribute under a plan for work performed in the building and construction industry, a complete withdrawal occurs only as described in paragraph (2), if –

(A) substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry, and

(B) the plan –

(i) primarily covers employees in the building and construction industry, or

(ii) is amended to provide that this subsection applies to employers described in this paragraph.

(2) A withdrawal occurs under this paragraph if –

(A) an employer ceases to have an obligation to contribute under the plan, and

(B) the employer –

(i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or

(ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

. . .

Section 4213 of MPPAA, 29 U.S.C. §1393, _Actuarial assumptions_, provides in its

entirety that:

(a) Use by plan actuary in determining unfunded vested benefits of a plan for computing withdrawal liability of employer.  The corporation may prescribe by regulation actuarial assumptions which may be used by a plan actuary in determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability under this part. Withdrawal liability under this part shall be determined by each plan on the basis of –

(1) actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan, or

(2) actuarial assumptions and methods set forth in the corporation's regulations for purposes of determining an employer's withdrawal liability.

(b) Factors determinative of unfunded vested benefits of plan for computing withdrawal liability of employer.  In determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability under this part, the plan actuary may –

(1) rely on the most recent complete actuarial valuation used for purposes of section 412 of the Internal Revenue Code of 1986 [26 USCS § 412] and reasonable estimates for the interim years of the unfunded vested benefits, and

(2) in the absence of complete data, rely on the data available or on data secured by a sampling which can reasonably be expected to be representative of the

status of the entire plan.

(c) Determination of amount of unfunded vested benefits.  For purposes of this part, the term "unfunded vested benefits" means with respect to a plan, an amount equal to –

    (A) the value of nonforfeitable benefits under the plan, less

    (B) the value of the assets of the plan.

Section 4221 of MPPAA, 29 U.S.C. §1401, <u>Resolution of disputes</u>, provides in pertinent part that:

(a) Arbitration proceedings; matters subject to arbitration, procedures applicable, etc.

. . .

    (2) An arbitration proceeding under this section shall be conducted in accordance with fair and equitable procedures to be promulgated by the corporation. The plan sponsor may purchase insurance to cover potential liability of the arbitrator. If the parties have not provided for the costs of the arbitration, including arbitrator's fees, by agreement, the arbitrator shall assess such fees. The arbitrator may also award reasonable attorney's fees.

    (3) (A) For purposes of any proceeding under this section, any determination made by a plan sponsor under sections 4201 through 4219 and section 4225 [29 USCS §§ 1381 - 1399 and 1405] is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

    (B) In the case of the determination of a plan's unfunded vested benefits for a plan year, the determination is presumed correct unless a party contesting the determination shows by a preponderance of evidence that –

        (i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or

        (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.

The PBGC Regulations governing MPPAA Arbitrations provide in pertinent part, at 29 C.F.R. §4221.10, <u>Costs</u>, that:

The costs of arbitration under this part shall be borne by the parties as follows:

(a) Witnesses. Each party to the dispute shall bear the costs of its own witnesses.

(b) Other costs of arbitration. Except as provided in § 4221.6(d) with respect to a transcript of the hearing, the parties shall bear the other costs of the arbitration proceedings equally unless the arbitrator determines otherwise. The parties may, however, agree to a different allocation of costs if their agreement is entered into after the employer has received notice of the plan's assessment of withdrawal liability.

Case 1:24-cv-02254-RER Document 1-10 Filed 08/02/24 Page 144 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund    Page 6 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

(c) Attorneys' fees. The arbitrator may require a party that initiates or contests an arbitration in bad faith or engages in dilatory, harassing, or other improper conduct during the course of the arbitration to pay reasonable attorneys' fees of other parties.

These provisions are binding in arbitrations conducted under the AAA Rules pursuant to 29 C.F.R. §4221.14(b)(5) as well as in arbitrations conducted under the PBGC Regulations.

There is no dispute that the Fund is a construction industry fund. Nor was there any dispute that substantially all of the employees of the Company for whom it was obligated to contribute to the Fund worked in the building and construction industry. The crux of the Parties' dispute in this case concerns the Fund's contention that the Company did not otherwise meet the conditions set forth in Section 4203(b) of ERISA to qualify for the building and construction industry exemption. Pursuant to Section 4203(b), a building and construction industry employer who ceases to have the obligation to contribute to the Fund is not deemed to have had a complete withdrawal triggering withdrawal liability unless that employer also continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption. The Fund maintained that the Employer continued to perform Laborer-type work after May 31, 2017 and, therefore, was not eligible for the Section 4203(b) exemption. The Employer maintained, to the contrary, that the limited work performed by supervisory and/or managerial employees and that the work performed by subcontractors did not constitute work in the jurisdiction of the collective bargaining agreement of the type that would have led to an obligation by the Employer to contribute to the Fund under the terms of the 2014 Agreement.

Case 24-cv-02254-RRR Document 10-10 Filed 08/02/24 Page 145 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund        Page 7 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

<u>Collective Bargaining between the Employer and the Union and Relevant Provisions in the
Parties' Agreements Regarding Subcontracting and Work Jurisdiction</u>

The Employer is a large, multi-billion dollar construction employer with projects in many

different markets, including the D.C. market.  The Company signed the June 1, 2006 through

May 31, 2008 Agreement ("2006-08 Agreement") between the Construction Contractors Council

AGC Labor Division ("CCC") and the Baltimore/Washington Laborers' District Council Local

657 and Local 11 ("District Council").  Article III of the 2006-08 Agreement identified the

Scope of Agreement as "all projects in the vicinity of Washington DC and the counties of Prince

Georges, Montgomery, Charles, Calvert, and St. Mary's in the State of Maryland and the

counties of Fauquier, Loudoun, Warren, Culpepper, Stafford, Spottsylvania, Caroline, Essex,

Green, Orange, Frederick, Clark, Fairfax, Arlington, Alexandria, Shenandoah, Page,

Rappahannock, Rockingham, Madison, King George, Westmoreland, and Prince William in the

state of Virginia."  The geographic scope of subsequent Agreements entered into between the

District Council and the Employer remained unchanged in the subsequent collective bargaining

agreements.  There is no dispute that the collective bargaining agreements signed by the

Employer with the Union were Section 8(f) agreements under the National Labor Relations Act

("NLRA").

The Employer has been a signatory to collective bargaining agreements with the District

Council and Locals 657 and 11, LIUNA, for a number of years.  Copies of the Parties' 2006-08

Agreement ("2006 Agreement"), 2011-14 Agreement ("2011 Agreement"), and 2014-17

Agreement ("2014 Agreement" or "Agreement") were introduced.  After the 2006 Agreement,

but prior to the 2011 Agreement, the Employer withdrew from the CCC and bargained stand-

alone collective bargaining agreements with the Union.  Those stand-alone collective bargaining

agreements, however, consisted largely of the CCC collective bargaining agreement that had

Case 1:24-cv-02250-RFR Document 11-10 Filed 08/02/24 Page 146 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund      Page 8 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

been negotiated with the Union, with a modest number of changes. One of the areas that the

Employer negotiated change was with respect to the subcontracting language in 2011 and 2014

Agreements.

Article. XI, <u>General Working Conditions</u>, of the 2006 Agreement provided in pertinent

part that:

> Section 2. The Local Union shall not coerce or in any way interfere with the Owner's personnel, operation or facilities at the project site. The Owner's right to contract directly with other companies for work at the project site shall not be limited, and the Union shall cooperate and not interfere with that Owner's operations.

Article XV, <u>Subcontracting</u>, of the 2006 Agreement provided in its entirety that:

> Section 1. On any site of construction, alteration, or repair of a building, structure or other work, an Employer may not sublet, assign or otherwise contract or subcontract out any work which is covered by this Agreement to any person, firm, corporation, contractor, employer or association which is not signatory to this agreement, except as set forth in this article.
>
> On occasion, when considering whether or not to undertake certain kinds of work, an Employer may not be able to find a contractor who is signatory to this Agreement who is ready and able to perform this work for that Employer or who is able to perform the work at a lower price than a nonsignatory contractor.
>
> In order to induce Employers who are represented by the Union under this Agreement to seek and acquire work, an Employer may subcontract work otherwise covered by this Agreement to contractors who are not signatory to this Agreement, under either of the following conditions:
>
> (a) When the work is not usually performed by that Employer; or
>
> (b) The Employer attempted to assign the work to one or more subcontractors who are signatory to this Agreement and no qualified signatory subcontractor was ready and able to perform the work in question at a lower price than that offered by a non-signatory contractor.
>
> (c) An Employer involved must notify the Union and be able to demonstrate that in fact no qualified subcontractor who is signatory to this Agreement is ready and able to perform the work in question.
>
> (d) In addition, the effect of the assignment of work to a non-signatory subcontractor shall not deplete the amount of work routinely performed by an Employer under this Agreement.
>
> (e) In all other respects the other terms of this Article shall apply.

The 2011 Agreement continued the language of Article XI, Section 2, without change.

The provisions of Article XV, <u>Subcontracting</u>, of the 2011 Agreement however, changed

materially from the 2006 Agreement and deleted subparagraphs b) and c). In all other respects,

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 147 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 9 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

the provisions of Article XV in the 2011 Agreement mirrored that of the 2006 Agreement.

Michael F. Ernst, Executive Vice-President, whose areas of responsibility include labor relations,

testified that he bargained those changes with the Union and that their effect was that the

Company was free to subcontract Laborer work to non-union subcontractors if they were able to

perform the work for lower cost than a signatory subcontractor.  The Company signed the 2011

Agreement with these changes to Article XV on March 7, 2013.

The 2014 Agreement included additional bargained-for changes to the Subcontracting

language of the Agreement.  Article XI, Section 2, continued without change from the prior

Agreements.  Article XV was again substantially changed.  It was renamed <u>Subcontracting

Notification</u>, and provided in its entirety that:

> Section l. The Employer agrees that in order that all monies and payments due to the Funds under
> this Agreement are properly paid, the Employer will notify the Union of each and all of its
> subcontractors employing members of the Union on all of its jobs.

Thus, the substantive limitations contained in Article XV of the prior Agreements upon the

Company's right to contract out work were eliminated in its entirety.

In addition to the provisions regarding subcontracting set forth above, the 2006, 2011,

and 2014 Agreements contained the following language in Article X addressing <u>Jurisdictional

Disputes</u>:

ARTICLE X<br>JURISDICTIONAL DISPUTES

> Section 1. There will be no strikes, no work stoppages or slowdowns, or other interferences with
> the work because of jurisdictional disputes.

> Section 2. Project conditions do not always justify strict adherence to craft lines which in itself
> does not establish precedent or change the appropriate jurisdiction of the crafts involved. Periodic
> review of the work assignments shall be made for the purpose of adjusting such assignments as
> appropriate to take care of changing needs.

> Section 3. In the event of a jurisdictional dispute, the International Unions shall promptly assign
> International Representatives to meet with the Employer and attempt a settlement in the event of
> questions of assignment.

Case: 24-2254 Document: 11-10 Filed: 08/02/24 Page: 148 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 10 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

Section 4. If the International Representatives cannot reach agreement on the dispute, they shall jointly prepare and sign a complete statement of the facts and circumstances involved in the dispute, which shall be submitted to the respective General Presidents for final resolution.

Appendix A, to the 2014 Agreement, <u>Wage Rates and Fringe Benefits, Effective July 15, 2014 – May 31, 2017</u>, provides in pertinent part as follows:

<u>Building Laborer Rate</u>

Work classifications include but are not limited to the following: Potmen, power tool operator, small machine operator, signalmen, taggers, laser beam operator, waterproofer, open caisson, test pit, underpinning, pier hole and ditches, Jaggers, operator of hand derricks, pipe layers, or tile layers, operators of jackhammers, paving breakers, spaders or any machine that does the same general type work, carpenter tenders, scaffold builders, operators of townmasters, scootcretes, buggymobiles and other machines of similar character, operators of tampers and rammers, and other machines that do the same general type of work, whether powered by air, electric, gasoline, or other types of fuels, builders of trestle scaffolds over one tier high and sand blaster, power and chain saw operators used in cleaning, installers of well point, wagon drill operators, acetylene & other types of burners, licensed powdermen, tool room clerk, water person, stake jumper, demolition; cement finisher, come-along crew, vibrator operators, concrete bucket or hose man, stripping of shored forming, hoisting & rigging, waterproofing, operator of forklifts, hand derricks, sand blasters, chipping of concrete, stripping of all edges, top of slab and bulkhead material, and spreading of gravel; asbestos and lead abatement; concrete laborer.

All Journey Worker Laborers must have at least 3,200 hours of experience in the construction industry.

Foreman shall be paid at a rate of $1.50 above the existing journeyman rate.

General Foreman responsible for more than two foremen will receive $2.50/hour above the basic rate of pay.

06/15/14          06/01/16

<u>General Laborer Rate</u>

General and maintenance cleanup, sweepers, janitors, cleaning of structures prior to the turnover to the owner, material handlers, fire watchmen, flagmen, dumpmen, spotters, landscape laborers, and truck checkers, laying of vapor barrier, removal of reshores, cleaning, stacking, banding & handling of stripped materials, light demolition (drywall walls), spraying concrete (water curing), and water person

<u>Hazardous Waste Workers Rate</u>

. . .

<u>Heavy & Highway Rates</u>

. . .

<u>Tunnel Raises and Shift Rates</u>
(Including Water and Sewer)

…

Fringe Benefits Contribution

| | Master, Journey Laborers | | Apprentice Laborers | |
|---|---|---|---|---|
| | 06/15/14 | 06/01/15 | 06/15/14 | 06/01/15 |
| . . . | | | | |
| Pension | $2.83 | * | $0.00 | * |
| . . . | | | | |

Annual Increases

The 2% total package increase for 2014 will be effective June 15, 2014.

*2015 Wage Rates and Fringe Benefits will be allocated by the Union 30 days prior to June 1, 2015. The 2015 total package increase will be 2%.

*2016 Wage Rates and Fringe Benefits will be allocated by the Union 30 days prior to June 1, 2016. The 2016 total package increase will be 2%.

*Up to 60 days prior to June 1, 2017, the Employer & the Union will re-open negotiations over wages and benefits.

The description of work performed by General Laborers was the same in the 2006 Agreement, 2011 Agreement, and 2014 Agreement. The description of work performed by Building Laborers in the 2011 Agreement added concrete and gravel work that did not appear in the 2006 Agreement. The 2014 Agreement added language to the description of Building Laborer work that included asbestos and lead abatement work and work as a concrete laborer.

The Fund's position in this case is that Appendix A defines Laborers' jurisdictional work; that Appendix A granted to members of the bargaining unit the exclusive jurisdiction to perform that work; and that the performance of "even one second" of Laborers' jurisdictional work by an employee of the Company after May 31, 2017 – the end date of the 2014 Agreement – constituted the performance of "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." The Company denied that the Agreement, including Appendix A, granted the Laborers exclusive jurisdiction over that work, noting that subcontractors (both Union and non-Union) and employees and contractors working

in other crafts routinely performed some work listed in Appendix A prior to June 1, 2017 without

complaints by the Union that such assignments of work violated the Agreement (including, in the

case of work performed by employees in other crafts, Article X of the Agreement).   The

Company acknowledged that some of its managers and supervisors performed limited work that

fell within the types of work identified in Appendix A on occasion, both before June 1, 2017, and

afterwards; the Company noted that this work was never grieved or challenged by the Union and

never resulted in any claims prior to June 1, 2017 for additional contributions to the Fund.  The

Company further asserted that the performance of Laborer work by outside contractors, whether

or not Union contractors, did not constitute performance by the Company of "work in the

jurisdiction of the collective bargaining agreement of the type for which contributions were

previously required" since the Company was not responsible prior to May 31, 2017 for

contributions on behalf of those hours of work and, as noted, the provisions of the Agreement

permitted the Company to hire both Union and non-Union contractors to perform Laborer work.

<u>The Abrogation of the 2014 Agreement</u>

On January 25, 2017, Mr. Ernst, wrote to the Union stating in pertinent part that:

> The Whiting-Turner Contracting Company ("Company") is signatory to a labor
> agreement ("Adoption Agreement") with the Baltimore/Washington Construction & Public
> Employees Laborers' District Council, LIUNA, Local 657 and Local 11 ("Union") that adopted
> the terms and conditions of the Agreement Effective: June 01, 2014 Expires May 31 2017 between
> Construction Contractors Council AGC Labor Division and Baltimore/Washington Construction
> & Public Employees Laborers' District Council, LIUNA Local 657 and Local 11 ("CCC
> Agreement"). Any and all such agreements were made pursuant to Section 8(f) of the National
> Labor Relations Act as the Company has never recognized the Union as a majority representative
> of its employees pursuant to Section 9(a).

> The Company is not renewing its Adoption Agreement with the Union and terminates its
> current labor agreement and any and all other agreements, understandings and obligations with the
> Union as of May 31, 2017. The Company is repudiating and terminating all bargaining
> relationships with the Union effective as of May 31, 2017.

> In addition, Whiting-Turner has not delegated its bargaining authority to any multi-
> employer association, including the Construction Contractors Council AGC Labor Division. The
> Company is neither signatory to the CCC Agreement nor has it ever agreed to become a member
> of any multi-employer collective bargaining unit as may be established by the CCC Agreement

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 151 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund Page 13 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

> between the Union and any multi-employer association. Therefore [Whiting-Turner] is not now, nor ever has it ever been a member of any multi-employer collective bargaining unit as established by any agreement between the Union and a multi-employer bargaining association. If you contend that Whiting-Turner has an agreement or has delegated its bargaining authority to any multi-employer association or other third party, this letter also serves to revoke such delegation of bargaining authority. Accordingly, Whiting-Turner will not be bound to any negotiations, re-negotiations, amendment, extension or renewal of any agreements negotiated by the Union and any multi-employer association.

Mr. Ernst explained that the Agreement with the Union was a Section 8(f) agreement and that, prior to the termination of the Agreement, the Company had employed, on average, 20-30 Laborers, but that the number was dynamic and increased or decreased based upon available workload. In addition to the bargaining unit Laborers, who were employees of the Company, the Company engaged a variety of subcontractors who provided Laborers to work at the Company's job sites. Not every job site was assigned a Company-employed Laborer. The subcontractors who provided Laborer services consisted both of Union and non-Union contractors.

Mr. Ernst testified that, over the years, many other employees and employees of subcontractors performed Laborer type work without any objection from the Union or claim that the performance of that work was prohibited by the Agreement. He cited to clean-up (sweeping) work having been performed by Ironworkers, Pipefitters, Carpenters, Electricians, Plasters, and most other trades. As noted, the Agreement contains a provision dealing with jurisdictional disputes, as well, but Mr. Ernst testified that this provision had never been invoked.

Mr. Ernst and others stated that they were not aware of any grievances or other complaints asserting that the Agreement was violated by virtue of Company supervisors performing modest amounts of Laborer type work when needed. Mr. Ernst noted that the Agreement had no language limiting the ability of the Company to assign supervisors to perform bargaining unit work in either the 2011 or 2014 Agreement. He admitted that the Company did not want its supervisors to perform Laborer task work, but understood that, in certain situations,

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 152 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund        Page 14 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

it was necessary for them to perform modest amounts of work more typically performed by Laborers, either independently or assisting others.

On January 31, 2017, the Fund wrote to Mr. Ernst advising that "[u]pon Whiting's cessation of its contribution obligations, the Fund will issue an official letter of notification of withdrawal, with the withdrawal liability amount due, and a full explanation of Whiting's procedural rights under ERISA.

Shortly after the January 31, 2017 letter, the Union filed a petition with the National Labor Relations Board ("NLRB") seeking representation elections to convert the two existing Section 8(f) bargaining relationships to Section 9(a) relationships. One petition was filed by LIUNA Local 11 and the second by LIUNA Local 710. Local 11's petition related to Laborers working in the Washington, D.C. area. Local 710's petition related to Laborers working in the Baltimore, Maryland area. The NLRB dismissed the petitions based upon the assertion of the Company that, by March 15, 2017, it would no longer be self-employing Laborers in either area. The decision of the Regional Director, dated March 13, 2017, did note that "[s]hould the Employer continue to directly employ any employees included in the petitioned-for units, I will entertain a motion by either of the Petitioners to reinstate their petitions." The Regional Director further determined that the Company self-performed its laborer work on only about 5% of its projects in Local 11's jurisdiction and self-performed its laborer work on only about 10% of its projects in Local 710's jurisdiction, with the remaining 90% to 95% of its laborer work in those jurisdictions performed by subcontractors. It was noted that all of the Company's laborer work was contracted out in the Company's work in 46 other states. The Regional Director found that the Company employed a total of approximately 100 laborers spread across 3 to 40 job sites in the combined geographic jurisdiction of the Locals and noted that the Company's collective

bargaining agreement with Local 710 expired on March 31, 2017 and its collective bargaining

agreement with Local 11 expired on May 31, 2017.

Mr. Ernst testified that, both prior to May 31, 2017 and thereafter, no Company salaried

employee was permitted to perform even one second of Laborers jurisdiction work.  Mr. Ernst

also testified that:

> Q: Okay. So given the fact that you were aware of this before the expiration of the agreement and
> it was entirely foreseeable, based on your personal observations, that Whiting-Turner's salaried
> employees might impermissibly perform laborers' jurisdictional work, why is it that you took
> absolutely no measures after its expiration to ensure that Whiting-Turner's salaried employees, in
> fact, did not perform any laborers' jurisdictional work?
>
> A: The reason why I did not think that they would – I think is how you phrased that – was because
> Whiting-Turner's salaried employees performed – and I think I used this word in my 30(b)(6), and
> you had a conversation with me about, but I'll use it again – de minimis work. And I know
> de minimis is not zero or any, so we can – you don't have to come back with that, but they
> performed work within -- within the -- that was laborers' jurisdictional work, like emptying a trash
> can in a trailer or putting up trash or putting a hole cover on, as some of my examples that I used
> yesterday, prior to the end of the agreement. And there wasn't any grievances from the union
> when they did that. And so I felt that even subsequent to the end of the 2014 to 2017 agreement, if
> they did the same things that was not considered a violation of the agreement.

(Tr. 484-85)

Later in his testimony, however, when being asked about flagging work performed by

salaried employees, Mr. Ernst stated the Company did not dispute that flagging is a Laborers'

jurisdictional work" and that "Whiting-Turner's salary employees should not – that Whiting-

Turner salary employees should do any laborers' jurisdictional work, zero, none, any means

none, right, we know that.  They don't do that, or they should not do that."  (Tr. 539)  He also

conceded that "the fact of whether a salaried person ever waved at a truck or a vehicle backing in

or around one of our jobsites, they may have, which would have been, if we construe that, if they

do it any time, one second, zero, any – however you wish to characterize it, then that would be a

violation of the agreement."  (Id.)  Mr. Ernst then testified:

> Q: It would be performing laborers' jurisdictional work, isn't that a fact?
>
> A: It would be.

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 154 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 16 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

(Tr. 540).

After May 31, 2017, the Company planned to provide for any needed Laborer work that was previously performed by bargaining unit Laborers in two ways – first, by using an increased number of subcontractors providing laborers, and second, by having contractors performing work in other crafts perform clean up and related work thus decreasing the need for dedicated laborers on many job sites. Mr. Ernst testified that he had a concern about ensuring that the Company did not direct perform any Laborers work because he did not want the Company to be accused by the Fund of performing work such that Section 4203(b) would no longer shield the Company from a finding of a withdrawal that triggered withdrawal liability.

Evidence Regarding the Performance of "Laborer" Work After May 31, 2017 in the D.C. Market at Company Job Sites

As noted, the Company was serving as the General Contractor with respect to approximately 80 to 100 job sites in the D.C. Market. Size ranged considerably, both in terms of dollars and in terms of the number of workers at each site. Beginning in or after 2008 or 2009, the Company began transitioning its core business operations in the D.C. Market and other markets to a business model where it no longer directly provided labor, including general laborer manpower. Rather, it was engaged exclusively in project management and hired subcontractors to perform trades and support work on site, including Laborers work. The Company provided a variety of supervisors, managers, and superintendents to oversee those projects, many of whom worked on site.

At the time that it permanently laid off its remaining Laborer employees, the Company employed between 25 and 50 Laborers. Those Laborers worked in several crews to perform Laborer work of the type described in Appendix A to the 2014 Agreement. There was no

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 155 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 17 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

dispute, however, that many Company job sites in the D.C. Market then accomplished Laborer work exclusively with subcontractors since no bargaining unit Laborers were permanently assigned to work at those locations. Following the changes negotiated to the 2011 and 2014 Agreements regarding subcontracting, the number of non-union subcontractors performing Laborer work increased, both absolutely and as a proportion of the overall mix of contractors performing such work.

The record further reflected that, occasionally and as needed, Company managers performed certain types of work that could be classified as Laborer work. These included: picking up small amounts of trash, sweeping an area (particularly prior to turn-over to the customer), directing truck or pedestrian traffic, setting up barricades, receiving items for delivery for use by either an outside contractor or a craft employee, and assisting in "all hands" emergency situations (as took place at the MGM Casino at National Harbor project when a pipe burst and caused a flood on a floor above a room filled with switchgear, resulting in employee Laborers, contractors, other crafts, and managers all trying to address the situation). The testimony from several managers made clear that supervisors occasionally performed this type of work both prior to the termination of the Agreement and also afterwards.

The Union introduced over 100 videos into the record. Most of the videos were of very short duration and addressed situations that were also captured in other videos. Some of the duplication resulted from multiple people videoing the same situation; others involved multiple short videos from the same person taken of a given situation. The individuals who took the videos testified concerning those events. Some of the videos depicted work by identified Company supervisory or managerial employees. Others depicted work by individuals who were wearing Whiting-Turner personal protective equipment ("PPE") such as vests and hard hats;

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 156 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund      Page 18 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

some of those individuals were identified as employees of contractors and others were not identified at all, but are presumed to have been either contractors or Company supervisory or managerial employees.

No point would be served by describing herein each of the videos. It is sufficient to note that all of the offered videos were viewed by the Arbitrator as part of the decisional process in addition to the viewing of many of those videos that took place during the hearings. The videos offered into evidence and made part of the record covered a number of Company job sites, but appear to have been only a modest sample of the videos taken. Scott Kickk, a Principal of Columbia Process and Investigative Services LLC, an investigator retained by Fund Counsel, testified that he took approximately 200 hours of video; that the videos he took ranged from about a half-hour each to 2.5 hours or more; and that excerpts of about one-third of the videos that he took were introduced as exhibits. Vernon Edward Kirby, another investigator retained by Fund Counsel, testified that he visited only three sites, spent about 40 hours total observing those sites between the summer of 2019 and May 2021, and that his instructions were to move on if he did not see anything suspicious after he had been observing the location for four hours on any given day. Jonathan Viera, an Organizer employed by the District Counsel, testified concerning videos of several Company job sites that he observed and took video, including a job site at American University, a job site at Catholic University, a job site at Suburban Hospital in Bethesda, MD, and a job site in Alexandria, VA. Raymin Alejandro Diaz, a Business Agent employed by the District Council, testified concerning observations and video that he made at Company job sites at 17th Street and Rhode Island Avenue, NW, at Catholic University, and on North Henry Street in Alexandria. Steve Lanning, Assistant Business Manager, LIUNA Local 11, testified that he visited Company job sites looking for individuals performing Laborer work

approximately 20 times, beginning in late summer of 2018.  Videos from each of these

individuals were introduced and a log introduced that described additional videos taken by each

of these individuals that were not offered or introduced as exhibits.

After review, the work shown to have been performed by Company salaried employees

after May 31, 2017, that were captured on the videos offered into evidence consisted of the

following:

1) Jason Marchetti, then Field Engineer, at Catholic University:

a) on October 17, 2018, assisting Mr. Carneglia with the tasks described below in 2 a);

b) on October 24, 2018 installing fence signs for traffic and pedestrians;

c) on November 6, 2018, flagging traffic in and out of the project; helping a

subcontractor get a tool box off a truck and installing the brackets to the truck to close it off;

2) Nicholas Carneglia, Project Engineer, at Catholic University:

a) on October 17, 2018, adjusting a water hose, helping a contractor to remove a

drainage/manhole cover, and using a water pump to pump out standing water; moving plywood

and using a saw to cut wood in connection with covering an area; stripping wood from concrete

using crowbar; helping with shoveling; disposing of material in a dumpster;

b) on October 18, 2018, using a crowbar to strip a wooden frame around a platform;

c) on October 24, 2018 installing fence signs for traffic and pedestrians;

d) on November 6, 2018, removing platforms

3) Kevin J. Higgins, Superintendent, at 17th and Rhode Island Avenue, NW:

a) on November 8, 2018, adjusting barricades and fence sections, moving a ladder to

clear an area, adjusting and securing the gates to the project to close off an entrance, securing the

walk area by moving around cones to direct workers on the site,

b) on November 19, 2018, working alongside a subcontractor adjusting a barrier and repositioning a number of sections of fence and sections of jersey wall;

c) on January 9, 2019, adjusting a barrier wall and picking up debris;

d) on January 11, 2019, adjusting a sign on a fence and moving barricades;

e) on January 15, 2019, picking and moving materials and taking measurements;

f) on January 16, 2019, moving traffic cones with contractors;

4) <u>Brian Zirkel, a salaried management employee of the Company, at North Henry Street, Alexandria, VA</u>:

a) April 8, 2019, tying mesh with wire ties;

b) July 25, 2019, picking up a 2x4 piece of wood and a trash cardboard box and placing them in a dumpster;

5) <u>Jake Gallagher, a salaried management employee of the Company, at West Rosslyn/Wilson Boulevard, Arlington, VA</u>:

a) on January 11, 2018, helping to reposition and start a generator;

b) on August 13, 2019, carrying a broom and stapler to the trailer and carrying a cardboard box outside the fence line, most likely to place it in the trash;

6) <u>Jim Morton, a salaried management employee of the Company, at North Henry Street, Alexandria</u>:

a) April 4, 2019, fastening mesh to fencing

b) July 8, 2019, retrieving and using water pump to pump water from job site;

c) July 9, 2019, guiding and providing traffic control to truck that was taking a dumpster out of the job site; and

7) <u>Kyle Jennings, Superintendent, at the City Ridge project</u>:

a) on May 6, 2019, moving a water hose and related materials.

In addition to the video evidence and testimony from those who took the videos and observed the job sites, testimony was adduced from a number of Company salaried employees regarding the performance of manual work by themselves and other salaried employees. Mr. Marchetti noted that he was working as a Field Engineer on the Catholic University project and that it was the first project he worked on for the Company. Mr. Marchetti further testified that he understood the directive to contract out all Laborer work had no impact on his ability to perform occasional work when needed to aid others or to address a safety situation or minor matter requiring attention. Describing the work he performed at Catholic University, he recalled that on two days he and Mr. Carneglia aided a subcontractor in the move of materials from the power plant building to another part of campus, a task that he recalled taking about 45 minutes to an hour on each of those two days. Mr. Marchetti recalled removing some accumulated trash in the jobsite trailer office and parking lot and putting it into a dumpster on several occasions. He estimated those clean-up efforts at 20-30 minutes of work per clean-up. With respect to the sign installation work, Mr. Marchetti noted that Catholic University insisted upon the signs being put up as a safety measure and that he and two other salaried employees worked on that task. In total, there were 12-16 signs (8-10 signs that he put up and 2-3 signs each for the two employees). Mr. Marchetti estimated that he spent 10 minutes per sign to perform that task which took place over more than one day and admitted that this was a task that, generally, would be performed by a laborer.

Mr. Marchetti also worked at several other D.C. Market locations, including City Ridge, the addition of a gymnasium at Ferdinand T. Day Elementary School in Alexandra, and Capital One Center at Tysons Corner. Mr. Marchetti testified that salaried employees performed

Case 1:24-cv-02254-RJR   Document 11-10   Filed 08/02/24   Page 160 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 22 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

occasional clean-up work at those locations as well, but that he generally called the subcontractor responsible for the debris and directed them to clean it up first and, failing that, called the general laborer subcontractor to clean up the debris. He estimated that, at City Ridge, he had seen a Company manager cleaning up items maybe twice over the close to a year that he worked at that location and that it also happened occasionally at the other job sites, but given the dates he worked there felt that he was unable to put a precise number on those instances.

Seth H. LeJeune, Senior Superintendent, testified that his understanding was that if he sees something minor that needs to be done, he can perform that work, but is not required to do so. Mr. LeJeune testified that this was the case both before and after 2017. He estimated that, about 3 to 4 times during the course of a given project that he was responsible for, he would perform manual work such as sweeping, placing an item in a trash can, or the like, and that, during his 21 years with the Company, he was unaware of a single complaint or grievance from the Union concerning the performance of those tasks.

Mr. Jennings testified that he was responsible as Superintendent for the safety of the job at City Ridge and at Rosslyn. Mr. Jennings testified that with the elimination of Laborers crews employed by the Company, the only impact was to increase the amount of subcontracting. He acknowledged that, at the larger projects, there were much larger pools of people available and thus greater flexibility to assign contractor employees to perform clean up, walking and backing duties, and the like. He estimated that he had personally done work such as traffic direction, minor movement of materials, sweeping, signage or the like maybe a dozen times over the prior three-year period. He explained that he always tries to accomplish those jobs first with contractors, but that if the safety of the job required that the work be accomplished and it was not possible to assign a subcontractor, then he would try to personally accomplish the task.

Case 1:24-cv-02254-RJR   Document 11-10   Filed 08/02/24   Page 161 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 23 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

Douglas Lee, a Senior Superintendent who has worked for the Company for over 30 years, testified that he was responsible for the ICC-B (Intelligent Central Community-Bethesda) project, which was a $400-500 million project that utilized 300-400 workers. The ICC-B project was one that had a crew of about six bargaining unit Laborers working on the project prior to the Company's abrogation of the 2014 Agreement, after which time Mr. Lee testified that they amended the contract with Potomac Abatement to provide laborers. Potomac Abatement is a non-union subcontractor. Mr. Lee acknowledged that he has personally swept or picked up small amounts of scrap or moved something that was blocking an egress or emergency exit door, but stated that those instances of work were limited to doing so occasionally and as required to keep the job safe or to turn over a particular area to a customer. Mr. Lee testified further that he has performed those occasional tasks during his entire career without any concerns having been raised prior to 2017 that such behavior was precluded by the collective bargaining agreement with the Laborers.

Phil Knight, Vice-President, Field Operations, testified that he has observed a Project Manager or Superintendent performing minor Laborer type work, such as picking up trash, or moving items out of the way about 3-4 times a year. Mr. Knight stated that, at the MGM Casino at National Harbor project (which was very large), there were approximately 2700 employees on the job, most of whom were employed by outside contractors, at its peak a crew of about 100 bargaining unit Laborers (by March 2017 that number had been reduced to 5 bargaining unit Laborers), and about 130 salaried employees (Project Managers, supervisors, and others). After the layoff and elimination of bargaining unit Laborers, Mr. Knight testified that none of the Company employees worked differently than before. Mr. Knight also described a situation in which an 8-inch fire sprinkler line ruptured, causing water to go into finished green room space

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 152 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 24 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

for a theater, creating a situation in which everyone worked diligently to contain and clean up the spill – inclusive of direct hires (Laborers and other crafts), contractors, and supervisors.

Although each of the Company's witnesses testified that, both prior and subsequent to the termination of the 2014 Agreement, salaried employees performed occasional and minimal amounts of manual work that would normally be performed by Laborers, each also testified that they understood that they were not permitted to perform even "one second" of Laborer work after the termination of the Agreement.

The Calculation of the Amount of the Withdrawal Liability in this Case

The withdrawal liability assessment in this case was based upon the "presumptive method" or "20-pool" method of calculating withdrawal liability contained in MPPAA. The Fund in 2005 had a "clean start" as a result of a merger of plans. Each annual withdrawal liability pool was calculated thereafter with the determination of the Fund's unfunded vested benefits liabilities calculated based upon use of the "Segal blend." The Company maintained that each year's unfunded vested benefits liabilities of the Fund for purposes of the withdrawal liability assessment was required to have been calculated using the same assumptions that are used for purposes of determining the minimum funding requirements. No challenge was raised by the Company with respect to any of the assumptions used to calculate the Fund's unfunded vested benefits liabilities for purposes of withdrawal liability other than the interest rate assumption. Thus, other than the interest rate assumption, no challenges were raised to the mortality assumption, retirement age assumption, turnover assumption, expense assumption, or any of the other assumptions. The interest rate assumption for each of the years in question (2005-2016) for minimum funding purposes ("funding interest rate assumption") was 7.25%.

The Segal blend calculates the unfunded vested benefits liabilities of the Fund for

Case 1:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 163 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund                Page 25 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

withdrawal liability purposes twice.  To the extent that there are fund assets, based on the market value of those assets, the unfunded vested benefits liabilities are calculated using the PBGC interest rate assumptions that applied in the event of mass withdrawals or plan terminations ("PBGC rates").  Those PBGC rates are a proxy for annuity rates and their use represents a "settlement" of the vested benefit liabilities such that there is no longer any risk associated with that valuation – whether gains or losses and whether due to investment issues (returns higher or lower than the assumed rates of return or due to actuarial issues (gains or losses due to the cost of providing vested benefits exceeding or being lower than what was projected based upon assumptions regarding retirement rates and dates, turnover, mortality, and the like).  To the extent that there remained unfunded vested benefits liabilities calculated using PBGC rates that were not matched by Fund assets, the remaining unfunded vested benefits liabilities are determined based upon use of the funding interest rate assumption.

According to tables in a December 10, 2021 Expert Report authored by Ethan E. Kra, Ph.D., F.S.A., E.A. ("Kra Report"), with the possible exception of 2008, during the years relevant to the withdrawal liability assessment in this case (i.e., 2005-16) the PBGC rates were lower (and frequently significantly lower) than the funding interest rate assumption.  The use of a lower interest rate assumption will result in a higher valuation of unfunded vested benefits liabilities than a similar calculation of the value of those liabilities performed using the higher funding interest rate assumption.  The deposition of Dr. Kra was entered into the record, but Counsel agreed that the entry of the deposition and Kra Report eliminated the need to also have Dr. Kra testify in the hearings in this matter.

The record included testimony and a deposition provided by Steven R. Loomis, ASA, FCA, MAA, and Enrolled Actuary, Segal Consulting.  Mr. Loomis served as the Fund Actuary

Case 1:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 164 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund     Page 26 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

since approximately 2009 or 2010, and has been an Enrolled Actuary since 2000. In that

capacity, Mr. Loomis was responsible for and signed the schedules to the Form 5500s, the

Actuarial Valuations, and the Withdrawal Liability Valuation reports, each of which are prepared

annually. Dr. Kra testified that he did not speak with Mr. Loomis, but based upon his review

determined that Mr. Loomis' selection of assumptions that were used to calculate the unfunded

vested benefits liabilities of the Fund for purposes of determining withdrawal liability were not

unreasonable, either individually or in the aggregate.

      The Company opted not to provide evidence from an actuarial expert in this case and,

instead, relied upon the testimony of Mr. Loomis (including his deposition) and the report and

deposition of Dr. Kra, and the Company's position concerning certain recent court decisions that

addressed use of interest rate assumptions for purposes of calculating and assessing withdrawal

liability that differed from the funding interest rate assumptions used by the plan for those same

years.

      The Kra Report reviewed the use of both the funding valuation interest rate and a

contemporaneous settlement interest rate as components of many blends used to determine

unfunded vested benefits liabilities for purposes of withdrawal liability including the Segal blend

in particular. Dr. Kra noted that the Segal blend is a widely used method, having been adopted

by approximately 30% to 40% of all multiemployer plans (including a larger proportion of the

larger plans which cover greater numbers of participants). The Kra Report reviewed the reasons

for using different interest rate assumptions to value unfunded vested benefits liabilities for

withdrawal liability purposes, as contrasted with funding purposes. These differences were

identified as including the following reasons for use of a blended interest rate assumption to

determine unfunded vested benefits liabilities for purposes of withdrawal liability: 1) differences

in the duration of liabilities being measured for withdrawal liability from the duration of

liabilities being measured for funding purposes; 2) the Fund is a relatively mature fund, with

liabilities heavily weighted to older participants; only 16.5% of vested benefits liabilities were

associated with active participants, 18% of vested benefits liabilities were associated with

deferred vested participants, and 65.5% of vested benefits liabilities were associated with retired

participants; a market based interest rate would be reflective of shorter duration of the liabilities

and expected cash flow; 3) administrative expenses were not included in the funding interest rate

assumption and an allowance for administrative expenses was made by Mr. Loomis when

determining unfunded vested benefits liabilities based upon use of PBGC rates; Mr. Loomis

noted that investment advisory and management fees have averaged 0.5% per year; 4) use of a

risk-free life annuity rate is reflective of assumptions of the risk regarding both investment

performance and the actual cost of providing promised benefits; to the extent that the Fund's

investment policy provides for investment in riskier investments, a withdrawing employer should

not receive the benefit of that additional risk when not liable for any underperformance of those

same investments and actuarial risks associated with losses based upon demographics; as a

mature plan, the Fund is less able to recover from any adverse performance either actuarially or

in terms of its investments; Dr. Kra noted increases in mortality that likely will increase the costs

to the Fund of providing vested benefits beyond those that are assumed; 5) the valuation of a

liability stream is independent of the actual assets that the Trustees choose to invest in; the cost

of providing benefits is the same whether the Fund opts to invest more in bonds or more in

stocks or to purchase annuities; 6) a reasonable expectation going forward is that investment

returns over the next decade or so will be lower than in the past few decades; and 7) in the 2017

Actuarial Valuation, the Plan Actuary noted that "[if] all investment returns were equal to the

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 166 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 28 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

assumed return over the last 10 years, the market value of assets as of the valuation date would

have been $183,395,363 as opposed to the actual value of $110,151,588."

The Kra Report also noted that the PBGC rates were only one set of rates that could have

been used as a proxy for settlement or market-based rates and opined that, as of December 31,

2016, any rate approximately between 2.25% and 4.25% would not have been unreasonable.

The PBGC Rates as of that date were 1.98% for the first 20 years and 2.67% thereafter – a rate

that fell within that range.  To facilitate comparisons of various potential market-based rates, the

Kra Report listed for each of the years used in the calculation of withdrawal liability the

following rates: a) 30-year treasury note rates; b) 10-year treasury note rates; c) IRS composite

rates; d) IRS Lump Sum rates; e) PBGC Rates (old and new); and f) Citigroup Pension Liability

Index rates.

Mr. Loomis testified that the use of the Segal blend represented his "best estimate of

anticipated experience under the plan" with respect to the interest rate assumption.  Mr. Loomis

explained that the Segal blend first calculates the unfunded vested benefits liabilities of the Fund

using PBGC rates (which are a proxy for annuity or risk-free rates).  To the extent that those

liabilities are matched by plan assets, the PBGC rates are used.  Any remaining UVBLs are then

valued utilizing the funding interest rate assumption.  Mr. Loomis testified that he has been an

Enrolled Actuary for 20 years and has worked as an actuary at the Segal Company for 23 years.

Approximately two-thirds of his work involves multiemployer plans and he is serving as the

Enrolled Actuary for approximately 12 multiemployer pension plans.  Mr. Loomis explained that

an assessment of withdrawal liability is essentially a settlement of the employer's obligations to

pay a proportion of the fund's unfunded vested benefits liabilities as of the end of the plan year

preceding withdrawal.  In his deposition, Mr. Loomis provided the following explanation for his

partial use of PBGC rates:

Q . . . When determining the discount rate, why are you matching up the assets to the PBGC rates?

MR. ROSE: Objection to form.

THE WITNESS: Well, just to be clear, we kind of – we're parsing this into different pieces, but my best estimate of anticipated experience under the plan for withdrawal liability purposes is the blend, it's the component pieces of the blend as a whole. And the reason for – and to answer your question, the reason for that first part is that I'm required by the actuarial standards of practice to consider the purpose of the measurement. And since this measurement is a settlement calculation for the employer that's withdrawing, the first step in that calculation is to do a liability – a funded percentage measurement on settlement – on settlement liabilities.

. . .

Q You keep talking about a purpose of the measurement and settlement.  What do you mean by settlement in your testimony?

MR. ROSE: Objection; vague and ambiguous, but if you're able to answer –

A The employer is no longer going to be a part of the fund going forward, so they are essentially going to be assessed a one-time charge now for their liabilities.

Q And is that the reason why -- well, let me say this. So viewing this as a settlement, how does that affect your choice of discount rate? Is this a different measurement purpose than minimum funding?

A When you say this, is the withdrawal liability calculation different than minimum funding?

Q Yes.

A Yes.

Q Why is that?

MR. ROSE: That's been asked and answered a few times.

THE WITNESS: The purpose of a measurement is different. The funding is for – to determine the cost of an ongoing plan for employers that are remaining in the fund. This is to determine the cost to an employer that's leaving the fund.

Q Why should those be different?

MR. ROSE: Objection; vague and ambiguous.

THE WITNESS: Why – because the employer is settling their obligation at that point. They're not going to be a part – it's a risk – it's a risk transfer. The ongoing employers are taking on the risk of future investments, future investment returns. There's no more risk to the employer that's left. So you need to use a risk free rate in determining that first step of the calculation.

Q Are you saying that the PBGC rates are the risk free rates, is that what – is that – I mean, I'm not trying to put words in your mouth, but I'm trying to understand. You just mentioned –

A They're settlement rates.

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 168 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 30 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

Q And what do you mean by settlement rates then?

THE WITNESS: You're settling your liability. There's only two ways to settle a liability. You can pay everybody a lump sump or you can purchase annuities for them.

(Joint Exhibit 16, Tr. 102-06)

Mr. Loomis testified that he knows of at least one actuary employed by the Segal Company who does not use the blend as his or her best estimate and asserted that he (Loomis) chose to use the blend because it is his best estimate and not because of any Segal position. Mr. Loomis confirmed that the calculation of withdrawal liability in this case used all of the same actuarial assumptions as were used in connection with determining minimum funding requirements other than the interest rate assumption.

Mr. Loomis noted that the Segal blend is based, in part, on the experience of the plan, but that the selection of the PBGC rates were not, but were a proxy for annuity rates as of the date of the measurement. He explained further that in arriving at his best estimate of the funding interest rate assumption, he considered a variety of items of professional judgment and a variety of data points, including consideration of the Fund's investment history and projections as to how various asset classes are projected to perform; some of those estimates are provided by the Segal Company.

While Dr. Kra indicated in his deposition that he may well have used PBGC rates, rather than a blend, he also opined that use of the Segal blend was a reasonable approach in light of the purpose of the measurement. Dr. Kra testified that it was viewed as reasonable and used by a large number of actuaries. He noted that some blends, like the Segal blend, use funding and PBGC interest rates, and that others use different measures of market-based rates.

The Company relied heavily upon two recent United States Court of Appeals decisions:

1) Sofco Erectors, Inc. v. Trustees of the Ohio Operating Engineers Pension Fund, 15

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 169 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 31 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

F.4th 407 (6th Cir. 2021); and

2) <u>UMWA 1974 Pension Plan</u> v. <u>Energy West Mining Company</u>, 39 F.4th 730, 457 U.S. App. D.C. 389 (D.C. Cir. 2022), <u>cert. denied</u>, ___ U.S. ___, 2023 U.S. LEXIS 1176 (U.S., Mar. 20, 2023).

Additionally, since briefing, the United States Court of Appeals for the Ninth Circuit has issued a decision addressing the interest rate assumption in <u>GCIU-Employer Retirement Fund</u> v. <u>MNG Enterprises</u>, 51 F.4th 1092 (9th Cir. 2022).

The Court of Appeals in <u>Sofco</u> affirmed a district court's finding that the use of the "Segal blend" was inconsistent with Section 4213(a) of ERISA. The District Court in <u>Sofco</u> had overturned the award of an arbitrator who held that the use of the Segal blend was reasonable and represented the Fund Actuary's "best estimate of anticipated experience under the plan." In reaching its findings, the Court of Appeals reasoned that the use of the Segal blend was not based upon the anticipated experience under the plan and, therefore, failed to comply with the requirements of Section 4213(a). The use of a settlement interest rate assumption was found improper where the expectation was that the plan would remain an ongoing plan and was not required to purchase annuities to provide benefits to satisfy the departing employer's share of vested benefit liabilities. The Court of Appeals rejected an argument that the "best estimate" requirement is procedural and not substantive, finding that such a construction would read the "best estimate of anticipated experience under the plan requirement" meaningless. The "settlement" rationale underpinning use of the Segal blend was rejected as unsupported by MPPAA and found to be unsupported by statutory text or legislative history. Finally, the <u>Sofco</u> Court found that the fact that use of a blend represented "accepted actuarial practice" and was supported by Actuarial Standard of Practice ("ASOP") No. 27, but held that those practices could

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 170 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 32 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

not conflict with the requirements of Section 4213(a) relative to the assumptions used to calculate withdrawal liability.

The Court of Appeals in Energy West reviewed an assessment of withdrawal liability that was calculated using the PBGC rates. Although an arbitrator and the district court both found that the use of the PBGC rates represented the actuary's best estimate of anticipated experience under the plan, the Court of Appeals disagreed and vacated and remanded for a recalculation of withdrawal liability. The Court of Appeals held that "[w]hen the actuary calculates Energy West's withdrawal liability, the discount rate must be similar, but need not be identical, to the discount rate assumption used to calculate minimum funding." In reaching that finding, the Court of Appeals reasoned that:

> . . . MPPAA's rule that the actuary use assumptions "which, in combination, offer the actuary's best estimate of anticipated experience under the plan" requires the actuary to choose a discount rate assumption based on the plan's actual investments. 29 U.S.C. § 1393(a)(1). While there may be a reasonable range of estimates, the discount rate assumption cannot be divorced from the plan's anticipated investment returns.
>
> The arbitrator found, and all agree, that the Pension Plan's actuary chose the risk-free PBGC rates based on the theory that risk-free rates are appropriate for withdrawal liability because the withdrawn employer no longer bears risk. The discount rate assumption was not chosen based on the Pension Plan's past or projected investment returns. Therefore, the PBGC rate assumption was not the actuary's "best estimate of anticipated experience under the plan."

(390 F.4th at 740). Like the Sofco Court, the Energy West Court found that ASOP 27 was an insufficient justification for the use of the PBGC rates since "MPPAA, not ASOP 27, is the law" and since "an unlawful assumption violates professional norms and is therefore 'unreasonable.'" (Id.). The Energy West Court further held that the aggregate reasonableness requirement is not to be viewed in a vacuum, but must be reasonable in light of the plan's characteristics – i.e., the predicted future of the plan.

The MNG Court also addressed the use by the plan actuary of PBGC rates to calculate unfunded vested benefits liabilities for purposes of withdrawal liability. The Court of Appeals

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 171 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 33 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

held that the use of PBGC rates violated Section 4213(a) of MPPAA because it did not consider

"the experience of the plan and reasonable expectations" and thus did not satisfy the best

estimate standard.  The underlying arbitration award requiring recalculation using funding

interest rate assumption to calculate the unfunded vested benefits liabilities of the plan was

affirmed.  In a footnote, the <u>MNG</u> Court noted that "[w]e express no view on an actuary's use of

the PBGC rate as a starting point or a component in a blended rate.").

<u>The Fund's Claim That Section 4212(c) May Have Been Triggered</u>

Although not raised in the Demand letter or in the Fund's Response to the Request for

Review, the Fund attempted to engage in discovery concerning a potential claim that the

negotiated changes in the Subcontracting provisions of the 2011 and 2014 Agreements were

transactions done with a principal purpose of evading or avoiding withdrawal liability in

contravention of Section 4212(c) of MPPAA.  The Arbitrator found that discovery in connection

with any such contention was premature and bifurcated any such claim for a later point in the

proceeding.  All positions of the Parties including whether such a claim could, in fact, be

asserted in this case and if so, whether the modifications to the subcontracting language of the

Agreement constituted a "transaction" for purposes of Section 4212(c), were reserved.

An October 8, 2019 email to Counsel from the Arbitrator summarized the situation as

follows:

> Dear Counsel:
>
> This email will confirm discussions held during this morning's conference call in this matter.
>
> The central focus of the discussions related to the ability of the Fund to assert a Section 4212(c) argument in this matter.  During discussion, it became clear that the Fund was alleging that changes to the subcontracting provisions of the 2014 collective bargaining agreement were negotiated with a principal purpose of evading or avoiding withdrawal liability by altering the way in which subcontracting might be considered when applying the building and construction industry exemption provisions of MPPAA.  Without addressing at this time whether this assertion, even if proved, would violate Section 4212(c) (a matter that is unclear at best), and without addressing whether the Fund enjoyed the right procedurally to pursue that argument in light of the

Case 1:24-cv-02254-RJR   Document 11-10   Filed 08/02/24   Page 172 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 34 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

Trustees' failure to have made any specific findings relative to the application of Section 4212(c) in this case, I suggested that the entire potential Section 4212(c) issue, including related defenses and discovery, be deferred at this time until after the conclusion of this phase of the arbitration with respect to the application of the building and construction industry provisions of MPPAA and the Employer's calculational challenge. The rulings on those issues may well moot out the claimed Section 4212(c) issue and, even if it did not, would serve to better frame the practical significance of pursuing that argument.

The decision to bifurcate this potential issue does not eliminate evidence concerning subcontracting by the Employer, either prior to or subsequent to the date of cessation of contributions/obligation to contribute. It does defer, however, discovery and evidence addressed at the alleged motives of the Employer with respect to the subcontracting changes that were part of the 2014 collective bargaining agreement. The bifurcation and deferral will, however, save significant time and cost in terms of discovery and hearing time that would be needed to address that assertion.

Counsel for the Employer advised that he could agree to this bifurcation/reservation of positions. Counsel for the Fund advised that he needed to first consult with the Trustees prior to doing so. I ask that Mr. Rose advise within the next few weeks whether the Fund is also in agreement with this approach.

There also was discussion concerning the reserved hearing dates. Assuming that there is no need to present evidence on the claimed Section 4212(c) issue, the Parties agreed that four days should be sufficient to present needed evidence. The dates of May 18-21, 2020, were reconfirmed, and the date of May 22, 2020, cancelled.

Although not discussed, a follow up call should probably be scheduled for some time in January or February to confirm that matters remain on schedule for the hearing dates and to reaffirm the appropriate dates for the filing of exhibits, stipulations, witness lists, etc., prior to the hearings.

On October 14, 2019, Fund Counsel confirmed the Fund's agreement to proceed on this case. Company Counsel did not reply, but also did not voice any objection to the approach set forth in the October 8, 2019 email.

## CONTENTIONS OF THE COMPANY

The Fund's withdrawal liability assessment in this case must be overturned in its entirety because Section 4203(b) of ERISA prevents the imposition of withdrawal liability in this case. There is no dispute that the Fund is a construction industry plan or that the Company is a building and construction industry employer for purposes of Section 4203(b). The crux of the Parties' dispute relates to the contention of the Fund that the Company continued to perform work in the jurisdiction of the collective bargaining agreement of the type for which

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 173 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 35 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

contributions were previously required, or resumed that work within 5 years after the date on which the obligation to contribute under the plan ceased.

The Fund has relied in support of its position on over 200 video clips of individuals on Company job sites in the D.C. Market. The clips show individuals performing small tasks that are done on a daily basis on construction sites – sweeping, moving trash, fixing fences, affixing signs, directing trucks, or similar tasks. The Company acknowledges that, when performed by bargaining unit Laborers, those tasks fell within the scope of Laborers Union jurisdictional work. In some instances, the videos showed the performance of these tasks by subcontractors and, in other instances, the performance of these tasks by salaried employees of the Employer. The videos and related testimony, however, did not support the Fund's assertion that they evidenced the Company continuing or resuming the performance of work of the type for which contributions were required under the 2014-17 Agreement. Out of the large number of videos taken, many of which were produced as exhibits, not a single second of those videos showed a non-supervisory employee of the Company performing work of the type previously performed by bargaining unit Laborers. The Agreement never required that contributions be made to the Fund with respect to work that was performed occasionally by supervisors, even if the work was similar, in some respects, to the work traditionally assigned to and performed by bargaining unit Laborers and others. The work in question was work that supervisors had performed for years on the Company's job sites without any claim by the Union that such work violated some limitation in the Agreement. Even during audits, the Fund made no claims that contributions were owed due to such incidental work. To the extent that the work in question was performed by employees of contractors – either contractors retained to provide Laborer work or contractors from other trades or crafts whose contracts required that they perform clean up or receiving

duties – that also was not work that the Agreement required be performed by using bargaining unit Laborers or work that led to any obligation to make additional contributions to the Fund. In early 2017, the Company employed only about 20-50 bargaining unit Laborers on various crews and they did not cover all of the Company's job sites in the D.C. area. Unless the Company self-performed Laborer work after May 31, 2017, and there was no evidence that the Company did so, there was no basis for finding that the Company performed work within the five-year period for which contributions would have been due under the terms of the expired Agreement.

The Company's business model has changed significantly in recent years. Mr. Ernst testified in his June 23, 2021 deposition, that, when he first became employed at the Company in 1982, 60% to 70% of the Company's operations involved the self-performance of construction work. By the time of the events in question in this case, the Company had ceased doing any self-perform work. It was not pouring concrete, erecting structural steel, or performing similar work and was serving as a General Contractor, accomplishing construction at projects by means of extensive use of trade subcontractors (both union and non-union) and managing those projects with several hundred salaried employees.

The Company's Agreement with the Laborers Union did not contain express language that made the work performed by the Laborers exclusive. Appendix A to the Agreement – which was relied upon by the Union extensively in its examination of witnesses – lists job tasks in a number of categories. The Agreement, however, contained no language that preserved or guaranteed all of that work for performance by bargaining unit Laborers. Rather, the language described the duties typically performed by Laborers for purposes of pay, with certain of those tasks supporting additional hourly pay.

The provisions of the Agreement clearly allowed the Company to engage subcontractors,

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 175 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 37 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

both Union and non-Union. Article XV, <u>Subcontracting Notification</u>, of the 2014-17 Agreement

simply obligates the Company to notify the Union of any subcontractors that employ members of

LIUNA Local 11 or 657 so that all monies and payments due to the Funds are properly paid by

the subcontractors for those contributions. There is no limitation on the Company's right to

subcontract and no restriction on its ability to employ non-union subcontractors to perform

laborer work. This represented a significant change from the provisions of Article XV of the

2006-08 Agreement and Article XV of the 2011-14 Agreement, each of which limited the

Company's right to engage in subcontracting by imposing certain conditions that needed to be

met.

Nor did the Agreement prohibit Company supervisors from occasionally performing

Laborer work. Multiple Company witnesses testified that they had performed what the Union

asserts is "Laborers' jurisdictional work" during the years that the Company had both bargaining

unit Laborers working and the Agreement was in effect. At no time did anyone complain that

the performance of minor Laborer tasks by supervisors violated the Agreement and no

grievances to that effect were filed. The duties that they testified had been performed included

sweeping, moving materials, directing trucks, cleaning up, and watching other supervisors do the

same thing (testimony of Mr. LeJeune who estimated that he had seen others do so

approximately 20 times and that he personally had done so 3-4 times, on average, at each project

at which he had worked); sweeping, cleaning up, moving materials, setting up signs, and moving

trash out of a hoist (testimony of Mr. Jennings); sweeping and cleaning and witnessing other

supervisors doing so as well (testimony of Mr. Lee); and performing on average about 10

minutes a day of "manual labor" of various types on job sites, with no change in the types of

work or the amount of work since 2017 (testimony of Mr. Higgins). All managers who testified

noted that laborer-related work was never part of their job responsibilities, was never a major

activity in terms of time, and was only performed when necessary for the safe and efficient

operation of the job.  The Company executives who testified similarly confirmed that they had

witnessed managers performing labor work, both before and after 2017, but expected that time to

be limited because it was not a good use overall of their time.

      The duties in question were performed openly and, at times, alongside members of the

bargaining unit.  Contributions were never made to the Fund for such incidental labor work being

performed by salaried employees and neither the Union nor the Fund ever claimed contributions

for that work despite audits having been conducted to confirm that the Company made all

required contributions.

      The fact that subcontractors were performing significant amounts of Laborer work under

the Agreement was not disputed.  Laborer work needed to be performed on a daily basis at all of

the Company's job sites in the D.C. Metro area, but the Company directly employed only 20 to

50 Laborers and those employees were not assigned to work at all of the Company's job sites.

      When the Company gave notice to the Union that it would abrogate the 2014-17

Agreement and would terminate all of its Laborers employed in the D.C. Metro market, the

Union responded by filing a petition for election with the NLRB, the purpose of which was to

convert the existing Section 8(f) relationship to a Section 9(a) relationship.  The NLRB rejected

the petition based upon the Company's assertions – which the Board found credible – that it was

ceasing self-performance of Laborer work in the near future.  The Board noted that the Union

could refile its petition of the Company resumed directly employing Laborers; the Union has not

done so.

      After the Company notified the Union of its abrogation of the Agreement, it terminated

Case 2:24-cv-02254-RJR Document 1-10 Filed 08/02/24 Page 177 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 39 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

all of the bargaining unit Laborers and subcontracted all Laborer work on the Company's job sites in the D.C. Metro region that was not already being contracted out.  The Company directed its superintendents and managers not to direct hire any Laborers and included in its subcontracts with various trades the following language:

> The Subcontractor shall clean up and remove daily from the job site dirt, trash and debris arising from its work as directed by the Contractor. In the event the Subcontractor fails to clean up and remove such dirt, trash and debris, the Contractor may, at its discretion, arrange for the same at Subcontractor's expense.

The standard form contracts also included in the scope of work, among other items, the responsibility to receive, unload, move, inventory, and install all materials; to perform needed sweeping and mopping and other types of general clean-up and housekeeping; to coordinate and schedule deliveries and perform all needed traffic maintenance; to perform excavation, backfill, and mucking work; and to place and maintain fences, gates, and handrails.  Given the performance of these tasks by the trade subcontractors and the hiring of additional Laborer subcontractors, the Company has been able to complete work at each of its D.C. Metro area job sites without hiring a single hourly employee to perform work that the Fund asserts is traditional Laborer work.  As noted, the occasional performance of incidental manual work by supervisors did not change post-May 31, 2017 from the work performed by those supervisors prior to that date.

The Fund advised the Company a mere six days after it notified the Union of the Company's intention to abrogate the Agreement and to cease directly employing Laborers that the Fund would assess withdrawal liability.  The Fund stated that intention prior to the Company even actually ceasing contributions and prior to receiving any evidence at all that the Company would continue to perform work of the type for which contributions would have been due in the jurisdiction of the Union.  It also assessed withdrawal liability in this case years prior to it

Case 2:24-cv-02254-RJR Document 1-10 Filed 08/02/24 Page 178 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 40 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

receiving the first of its videos of work site activity – videos that the Company contends fail to actually establish that any employees of the Company actually continued to perform work that would deprive the Company of the benefit of the building and construction industry provisions of Section 4203(b) of ERISA.  The exemption was created because Congress recognized the nature of employment in the building and construction industry and determined to impose withdrawal liability only when the withdrawing employer is actually taking work out of the jurisdiction of the plan, thus adversely impacting the plan's contribution base.  See, e.g., Multiemployer Pension Plan Amendments Act of 1979: Hearing on S. 1076 Before the Senate Committee on Labor and Human Resources, 96th Cong. 140 (1980) (statement of Matthew Lind, Executive Director, PBGC); Structure Tone, Inc. v. New York City District Council of Carpenters Pension Fund, No. 17-cv-2917 (RJS), 2018 WL 1633768, at *1, *4-5 (S.D.N.Y. Mar. 30, 2018) (discussing Congressional intent in the design of the construction industry exception).  In this case, there was no showing that the Company continued to perform work that previously was performed by bargaining unit Laborers, but which no longer generated contributions to the Fund. The cases have recognized that, in determining whether work is of the type for which contributions were previously required, consideration must be given to the terms of the collective bargaining agreement itself and federal labor law.  Trustees of the Plumbers and Pipefitters National Pension Fund v. Plumbing Services, Inc., 791 F.3d 436, 445 (4th Cir. 2015) (granting summary judgment on claim for withdrawal liability due to a failure to have initiated review and arbitration in accordance with MPPAA Section 4221 requirements); Laborers' Pension Fund v. W.R. Weis Company, 180 F. Supp.3d 540, 554 (N.D. Ill. 2016), aff'd, 879 F.3d 760 (7th Cir. 2018) (finding no continuation of covered operations and finding Section 4203(b) applicable when marble finishers employed by Weis performed work previously performed by laborers

Case 1:24-cv-02254-RJR Document 10-10 Filed 08/02/24 Page 179 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 41 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

prior to the elimination of all laborers and had contributions made on behalf of that work to a different pension plan; factually, the employer was found to never have had an obligation to contribute for work by non-laborers for whom contributions were made to another pension fund even though the finishers performed some work that were within the former general jurisdiction of the laborers' collective bargaining agreement; findings of the arbitrator, while brief, seemed to rely on the history, custom, and past practice to resolve the contractual ambiguity and supported the finding that the fund had not previously required the employer to make contributions for any work performed by bricklayers, marble setters, or finishers).  The position of the Employer is even stronger than that advanced by the employer in Weis.  In Weis, the laborers were actually replaced by other employees of the employer.  Here, by contrast, the Laborers were replaced by outside contractors and supervisors performed only minimal amounts of laborer work in amounts no different than had been performed without objection prior to the withdrawal from the Fund. Even Mr. Marchetti, who spent more time performing labor work than other supervisors, testified that he only performed less than 2 hours of laborer work at a time, with the largest amount of time being spent hanging 8-10 fences requested by the client for safety reasons, and on another occasion, assisted subcontractor laborers move material, a job that he spent 45 minutes to an hour on two consecutive days performing.

The record established that the Company has not done any work since the Agreement expired on May 31, 2017 that would have required contributions to be made to the Fund under the terms of that Agreement.  The Company has not hired any employees to perform Laborer work.  The limited performance of work by supervisors was an established past practice and did not violate any express contract language and has never been understood to generate an obligation to make additional contributions to the Fund.  The identification of work to be

Case 1:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 180 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund            Page 42 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

performed by Laborers under the Agreement was not exclusive and could be performed both by employees in other trades if incidental to the completion of their work and by subcontractors, both union and non-union. The Fund has not asserted in this arbitration or in its assessment that the Company's subcontracting of Laborer work – which was permitted by the Agreement – resulted in the Company losing the benefit of the building and construction industry exemption. Rather, its sole claim related to the performance of minimal, incidental laborer type work by supervisors – who are acknowledged by the Fund not to be "employees" under the Plan and Trust and on whose behalf the Fund would never have accepted contributions – and which was something that was performed by those supervisors prior to the expiration of the Agreement without any assertion that it violated the terms of the Agreement or created any obligation to make contributions to the Fund. That limited work cannot be found to constitute a continuation or resumption of work of the type for which contributions would have been required. Carpenters Pension Trust Fund for Northern California v. Underground Construction Company, Inc., 31 F.3d 776 (9th Cir. 1994) (finding that contribution history of two joint ventures that included participation by the employer could not be attributed to the employer when calculating the employer's withdrawal liability upon a complete withdrawal; finding that the question of whether the employer was responsible for the contributions made by the joint ventures was a matter of interpretation and application of the collective bargaining agreement).

The Agreement contains no language that prohibits or limits supervisors from performing any type of work. Further, the Trust Agreement limits an employer's liability to "payments required by law, by this Agreement and Declaration of Trust, by participation Agreements, or by the collective bargaining agreements with respect to his or its individual or joint venture operations." (Article VII, Section 4, Trust Agreement)

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 191 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 43 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

The subcontracting of work similarly cannot be found to be the performance of work of the type for which contributions would have been made.  The PBGC addressed the subcontracting question under Section 4203(b) almost 40 years ago in PBGC Opinion Letter No. 85-5 and reasoned that "there is no withdrawal unless the employer would have been obligated to make contributions for work performed by subcontractors under the terminated agreement."  The PBGC reasoned that there would be no withdrawal if contributions for subcontractors were not required under the prior collective bargaining agreement "because the employer would not be continuing to perform work of the type for which contributions were previously required."  A number of courts have adopted a similar approach towards the application of Section 4203(b). See Sheet Metal Workers National Pension Fund v. Courtad Construction Systems, Inc., 439 F. Supp.2d 574 (E.D. Va. 2006) (directing dispute over whether work performed by subcontractors constituted the performance of work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required to arbitration and directing payment of interim payments with interest and liquidated damages); H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for Northern California, 859 F.2d 808 (9th Cir. 1988) (finding that the performance of construction work by contractors when the collective bargaining agreement required the employer to make contributions to the fund on behalf of those contractors constituted continued performance of construction work under Section 4203(b) such that withdrawal liability was properly assessed); Oregon-Washington Carpenters-Employers Pension Trust Fund v. BQC Construction, Inc., 485 F. Supp.2d 1206 (D. Ore. 2007) (vacating arbitration award that found building and construction industry provisions applicable since record established that employer continued to perform on site installation work of the type for which contributions were previously required with a non-union subcontractor; finding that the occasional performance of

Case 2:24-cv-02254-RJR Document 1-10 Filed 08/02/24 Page 182 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 44 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

installation work by the employer's production employees did not constitute the performance of work of the type for which contributions were previously required); and Seaway Port Authority v. Duluth-Superior ILA Marine Association, 920 F.3d 503 (8th Cir. 1990) (the Authority was never contractually bound to make contributions to the fund and, therefore, was never an employer).  By replacing direct-hire Laborers with subcontractors, the Company has not continued to perform covered work, has not decreased the Fund's contribution base, and has not incurred a withdrawal.  This is not a case, like H.C. Elliott, in which the employer "stays in the industry but goes non-union and ceases making payments to the plan."  In this case, the Company existed the self-performing of Laborer work and contracted out the work to a combination of both union and non-union subcontractors, exactly as was the case prior to 2017 and exactly as permitted under the Agreement.

The Fund's use of the "Segal blend" interest rate assumption to value the unfunded vested benefits liabilities of the Fund was violative of Section 4213 of ERISA.  Two recent United States Court of Appeals decisions make clear that the use of the blend in this case was improper and that any withdrawal liability due must be recalculated based upon use of a valid interest rate assumption.  Although ERISA contains separate provisions addressing the selection of assumptions for minimum funding and for withdrawal liability purposes, the language used in those two sections are identical.  For minimum funding, actuaries must select assumptions "each of which is reasonable (taking into account the experience of the plan and reasonable expectations), and which, in combination, offer the actuary's best estimate of anticipated experience under the plan."  ERISA Section 304(c)(3), 29 U.S.C. §1084(c)(3).  For calculating unfunded vested benefits liabilities for purposes of determining withdrawal liability, actuaries also are required to select assumptions "which, in the aggregate, are reasonable (taking into

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 183 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund      Page 45 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

account the experience of the plan and reasonable expectations) and which, in combination, offer

the actuary's best estimate of anticipated experience under the plan." ERISA Section 4213(a)(1),

29 U.S.C. §1393(a)(1). Fund Actuary Loomis testified that the 7.25% funding interest rate

assumption represented his best estimate of anticipated experience under the plan after

considering future investment returns, past investment returns, and the investment allocation of

the plan assets. If that is his best estimate, for purposes of funding, it should also be his best

estimate for purposes of calculating the value of unfunded vested benefits liabilities for purposes

of withdrawal liability.

     He testified that he treated assessment of withdrawal liability as a "settlement" of the

Company's obligations to the Fund and thus blended the funding interest assumption with the

PBGC interest rates used for plan terminations which are based upon rates for annuities in the

marketplace. He relied in this regard upon, among other things, Actuarial Standards of Practice

("ASOP") 27, Section 3.7 stating that actuaries may select interest rate assumptions based upon

the purpose of measurement, including defeasance or settlement.

     This precise rationale, however, was found improper by both the Courts of Appeals for

the Sixth Circuit in Sofco Erectors, Inc., supra, and the Court of Appeals for the District of

Columbia Circuit in Energy West Mining Company, supra. Mr. Loomis provided no specific

rationale for using PBGC rates and how that met ERISA's requirement that the assumption

reflect the actuary's best estimate of anticipated experience under the plan. The record did not

reflect that the Fund invests in annuities or purchases annuities after an employer withdraws and

makes withdrawal liability payments. The PBGC rates as of December 2016 were very low –

1.98% for the first 20 years and 2.67% thereafter. The use of the PBGC rates diluted the

actuary's best estimate of anticipated plan experience and resulted in a significant magnification

of the unfunded vested benefits liabilities for the Fund in each of the relevant plan years.  As

held by the Court of Appeals in <u>Sofco</u>,

> [T]here is nothing in the statutory test to indicate that ERISA adopted a similar regime for individual withdrawals from multiemployer plans. Nor can we find any suggestion that Congress intended to give an actuary the discretion to dilute her best estimate of anticipated experience under the plan in order to shift risk onto the departing employer. The PBGC has not adopted this approach either.

(15 F.4th at 422.)  The <u>Sofco</u> Court also found that ASOP 27 provided no support for the use of

the blend since any professional standards "must succumb to the statutory requirements."  Id. at

423.  The Court of Appeals in <u>Energy West</u> similarly held that "[w]hatever the merits of the

actuary's theory, it cannot displace the Best Estimate Requirement."  39 F.4th at 740.

      Although the District of Columbia Circuit was confronted with an actuarial calculation of

unfunded vested benefits liabilities that was based upon application of the PBGC rate, rather than

the blend, the Court found that while the use of the minimum funding rate was not required, the

minimum funding interest rate assumption and the withdrawal liability discount rate assumption

must be "similar" and also must both be "the actuary's best estimate of anticipated experience

under the plan."  <u>Id</u>. at 741-42.  In this case, there was no evidence that Mr. Loomis adjusted any

other assumptions as part of the selection of the blended interest rate assumption.  Once the

Arbitrator finds that the interest rate assumption was not determined in accordance with the

requirements of Section 4213(a)(1), it follows that the Company's withdrawal liability (if any)

must be recalculated using the funding interest rate assumption.  As noted in <u>National Retirement

Fund</u> v. <u>Metz Culinary Management</u>, 946 F.3d 146 (2d Cir.), <u>cert. denied</u>, 141 S. Ct. 246 (2020),

MPPAA precludes retroactive changes to interest rate assumptions.  It would, therefore, be

improper for the Fund Actuary to select any different interest rate assumption now and apply it

retroactively to the years relevant to the calculation of withdrawal liability in this case.

      The Fund's claim for costs and attorneys' fees must be denied.  Pursuant to PBGC

Case 24-cv-02254-RJR  Document 1-10  Filed 08/02/24  Page 185 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 47 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

Regulation Section 4221.10(b), 29 C.F.R. §4221.10(b), attorneys' fees may be awarded by an arbitrator only upon a showing of bad faith or a showing that the opposing party has engaged in dilatory, harassing, or other improper conduct.  The Company's initiation of arbitration was in good faith both with respect to its challenge to the interest rate assumption – which was supported by two recent Court of Appeals decisions – and with respect to the construction industry exemption.  The Fund, by contrast, assessed withdrawal liability based upon a view of Section 4203(b) that is inconsistent with the facts and applicable case law.  Nor was it shown that the Company engaged in any improper conduct during the course of the arbitration proceeding or during discovery.  If any party engaged in inappropriate behavior in discovery, it was the Fund, not the Company.  The Fund scheduled and took numerous depositions that it knew had no effect on the core issue in the case, demanded to depose witnesses including apex witnesses, retirees, and former employees who had no information to add to the disputed facts.  With respect to the video evidence, the Fund declined to provide responses to the evidence that the Fund had with respect to its claims that the Company continued to perform work for which contributions would have been due, claiming legal privilege.  It became apparent during the hearing that the Fund hid the videos until it wished to disclose them – which occurred only shortly before the start of the hearings.

With respect to the interest assumption challenge of the Employer, the Fund's initial brief fails to cite to Sofco or Energy West, ignoring this clearly relevant case law.  This is particularly troubling since the D.C. Circuit is the controlling jurisdiction in this arbitration and Energy West is the applicable and controlling law regarding the use of the Segal blend.

Nor has the Fund established that the five factors used by the courts to determine whether to award attorneys' fees in an ERISA case have been met – 1) the losing party's culpability or

bad faith; 2) the losing party's ability to satisfy a fee award; 3) the deterrent effect of such an

award; 4) the value of the victory to plan participants and beneficiaries and the significance of

the legal issue involved; and 5) the relative merits of the parties' positions.  See, e.g., Eddy v.

Colonial Life Insurance Company of America, 313 U.S. App. D.C. 205, 59 F.3d 201 (D.C. Cir.

1995) (adopting and applying the factors set forth in Hummell v. S.E. Rykoff & Company, 634

F.2d 446 (9th Cir. 1980)).  The Company's good faith position regarding the building and

construction industry exemption was that only if it employed individuals whose primary job was

to perform Laborer work would it then be considered to have continued to perform work in the

jurisdiction of the collective bargaining agreement.  That position further is supported by

applicable case law.  The Fund's claim of bad faith rests not on any proof of actual, subjective

bad faith, but upon its theory of the case that supervisors performing occasional, incidental labor

tasks is "work . . . of the type for which contributions were previously required."  The

Company's position concerning the actuarial assumptions used to calculate the withdrawal

liability in this case also are supported by two recent Court of Appeals rulings – Sofco and

Energy West.  No claim can legitimately be made that initiating arbitration in this case was done

in bad faith as the Fund maintains.  There was no showing of malice or actions such as

deliberately offering false testimony or advancing frivolous or improper arguments.  In contrast,

the Fund acted inappropriately in ways that increased the costs of the process needlessly.  It

initially engaged in discovery and asserted that the Company had engaged in an "evade or avoid"

transaction even though it never made that claim in its assessment or in its response to the

Company's Request for Review.  It withheld production of its videos until late in the discovery

process and deliberately withheld documents to be a surprise in arbitration.  The Fund demanded

to depose apex witnesses including those who had no knowledge of the facts.  It relied heavily on

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 187 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 49 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

video evidence to support its assertions that work continued to be performed in the jurisdiction, but that evidence was gathered long after the assessment; at the time of the assessment, the Fund had no evidence whatsoever of any work being performed by the Company, yet issued the assessment anyway. Moreover, the Fund initially attempted to cloak production of the video on the basis of claims that it was done at the direction of Counsel and, therefore, privileged. The Fund, in its initial brief, failed to reference either Sofco or Energy West despite the fact that, at the time, they represented the two most recent, controlling decisions on the question of the actuarial assumptions issued by Courts of Appeals. If the Arbitrator is inclined at all to award attorneys' fees and/or costs, it should be in favor of the Company against the Fund, not as the Fund claimed, against the Company.

For all of these reasons, the Arbitrator should issue a ruling that the Company did not incur a complete withdrawal because of the provisions of Section 4203(b) of MPPAA. In the alternative, the withdrawal liability calculation improperly used the Segal blend in violation of Section 4213 and must be vacated and recalculated using the 7.25% minimum funding interest rate assumption.

## **CONTENTIONS OF THE FUND**

The Fund recognizes that the Company enjoyed the right to withdraw from the Fund. Once it chose to do so, however, it was obligated to pay its fair share of the Fund's unfunded vested benefits liabilities under ERISA. The Company's assertion that Section 4203(b) of ERISA shields it from being required to pay withdrawal liability is in error. While the Company undertook extraordinarily efforts before and during the arbitration to avoid its responsibility for paying withdrawal liability to the Fund, the evidence clearly showed that salaried employees of

the Company were performing work within the jurisdiction of the Laborers' Agreement in the five-year period subsequent to the Company's abrogation of its Agreement.

Prior to the expiration of the Agreement, Laborers were available to assign to various Company job sites, as needed, to perform a wide range of work including, but not limited to, clean up, sweeping, janitorial services, flagging of traffic, spotting, truck checking, material handling, receiving of material, signaling, fence erecting, repairs and dismantling, operations of tools, and traffic maintenance. These duties were performed prior to 2017 and continued to be performed after 2017 on each of the Company's job sites.

The Fund sent both Union officials and outside investigators to Company job sites to video the performance of Laborer work by Company employees. The Union introduced over 100 such examples during the hearings in this matter. Moreover, numerous Company employees admitted in their testimony that they performed a variety of work of the type outlined in Appendix A to the Agreement that described the work jurisdiction of the Laborers. After the Company's termination of all of the bargaining unit Laborers, it was clear that there were insufficient subcontractors still available to perform all of the needed Laborer work. Thus, despite numerous written and oral Company directives to its supervisors that they should not perform even "one second" of Laborer work, the Company was unable to meet this unrealistic objective. The videos and testimony of those who observed the operations first-hand made clear that Company salaried employees routinely performed Laborer work at multiple job sites, when needed, and when subcontractors were unavailable to perform those tasks.

The Company knew that if it self-performed any Laborer work after May 31, 2017 – even in modest amounts – that this would result in a loss of its claim to be excused from withdrawal liability pursuant to Section 4203(b) of ERISA. A March 1, 2017 email sent by Kim Holland,

Mr. Ernst's assistant, to multiple Project Managers and Superintendents in the D.C. Metro area, advised those individuals to ensure that all Laborers still working on Company projects be terminated; that all Laborer work after that date be assigned to subcontractors for performance; and to report the Laborer duties that still needed on the project after termination and the name of the independent contractor whose employees would perform those duties.

As noted, however, and as borne out by the evidence, the need for Laborer work cannot necessarily be planned in advance. The need can arise at any time. When the Company had various gangs of Laborers available for assignment, these tasks could be performed by bargaining unit Laborers. After abrogation of the Agreement and the termination of the Laborers that it employed, that was no longer possible. The Fund knew that this would be the case even prior to the Company's withdrawal; it was simply the nature of the business. Thus, when the Company notified the Fund on January 28, 2017, that it was abrogating the 2014-17 Agreement, the Fund advised that the Company would be liable for withdrawal liability notwithstanding the fact that the Fund is a building and construction industry fund and that substantially all of the employees for whom the Company had made contributions were engaged in the performance of building and construction work. The Trustees knew, based upon the nature of the business, that Company employees would continue to perform Laborers' jurisdictional work and, the videos and testimony of the Fund's witnesses confirmed that this assumption was correct. On January 30, 2018, after the completion of the relevant actuarial reports, the Fund assessed withdrawal liability against the Company. Although the Company maintained that it was excused from paying withdrawal liability due to the provisions of Section 4203(b), the facts make clear that the Company's claim of entitlement to the benefit of Section 4203(b) is contrary to both the facts and to the law. It continued to falsely assert throughout the arbitration that its employees were

not performing work for which the Company previously contributed to the Fund despite

voluminous video records, eye-witness accounts from Union witnesses, and acknowledgements

by multiple Company employees that they continued to perform such work and observed others

doing so.

The Company stipulated that "[a]fter May 31st, 2017, no Whiting-Turner employees,

including salaried employees or hourly employees, were permitted to perform Laborers'

jurisdictional work." The Company further stipulated that:

22. The Union's trade work jurisdiction was defined in Appendix A of the relevant agreements.

23. The jobs listed under the Building Laborer rate of Appendix A of the CBA are all work that falls within Laborers' jurisdictional work.

24. The jobs listed under the General Laborer rate of Appendix A of the CBA are all work that falls within Laborers' jurisdictional work.

25. Flagging is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

26. Signaling is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

27. Sweeping is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

28. Moving materials is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

29. Clean up and cleaning are jobs that fall within Laborers' jurisdictional work pursuant to Appendix A of the CBA.

30. Installing signs is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

31. Refastening the gate of a stake body truck is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

32. Spotting is a job within the scope of Laborers' work pursuant to Appendix A of the CBA.

The Company also stipulated, based upon the deposition testimony of Company

employees, that:

57. Jason Marchetti testified under oath that he installed a sign on a fence at the Catholic University project site after the expiration of the CBA.

58. Jason Marchetti testified under oath that installing signs is a task that falls within Laborers' jurisdictional work.

Case 1:24-cv-02254-RRR   Document 1-10   Filed 08/02/24   Page 191 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 53 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

59. Jason Marchetti testified under oath that he has unloaded a truck on a Whiting-Turner project site.

60. Jason Marchetti testified under oath that he refastened the gate of a stake body truck.

61. Jason Marchetti testified under oath that the video file WT006 shows Nick Carneglia using a crowbar at Whiting-Turner's Catholic University project site.

62. Jason Marchetti testified under oath that using a crowbar would be a task for a Laborer.

63. Rob Ferrara testified under oath that the video file WT047 shows a person flagging and signaling, and that signaling and flagging are Laborers' jurisdictional work.

64. Kyle Jennings testified under oath that the video file WT047 shows a person holding a "slow" sign for the purpose of controlling traffic and that controlling traffic is a general Laborers' job.

65. Kyle Jennings testified under oath that the video file WT125 shows an individual in a Whiting-Turner yellow vest waving a truck back and that this task is general Laborers' jurisdictional work.

66. Rob Ferrara testified under oath that the video file WT105 shows an individual signaling and that signaling is Laborers' jurisdictional work.

67. Kyle Jennings testified under oath that the video file WT105 shows an individual escorting a truck out of a site and that this task is general Laborers' jurisdictional work.

68. Kyle Jennings testified under oath that the video file WT015 shows a person wearing Whiting-Turner yellow vest backing up a truck and that task falls within general laborers' work.

69. Rob Ferrara testified under oath that the video file 20191031_120216 shows a person wearing Whiting-Turner PPE moving materials and that moving materials on a jobsite is general Laborers' work.

70. Rob Ferrara testified under oath that the video file 20200709_135455 shows a person helping signal and that signaling is general Laborers' work.

71. Kevin Higgins testified under oath that the video file 20210513_121926 shows a person wearing Whiting-Turner PPE guiding a truck which is Laborers' jurisdictional work.

72. Whiting-Turner's 30(b)(6) witness testified under oath that salaried employees are not allowed to perform the responsibility of cleanup and cleaning on Whiting-Turner project sites.

Despite those stipulations, however, the record made clear that Whiting-Turner managers and executives and non-union contractors performed Laborer jurisdictional work during the five-year period following the end of the 2014 Agreement. The Stipulations are sufficient to support the Fund's determination that the Company continued to perform work in the jurisdiction of the Agreement for which contributions would have been due within the five-year period following May 31, 2017. Following the Company's abrogation of the 2014-17 Agreement, it ceased to

have an obligation to contribute to the Fund as of June 1, 2017 – the day following the expiration

of that collective bargaining agreement.  The witnesses of both the Company and the Fund

clearly established that Company supervisory employees were regularly performing Laborer

work that, if performed by bargaining unit Laborers, would have resulted in contributions to the

Fund, but that, when performed by the Company's salaried employees, did not.  That harm to the

Fund's contribution base is precisely the harm that Section 4203(b) presumed would not occur

absent the Company continuing or resuming work of the type for which contributions previously

would have been due.

The Company's challenge to the calculation of withdrawal liability in this case must be

rejected.  Fund Actuary Loomis testified that he used his best estimate of anticipated experience

under the plan to calculate the withdrawal liability in this case.  Section 4221(a)(3)(B) of ERISA,

29 U.S.C. §1401(a)(3)(B) creates a strong presumption of correctness that the Company has not

overcome.  Absent a showing that the assumptions used by Mr. Loomis are in the aggregate,

unreasonable (taking into account the experience of the plan and reasonable expectations) or that

a significant error was made in applying the actuarial assumptions or methods, Section

4221(a)(3)(B) requires that the calculation be affirmed.

An uncontested, independent actuarial expert (Dr. Kra) opined that "the assumptions

selected by [Mr. Loomis] and used in valuing the Plan's [unfunded vested benefits] as of each

December 31, from 2007 through 2016 were not unreasonable in the aggregate (taking into

account the experience of the Plan and reasonable expectations)."

The Segal blend is commonly used by funds in determining the value of unfunded vested

benefits liabilities for purposes of withdrawal liability.  It calculates the value of unfunded vested

benefits liabilities using PBGC rates first, based upon the assumption that the existing assets of

Case 1:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 56 of 51

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 55 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

the fund are used to "settle" those benefit liabilities. The value would, therefore, be equivalent to the cost of purchasing an annuity to provide those benefits. Any other formulation shifts all of the risks concerning the future investment performance of the Fund's assets as well as the actuarial risks of increased longevity, earlier than anticipated retirements, downturns in the industry, and the like, solely onto the Fund.

The Fund recognizes that the Sofco and Energy West decisions sustained challenges to the use of actuarial interest rate assumptions that differed from the funding interest rate assumption of the plan. Other courts, however, have upheld use of the Segal blend – see, e.g., Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund, 331 F. Supp.3d 365 (D.N.J. 2018). In an amicus brief filed with the Second Circuit by the PBGC, which is vested with the authority to establish interest rates for use in calculating withdrawal liability pursuant to Section 4213(a)(2) of ERISA, the PBGC has opined that the Segal blend is an appropriate approach to valuing unfunded vested benefits liabilities for withdrawal liability purposes. (Subsequent to the filing of the briefs in this matter, the PBGC has published Proposed Regulations, 87 Fed. Reg. 62316 (October 14, 2022) that would create interest rate assumptions under Section 4213(a)(2) that would authorize the use of any interest rate assumption to determine the unfunded vested benefits liabilities for purposes of withdrawal liability between the PBGC rates and funding interest rate assumptions, inclusive, including blends such as the Segal blend used in this case.)

The Fund submits that it is entitled to an award of reasonable attorneys' fees and costs in connection with this arbitration due to the Company's bad faith behavior throughout this arbitration. ERISA Section 4221(a)(2) authorizes the arbitrator to award reasonable attorneys' fees. Section 4221.10 of the PBGC Regulations authorizes grants of attorneys' fees and costs. The Company falsely asserted that it had not performed work in the jurisdiction of the type

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 194 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 56 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

outlined in Appendix A of the 2014 Agreement after June 1, 2017.  The Company then engaged

in tactics designed to obstruct the Fund's reasonable discovery.  The Company also initiated the

arbitration in bad faith.  The Company challenged the withdrawal liability assessment based on

its assertion that it had not performed work in the jurisdiction of the applicable collective

bargaining agreement after the expiration of the 2014 Agreement.  This is false and the Company

either knew or clearly should have known at the time of its Request for Review that this assertion

was false.  The Company made those false claims and representations despite knowing that

salaried employees were performing Laborers' work at multiple job sites after the expiration of

the Agreement.  The Company took no steps, other than a single email, to ensure that its own

employees did not perform Laborers' jurisdictional work.  At a minimum, the Company failed to

investigate the facts prior to dragging the Fund through this arbitration and causing it to incur

substantial attorneys' fees and investigative costs to prove the Company's continued

performance of bargaining unit work.  The Company's dilatory tactics during discovery,

including particularly, the Company's actions regarding the Fund's attempts to schedule the

depositions of eight Company executives and managers (it did not make a single witness

available for deposition until ordered to do so by the Arbitrator), including the attempt to

schedule a Section 30(b)(6) deposition, as well as the Company's denials in written discovery

that it thought words such as "signaling," "flagging," "sweeping," "moving," "cleanup," and

"cleaning" – words that were contained in Appendix A – were vague and ambiguous all reflect a

pattern of bad faith conduct by the Company.  The failure to initially produce the Foundations of

Excellence policy, despite it having been requested by the Fund, also is reflective of bad faith

conduct.

          For all of these reasons, the Employer should be found to have failed to shoulder its

Case 2:24-cv-02254-RJR Document 1-10 Filed 08/02/24 Page 195 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund     Page 57 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

burden of proving that the assessment of withdrawal liability in this case was improper and

should uphold that assessment in its entirety. The Arbitrator should also award the Fund its

reasonable attorneys' fees and costs.

## DISCUSSION AND OPINION

The issue presented in this case is whether the Company proved by a preponderance of

the credible record evidence that the Fund's assessment of withdrawal liability in this case was

violated Section 4203(b) of ERISA and was improper as issued contrary to law. If so, it is then

necessary to determine the appropriate remedy. If not, then the Fund's challenge to the amount

of the assessment must also be resolved. That challenge that in this case focused upon the Fund

Actuary's use of the Segal blend to determine the value of the unfunded vested benefits liabilities

of the Fund for purposes of calculating the withdrawal liability assessment.

Due to the bifurcation of a potential Section 4212(c) issue that might affect the findings

of fact and conclusions of law in this case concerning the application of Section 4203(b), the

Phase One ruling in this case will be issued in the form of an Interim Award. The Interim Award

presumes that no Section 4212(c) claim will be asserted that ultimately will be found to have

merit. If such a claim is both asserted and found to be meritorious, then the findings and

holdings set forth in this Phase One Ruling and Interim Award may need to be re-evaluated and

reconsidered and/or modified.

After careful consideration of the record evidence and applicable law, I find that the

Company has shouldered its burden in this case and has shown by a preponderance of the

credible record evidence that Section 4203(b) of ERISA precluded the assessment of withdrawal

liability in this case. As a result of this holding, it is not necessary to address whether ERISA

Section 4213 prohibited the Fund Actuary's use of the Segal blend in this case to determine the

Case 2:24-cv-02254-RJR   Document 11-10   Filed 08/02/24   Page 196 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 58 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

Fund's unfunded vested benefits liabilities for withdrawal liability purposes. The claims relative to requested assessments of attorneys' fees and costs are all denied. Once any Section 4212(c) issue has been addressed, and if there is no reason to alter or modify the Interim Award, then the Fund will at that time be directed to refund to the Employer all interim payments of withdrawal liability, with appropriate interest determined in accordance with applicable PBGC regulations. A summary of the principal reasons for these holdings follows.

<u>The ERISA Section 4221(a)(3)(A) Presumption of Correctness</u>

Section 4221(a)(3)(A) of MPPAA, 29 U.S.C. §1401, provides that:

> (3) (A) For purposes of any proceeding under this section, any determination made by a plan sponsor under sections 4201 through 4219 and section 4225 [29 USCS §§ 1381 - 1399 and 1405] is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

In <u>Concrete Pipe and Products of California, Inc.</u> v. <u>Construction Laborers Pension Trust for Southern California</u>, 508 U.S. 602 (1993) ("<u>Concrete Pipe</u>"), the United States Supreme Court found that the Section 4221(a)(3) presumptions of correctness did not violate Fifth Amendment due process requirements by denying access to an impartial decisionmaker. In reaching that finding, the Supreme Court found that the possibility of bias stemming from the statutory role and fiduciary obligation of the trustees would prevent them from serving as adjudicators of withdrawal liability. The Court found the language of Section 4221 to be "incoherent" and construed the statute to avoid serious problems of unconstitutionality unless that construction was plainly contrary to the intent of Congress. The Court held that:

> Although we are faced here not with ambiguity within the usual degree, but with incoherence, we have a common obligation in each situation to resolve the uncertainty in favor of definite meaning, and the canon for resolving ambiguity applies with equal force when terminology renders a statute incoherent. In applying that canon here, we must give effect to the one conclusion clearly supported by the statutory language, that Congress intended to shift the burden of persuasion to the employer in a dispute over a sponsor's factual determination. This objective can be realized without raising serious constitutional concerns simply by construing the presumption to place the burden on the employer to disprove a challenged factual determination by a preponderance. In so construing the statute we make no pretense to have read the congressional mind to perfection.

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 197 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 59 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

> We would not, indeed, even have this problem if an argument could not obviously be made that
> Congress intended greater deference than the preponderance standard extends. But one could
> hardly call the intent clear after wondering why the preponderance standard was also included.
> In these circumstances it is enough that the choice to attain coherence by obviating constitutional
> problems is not "plainly contrary to the intent of Congress." DeBartolo, supra, at 575.

> Because the statute as we construe it does not foreclose any factual issue from independent
> consideration by the arbitrator (the presumption is, again, assumed by all to be inapplicable to
> issues of law), there is no constitutional infirmity in it. For the same reason, that an employer may
> avail itself of independent review by the concededly neutral arbitrator, we find no derivative
> constitutional defect infecting the further presumption that a district court must afford to an
> arbitrator's findings of fact. See 29 U.S.C. § 1401(c).

(Id. at 629-30).

Thus, following the Supreme Court's decision in Concrete Pipe, it is clear that in

arbitrations under MPPAA challenging determinations of withdrawal liability, with respect to

non-actuarial calculational issues (which involve a different set of presumptions contained in

Section 4221(a)(3)(B) of ERISA), the process is a de novo, not an appellate one, and that the

employer that challenges a determination of the trustees that withdrawal liability is due bears the

burden of disproving all challenged determinations by a preponderance of the evidence.

No such burden of proof or persuasion is applicable, however, to questions of law, which are

viewed de novo and without any presumption of correctness.

The Supreme Court in Concrete Pipe addressed the Section 4221(a)(3)(B) presumption of

correctness as well, but given the ruling that it is not presently necessary to address Whiting-

Turner's challenge to the amount of the withdrawal liability assessment, it is not necessary to

address in any detail the discussion by the Concrete Pipe Court with respect to the Section

4221(a)(3)(B) presumptions.

No Withdrawal Permitting the Assessment of Withdrawal Liability Occurred Due to the
Provisions of Section 4203(b) of ERISA

Section 4203(b) of ERISA provides special rules that apply when an eligible building and

construction industry employer ceases to have an obligation to contribute to a building and

Case 2:24-cv-02254-RJR Document 11-10 Filed 08/02/24 Page 198 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund    Page 60 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

construction industry plan.

The Parties stipulated and the record supports a finding that: 1) the Fund is a building and construction industry plan as defined in Section 4203(b)(1)(B); and 2) substantially all the employees of the Company with respect to whom the Company had an obligation to contribute to the Fund performed work in the building and construction industry, thus satisfying the provisions of Section 4203(b)(1)(A). Pursuant to Section 4203(b), a complete withdrawal of an eligible building and construction industry employer from a building and construction industry plan is not subject to the general rules contained in Section 4203(a) and occurs only if: 1) the Company ceases to have an obligation to contribute under the plan [Section 4203(b)(1)]; AND 2) the Company continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required [Section 4203(b)(2)(B)(i)] OR resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases and does not renew the obligation to contribute at the time of the resumption [Section 4203(b)(2)(B)(ii)].

There was no question that the Company ceased to have an obligation to contribute to the Fund with the expiration of the 2014 Agreement on May 31, 2017. The Fund in this case determined that the Company continued to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required and/or resumed such work prior to June 1, 2022. The only question factually is whether the Company continued or resumed work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required such that the provisions of Section 4203(b)(2) permitted the Fund to have imposed withdrawal liability as a result of the cessation of the obligation to contribute. If a preponderance of the credible record evidence rebuts the

determination of the Fund that the Company continued to perform work in the jurisdiction of the type for which contributions were previously required or resumed such work within the five-year period beginning June 1, 2017, then the assessment in this case must be overturned as contrary to law.

The record made clear that the Company ceased employing directly Laborers following the permanent layoffs of all of its bargaining unit Laborers on or about March 1, 2017. All of the Laborer type work needed in the D.C. Market on the Company's job sites was performed on and after June 1, 2017, through the use of outside contractors (both Union and non-union) with occasional performance of Laborer type work by salaried employees. The first question to be addressed is whether the performance of Laborer type work by employees of outside contractors was the continued and/or resumed performance of Laborer work by the Company for purposes of Section 4203(b)(2)(B)(ii) of ERISA. The second question is whether the work performed by salaried employees of the Company so qualified.

The Fund appears to acknowledge that, based upon the facts in this case, the work performed by employees of outside contractors cannot form the basis of a finding that Section 4203(b)(2)(B) was met in this case. The performance of this identical work by outside contractors prior to May 31, 2017 was not viewed as "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were [then] required." Laborer type work was unquestionably being performed by outside contractors at numerous job sites of the Company in the geographic jurisdiction of the collective bargaining agreement for years without any claim that the work was contractually required to have been performed by employees of the Company or that the Company was obligated to make contributions to the Fund for those hours of work. In or about March 2017, the number of bargaining unit Laborers working for the

Company ranged between approximately 25 and 50 in number and Laborer crews were not even

assigned to work at many of the Company's job sites despite a need for Laborer type work to be

performed at those sites.  The clear terms of the Agreement permitted the Company to contract

out Laborer type work and did not obligate the Company to either ensure that the work was

being performed by Union contractors or require that the Company be responsible for ensuring

that those Union contractors that were engaged by the Company paid to the Fund the full

amounts that those contractors were obligated to contribute for Laborer type work under the

collective bargaining agreements between the contractors and the Union.

There is no dispute that, after May 31, 2017, the Company continued to use outside

contractors to perform work of the type described in Appendix A to the 2014 Agreement.  Many

of those contractors continued to perform work that they were performing prior to the expiration

of the 2014 Agreement without any claim that the Company was obligated to make contributions

to the Fund on behalf of that work.  Some of those contractors were Union subcontractors who

were independently obligated to contribute to the Fund on behalf of the work being performed

pursuant to the provisions of the subcontractors' collective bargaining agreements with the

Union.  Others of those contractors were non-Union and no contributions were being made to the

Fund with respect to that work.

Not only was there no provision in the collective bargaining agreement that even

arguably required the Company to have made contributions on behalf of Laborer work

performed by outside contractors, but the final audit performed by the Fund did not maintain that

the Company owed contributions on behalf of hours of work performed by outside contractors.

The lead case with respect to whether the performance of work by outside contractors

after a cessation of the obligation to contribute to a plan constituted the continued or resumed

Case 1:24-cv-02254-RJR   Document 1-10   Filed 08/02/24   Page 201 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 63 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

performance of work for which contributions were obligated to have been made is <u>H.C. Elliott,</u>

<u>Inc.</u> v. <u>Carpenters Pension Trust Fund for Northern California</u>, 859 F.2d 808 (9th Cir. 1988).

In <u>Elliott</u>, the Court of Appeals held that:

> Beginning in November of 1982, however, Elliott had begun subcontracting its carpentry work and had ceased making contributions to the Carpenters trust fund. Although it continued as a housing contractor, the carpentry work on its projects was done by subcontractors rather than by its own employees.
>
> The subcontracting provisions of the collective bargaining agreement to which Elliott was signatory are important for our resolution of the case. They affect our decision as to whether Elliott is continuing to perform the type of work covered by the agreement. Section 50 of the agreement required that signatory employers subcontract only to contractors willing to comply with the provisions of the agreement. The agreement further required that when a subcontractor was delinquent in making payments to the trust fund, the signatory employer was required to make those payments. In addition, the agreement placed upon the employer the "primary" responsibility for trust fund payments. Thus, the trust fund could look to a signatory employer for payments to the fund regardless of whether the work was done by employees of that employer or by employees of a subcontractor. Work covered by the agreement, therefore, included work done by subcontractors for purposes of the signatory employer's fund payment obligations.

(859 F.2d at 810).

The <u>Elliott</u> Court reviewed the legislative history with respect to the adoption of the

building and construction industry provisions, noting Congress' understanding that "the

[unionized] construction industry as a whole did not necessarily shrink when a contributing

contractor leaves the industry; employees are often dispatched to another contributing

contractor." <u>Id</u>. at 811.  The <u>Elliott</u> Court also observed that "[t]he withdrawal of any employer

from the plan does decrease the base, however, if the employer stays in the industry but goes

non-union and ceases making payments to the plan" (<u>id</u>. at 812).  In that regard, the Court quoted

from the Senate Committee on Labor and Human Resources, <u>Summary and Analysis of</u>

<u>Consideration on S.1076</u>, 96th Cong., 2d Sess. 13 (1980) which noted that "an employer reduces

a plan's contribution base only if it continues to do what has been covered work but does not

have an obligation to contribute to the plan for that work.  In order to protect the plan, that

continuation of work without contributions is treated as a withdrawal."  The <u>Elliott</u> Court further

relied, in support of its analysis, upon PBGC Opinion Letter No. 85-5 (January 30, 1985), which

held in pertinent part that:

> This responds to your request for the PBGC's opinion concerning the application of the construction industry rule under Section 4203(b) of ERISA. Specifically, you wish to know whether an employer is liable under that rule when the employer ceases making contributions to a construction industry pension plan but continues in business performing all of its construction work through subcontractors.

> Section 4203(b) provides that a construction industry employer that contributes to a construction industry pension plan does not withdraw from the plan unless the employer "ceases to have an obligation to contribute under the plan, and . . . continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required . . . ." You pose two situations and ask whether they constitute withdrawals.

> First, an employer continues to be obligated to contribute to a plan under a collective bargaining agreement but ceases to perform construction work directly and thus ceases making contributions to the plan. Rather, it subcontracts the work (which may or may not be covered under the plan). Under these circumstances there is no withdrawal, because the employer has not ceased to have an obligation to contribute for any work that it may perform.

> Second, an employer terminates its obligation to contribute and ceases to perform construction work directly. As above, it subcontracts the work instead. Under these circumstances there is no withdrawal unless the employer would have been obligated to make contributions for work performed by subcontractors under the terminated agreement. If contributions would not have been required, there would be no withdrawal, because the employer would not be continuing to perform work of the type for which contributions were previously required.

The provisions of PBGC Opinion Letter No. 85-5 and the holding and analysis of the

Court in Elliott support a finding that the continued use of subcontractors by the Company to

perform laborer type work in the D.C. Market did not constitute a continuation or resumption of

work in the jurisdiction of the collective bargaining agreement of the type for which

contributions were previously provided.  Other than the occasional modest work performed by

salaried employees (which will be addressed next), the Company has ceased directly performing

work of the type described in Appendix A as of June 1, 2017, and has chosen to have all of that

work performed by outside contractors for whom it was never obligated to make contributions to

the Fund.  Unlike the facts present in Elliott, the bargaining unit Laborers were assigned only a

portion of the overall Laborer work performed on Company job sites in the geographic

jurisdiction of the Union under the 2006, 2011, and 2014 Agreements.  Further, although the

Case 1:24-cv-02254-RJR   Document 11-10   Filed 08/02/24   Page 203 of 217

Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 65 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

limitations imposed by those collective bargaining agreements on the Company's contracting out

of Laborer work changed over time, the Company enjoyed significant discretion to contract out

work to both signatory and non-union subcontractors even under the terms of Article XV of the

2006 Agreement.  The limited restrictions on the Company's right to contract out work imposed

by Article XV of the 2006 Agreement were limited further in the 2011 Agreement, increasing

further the Company's ability to subcontract work to non-signatory contractors.  The 2014

Agreement resulted in significant additional changes to Article XV such that the only remaining

limitation was one that required the Company to notify the Union of all of its signatory

contractors.  Article XI, Section 2, a provision that appeared in all of the collective bargaining

agreements introduced into the record, recognized that "The Owner's right to contract directly

with other companies for work at the project site shall not be limited, and the Union shall

cooperate and not interfere with that Owner's operations."  Thus, both before and after June 1,

2017, the Laborer work being assigned to outside contractors – whether outside Laborer

contractors whose contracts covered only Laborer work or outside contractors in other crafts

whose contracts covered both non-Laborer work and Laborer work – was not work for which

contributions would have been required under the Agreement.

 Accordingly, the performance of Laborer work (including the Laborer work that, prior to

March 2017 was being performed on site by bargaining unit Laborers) by outside contractors

after May 31, 2017 cannot be found to constitute the continuation or resumption of work in the

jurisdiction of the collective bargaining agreement for which contributions were previously

required.  Stated differently, the contracting out of Laborer work at the Company's D.C. Market

job sites was not work described in Section 4203(b)(2)(B).

 The Fund's primary emphasis throughout the hearings and the subsequent briefing was

upon the "Laborer" work performed by salaried employees during the five-year period from June 1, 2017 through May 31, 2022. There again are multiple reasons why the preponderance of the credible record evidence makes plain that the minimal amounts of "Laborer" work performed by salaried managers did not constitute a continuation or resumption of work in the jurisdiction of the agreement for which contributions were previously required and that any determination to the contrary by the Fund must be overturned.

First, the record established that salaried managers were performing the same occasional and limited "Laborer" work for years prior to June 1, 2017. This limited performance of Laborer-type work was performed openly and was never challenged by the Union or the Fund as violative of the Agreement. The Agreement did not contain language that would have expressly precluded such work. Appendix A describes generally the work assigned to various categories of Laborers and addresses the pay rates applicable to such work. No provision of Appendix A or other language in the Agreement was shown to have obligated the Company to have assigned the work described in Appendix A exclusively to bargaining unit Laborers, much less proscribe occasional incidental work of brief duration to address safety or other operational needs that could not easily be addressed by bargaining unit or contractor Laborers. Further, regardless of whether or not the performance of such limited Laborer-type work by non-bargaining unit managers was violative of the Agreement, there was no evidence that the Union or the Fund had ever claimed that the Company was obligated to have made contributions to the Fund on behalf of such occasional and incidental work and no contract provision purported to require such contributions. Multiple Company witnesses described performing that work – at job sites where there were bargaining unit Laborer crews working and presumably at job sites where there were no bargaining unit Laborers working – and testified credibly and without rebuttal that no

complaints, grievances, or the like were filed over the performance of such limited work.

Work performed by non-bargaining unit employees never was work for which contributions

were required.  Nor was there evidence of even a single instance in which the performance of

such limited work by salaried, non-bargaining unit employees, resulted in monies being paid to

one or more bargaining unit employees for hours of work "lost" or monies being paid to the

Fund as contributions for those "hours" of work "lost."  The jurisdiction contained in Appendix

A was not shown to have been such that it barred all "Laborer" work from being performed by

non-bargaining unit employees of the Company, whether employees working in other crafts or

salaried employees, or by employees of outside contractors.

Second, there is no showing that the amount of "Laborer" work performed by the salaried

managers has increased after June 1, 2017 from the amount of such work that was performed by

those same employees prior to that date to a degree that it represented a replacement for one or

more bargaining unit Laborers.  As testified to by multiple witnesses, the direct performance by

managers of Laborer-type work identified in Appendix A of the 2014 Agreement, was generally

limited in nature, both as to duration and also as to circumstance.  Witness after witness stated

that the amount of work performed was modest (ranging from a few minutes to perhaps an hour

in duration for a given task) and to circumstances where safety considerations (such as directing

traffic or pedestrians, moving fence sections/gates/cones or barriers, affixing signs), final

sweeping or removal of modest amounts of debris to facilitate turnover of the area to the

customer, or the like was involved.  Some instances also involved assisting temporarily and

briefly Laborers (before June 2017 both bargaining unit Laborers and other employees and

contractors performing "Laborer" work), as was the case with respect to the ruptured water pipe

at the MGM Casino at National Harbor project.  Cf. Oregon-Washington Carpenters-Employers

Case: 24-v-02254-RJR Document 11-10 Filed 08/02/24 Page 206 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 68 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

<u>Pension Trust Fund</u> v. <u>BQC Construction, Inc.</u>, 485 F. Supp.2d 1206 (D. Ore. 2007) (although work performed by non-union subcontractors were found to constitute work of the type for which contributions were previously required, occasional installation work performed by the employer's production employees were found not to constitute work of the type for which contributions were previously required). The preponderance of the record evidence established that the Laborer type work being performed by bargaining unit Laborers prior to March 2017 was being performed thereafter by outside contractors, both Union and non-Union.

Out of the hundreds of hours of observation of Company job sites made in this case spanning multiple years, the manual work identified as having been performed by Company salaried employees totaled only a handful of hours in the aggregate. The video and testimony from the Fund's investigators and Union officials who visited multiple Company job sites from 2018 to 2021 failed to identify even a single day of "Laborer" work having been performed by salaried Company employees on any given day. The Arbitrator recognizes that the examples of work identified by the Union's investigators and employees are likely only part of the overall amount of such work performed by the Company's salaried employees. In fact, each of the Company witnesses who testified concerning their performance of such work or their observations of other Company salaried employees who did so candidly admitted as such. Even if one were to extrapolate from the video and testimony in this case, however, the result would not result in a sufficient number of hours of "Laborer" work being performed by the Company's salaried employees in the aggregate to have been equivalent to the employment of even a single additional Laborer. Further, given the Company's transition from a direct employer of Laborers to one that focuses on project management and hires contractors to perform that work, any occasional and modest manual work performed by the Company's salaried employees would

Case 1:24-cv-02254-RJR   Document 11-10   Filed 08/02/24   Page 207 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund        Page 69 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

have been performed by outside contractors, not bargaining unit Laborers in any event.  In sum, the occasional and limited performance of manual work of the type that was performed by bargaining unit Laborers on a non-exclusive basis under the prior Agreement was not shown to constitute the continued performance of work or a resumption of work for purposes of Section 4203(b)(2)(B) of ERISA.

Third, the fact that numerous Company managers testified that they understood that they were not permitted to perform "even a second of Laborer work" cannot support a contrary conclusion.  The record evidence, as noted, failed to establish that there was any bargained restriction on the performance of such occasional work of limited scope and duration in the language of the Agreement and no proof of any past practice that would have prevented the minimal and occasional work in question by Company salaried managers and executives.  More significantly, as previously noted, the clear preponderance of credible record evidence established that no contributions were required by the 2014 Agreement for any limited, occasional Laborer-type work performed by Company salaried employees.  The question of whether the work that was performed met or failed to meet the requirements of Section 4203(b)(2)(B) is independent of whether those managers believed that it was permissible to have performed the work or not.  To the extent that their subjective understandings are material, all of the individuals testified both to the fact that they understood that they were precluded from performing even a second of Laborer work and also their understanding that minimal, incidental, and occasional manual work of the type that they performed was permissible.

Having found that the preponderance of the credible record evidence rebuts the Fund's determination that the Company continued to perform or resumed the performance of work in the jurisdiction of the collective bargaining agreement of the type for which contributions were

previously required, it follows that the assessment of withdrawal liability in this case must be

overturned. Section 4203(b)(1) provides that the cessation of the obligation to contribute is not

to constitute a complete withdrawal unless the conditions set forth in Section 4203(b)(2) were

also met and the preponderance of the record makes clear that the preconditions for a finding of

withdrawal set forth in Section 4203(b)(2) did not exist in this case.

The Award in this case is entered as an Interim Award because of the ruling of October 8,

2019, noted earlier herein, bifurcating a potential Section 4212(c) issue. It is not known whether

or not the Fund will be asserting such a claim. If such a claim is asserted, then a determination

will be made as to the most appropriate way to address that potential claim, as well as any

question as to whether such a claim is procedurally arbitrable.

Given the holding that no complete withdrawal occurred such that no withdrawal liability

was properly assessed by the Fund, it follows that there is no reason at this point to address at

this point the Company's challenge to the calculation of the amount of the liability assessed in

this case.

The final items for comment at this time relate to the appropriate remedy. The Fund's

claim for an award of attorneys' fees and costs is denied. As noted earlier herein, the standards

for granting a request for attorneys' fees and costs are governed by Section 4221.10 of the PBGC

Regulations, 29 C.F.R. §4221.10. To award reasonable attorneys' fees, an arbitrator must first

find that an arbitration has been initiated or contested in bad faith or that the party against whom

an award of fees is sought has "engage[d] in dilatory, harassing, or other improper conduct

during the course of the arbitration." 29 C.F.R. §4221.10(c). To award costs, a lesser standard is

required. While the PBGC regulations recognize that the costs of the arbitration proceedings are

to be borne equally unless agreed otherwise, those regulations also recognize the discretion of

the Arbitrator to determine that an allocation of costs other than one that shares them equally is appropriate. 29 C.F.R. §4221.10(b).

No basis exists to assess attorneys' fees against either Party in this case. While all Counsel chose to litigate the dispute in this matter in a fulsome fashion, the conduct did not exceed, in my view, the bounds of appropriate and ethical behavior. There was no showing that the conduct of the Parties, particularly when viewed as a whole, was dilatory, harassing, or improper. Nor was there a showing that the arbitration was initiated or contested in bad faith. The Company had plainly legitimate reasons for challenging the Fund's determination that a complete withdrawal had occurred in this case. Further, the challenge to use of the Segal blend in connection with the calculation of the amount of withdrawal liability was not shown to have been in bad faith, particularly in light of recent case law in that area. Nor, examining the conduct of all Parties throughout the arbitration, am I persuaded that any reason has been shown to allocate costs on other than the customary "50-50" basis.

The Interim Award in this case is complicated by the potential bifurcated Section 4212(c) issue. If no such issue is asserted, or if any such issue is found to have been properly presented, but ultimately is found to be without merit, then the Interim Award with its conditional findings of no withdrawal by the Employer and its conditional award directing that the Fund rescind the withdrawal liability assessment and refund to the Employer all withdrawal liability payments with interest, calculated in accordance with applicable PBGC regulations, will become final. If a Section 4212(c) issue is presented, found arbitrable, and upheld, then it is possible that the conditional Interim Award may need to be modified and the Employer's challenge to the Fund Actuary's calculation of the withdrawal liability of the Employer may then need to be decided.

Because of the potential impact of the bifurcated potential Section 4212(c) issue, the

directive to the Fund to rescind the assessment and to refund the withdrawal liability payments made to the Employer, with appropriate interest, is to be treated as conditional and not final and is not required to be implemented until the outstanding potential Section 4212(c) claim has been resolved.

Finally, jurisdiction is retained to address any items related to the bifurcated Section 4212(c) matter, including any items resulting from decision of that matter, as well as any issues regarding the remedy in this case that the Parties fail to resolve on remand.

Case 1:24-cv-02254-RJR   Document 11-10   Filed 08/02/24   Page 211 of 217
Whiting-Turner Construction Company and Laborers District Council Pension Fund          Page 73 of 74
AAA Case No. 01-18-0003-5360 (Withdrawal Liability)

## INTERIM AWARD

The preponderance of the evidence established that Whiting-Turner Construction Company did not continue after May 31, 2017 to perform work in the jurisdiction of the 2014 Agreement of the type for which contributions were previously required. The preponderance of the evidence further established that Whiting-Turner Construction Company did not resume work in the jurisdiction of the 2014 Agreement of the type for which contributions were previously required in the five-year period after May 31, 2017.

Accordingly, the assessment of withdrawal liability was inconsistent with ERISA Section 4203(b)(1)(A) and must, therefore, be overturned. The Fund is directed to rescind the withdrawal liability assessment in this case due to its conflict with the requirements of Section 4203(b) of ERISA. The Fund is further directed to refund to the Employer all withdrawal liability payments made, with interest calculated in accordance with applicable PBGC Regulations.

Given this holding, it is not necessary at this time to rule on the Employer's challenge to the amount of the withdrawal liability assessed by the Fund.

The request for an award of reasonable attorneys' fees and costs is denied.

The Interim Award in this case is complicated by the potential bifurcated Section 4212(c) issue. If no such issue is asserted, or if any such issue is found to have been properly presented, but ultimately is found to be without merit, then the Interim Award with its conditional findings of no withdrawal by the Employer and its conditional directive that the Fund rescind the withdrawal liability assessment and refund to the Employer all withdrawal liability payments with interest, calculated in accordance with applicable PBGC regulations, will become final. If a Section 4212(c) issue is presented, found arbitrable, and upheld, then it is possible that the

conditional Interim Award may need to be modified and the Employer's challenge to the Fund

Actuary's calculation of the withdrawal liability of the Employer may then need to be decided.

Because of the potential impact of the bifurcated potential Section 4212(c) issue, the

directive to the Fund to rescind the assessment and to refund the withdrawal liability payments

made to the Employer, with appropriate interest, is to be treated as conditional and not final at

this time and is not required to be implemented until the outstanding potential Section 4212(c)

claim has been resolved.

Finally, jurisdiction is retained to address any items related to the bifurcated Section

4212(c) matter, including any items resulting from decision of that matter, as well as any issues

regarding the remedy in this case that the Parties fail to resolve on remand.

July 10, 2023

Ira F. Jaffe, Esq.
Impartial Arbitrator

**EXHIBIT 11**

In the Matter of Arbitration:

WHITING-TURNER CONSTRUCTION COMPANY   |

                                        |   AAA Case No. 01-18-0003-5360

             and                    |

                                          |

LABORERS DISTRICT COUNCIL PENSION      |   Withdrawal Liability
AND DISABILITY TRUST FUND NO. 2         |

Before: Ira F. Jaffe, Esq., Impartial Arbitrator

APPEARANCES:

     For the Employer:

          Gregory J. Ossi, Esq.
          (Norton Rose Fulbright US LLP)

     For the Fund:

          Jonathan G. Rose, Esq.
          (DLA Piper)

## **FINAL AWARD**

On July 10, 2023, an Interim Award issued finding in pertinent part that:

> [T]he assessment of withdrawal liability was inconsistent with ERISA Section 4203(b)(1)(A) and must, therefore, be overturned. The Fund is directed to rescind the withdrawal liability assessment in this case due to its conflict with the requirements of Section 4203(b) of ERISA. The Fund is further directed to refund to the Employer all withdrawal liability payments made, with interest calculated in accordance with applicable PBGC Regulations.

The Interim Award noted that there was a potential bifurcated Section 4212(c) issue, but the Fund advised in a subsequent conference and email that it would not be pursuing that issue further in this arbitration.

By email dated July 3, 2024, Counsel advised that they had reached agreement on the amount of interim payments to be refunded, with interest, and that no additional disputed issues remained for decision. That amount (calculated as of July 1, 2024) was $2,187,966.00 in interim

payments to be refunded plus an additional $494,511.02 in interest, for a total refunded payment of $2,682,477.02.

Accordingly, the Fund is directed to: 1) rescind the assessment of withdrawal liability in this matter due to it having been issued in contravention of the provisions of ERISA Section 4203(b), 29 U.S.C. §1383(b); and 2) pay immediately to the Employer the sum of $2,682,477.02, representing the amount of interim withdrawal liability payments made and interest calculated thereon in accordance with applicable PBGC Regulations.

July 3, 2024

_____
Ira F. Jaffe, Esq.
Impartial Arbitrator

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Laborers District Council Pension and Disability Trust Fund No. 2 and George Maloney as Co-Chair

**DEFENDANTS**

Whiting-Turner Construction Company

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Jonathan G. Rose, DLA Piper LLP (US),
500 Eighth St., NW, Washington, D.C. 20004

Attorneys *(If Known)*

Greg Ossi, Norton Rose Fulbright US LLP,
799 9th Street NW, Suite 1100, Washington D.C. 20001

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government
  Plaintiff
- [x] 3 Federal Question
  *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government
  Defendant
- [ ] 4 Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability | [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability | [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine | Injury Product | | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product | Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability | [ ] 380 Other Personal | Act | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal | Property Damage | [ ] 720 Labor/Management | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury | [ ] 385 Property Damage | Relations | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury - | Product Liability | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | [ ] 751 Family and Medical | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | Leave Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 790 Other Labor Litigation | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | [x] 791 Employee Retirement | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate | Income Security Act | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ | Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer. w/Disabilities - | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| | Other | [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. 1401(b)

Brief description of cause:
Complaint to Vacate Arbitration Award under 29 U.S.C. 1401(b) for violations of ERISA

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
0

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
08/02/2024

SIGNATURE OF ATTORNEY OF RECORD
/s/ Jonathan G. Rose (MD Bar # 15138)

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.