**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

WHITING-TURNER CONTRACTING
COMPANY,

        *Plaintiff/Counter-Defendant*,

    **v.**

LABORERS DISTRICT COUNCIL
PENSION AND DISABILITY TRUST
FUND NO. 2,

        *Defendant/Counter-Plaintiff.*

Civil No.: 1:24-cv-02250-JRR

---

<u>**MEMORANDUM OPINION**</u>

    Pending before the court are Defendant/Counter-Plaintiff Laborers District Council Pension and Disability Trust Fund No. 2 and George Maloney as Co-Chair's (collectively, the "Fund") Motion for Summary Judgment (ECF No. 21; the "Fund's Motion") and Plaintiff/Counter-Defendant Whiting-Turner Contracting Company's ("WT") Motion to Confirm Arbitration Awards (ECF No. 23; "WT's Motion"), docketed as a motion for summary judgment. The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025).

<u>**BACKGROUND**</u>

    This consolidated matter arises from WT's Complaint (ECF No. 1) to enforce a final arbitration award (ECF No. 1-2) that requires the Fund to repay WT $2,187,966.00 in withdrawal liability payments plus interest of $494,511.02 for a total of $268,477.02, and the Fund's Counterclaim to vacate the same award. (ECF No. 10.) The parties' arbitration proceeded pursuant to the Employee Retirement Income Security Act ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). The Fund is a multiemployer pension plan covered by the MPPAA and ERISA; and WT is a construction company. (ECF No.

22-1, Joint Stipulations ¶¶ 2, 3.)  The court first provides an overview of the relevant statutes and then moves to the factual background.

## A. Statutory Background

Congress passed ERISA to create "safeguards . . . with respect to the establishment, operation, and administration" of private employer employee benefit plans.  29 U.S.C. § 1001(a). Of particular concern was "the soundness and stability of plans with respect to the adequate funds to pay promised benefits" and to ensure that "employees and their beneficiaries [are not] deprived of anticipated benefits" by employer "termination of plans before requisite funds have been accumulated."  *Id.*  By enacting ERISA, "Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement—and has fulfilled the conditions required to obtain the vested benefit—that the worker will actually receive those benefits."  *Penske Logistics LLC v. Freight Drivers & Helpers Loc. Union No. 557 Pension Fund*, 721 F. App'x 240, 241 (4th Cir. 2018).

Under ERISA, a multiemployer plan is a plan to which more than one employer is required to contribute and which is governed by one or more collective bargaining agreements between/among the contributing employers and a union or unions.  29 U.S.C. § 1002(37)(A). Under such a plan, the participating employers share the responsibility of funding the plan.  Before the advent of the MPPAA, under ERISA, "employers could withdraw from a multiemployer plan, leaving vested benefits unfunded and threatening the plan's solvency."  *Penske Logistics*, 721 F. App'x at 241 (citations omitted).  To "shore up the financial stability of multiemployer pension plans," Congress enacted the MPPAA.  *Bd. of Trs., Sheet Metal Workers' Nat. Pension Fund v. BES Servs., Inc.*, 469 F.3d 369, 374 (4th Cir. 2006).

The MPPAA "amended ERISA to require a withdrawing employer to pay the employer's proportionate share of the plan's unfunded vested benefits by creating withdrawal liability 'in rough proportion to that employer's relative participation in the plan over the last 5 to 10 years.'" *Penske Logistics*, 721 F. App'x at 241 (quoting *Borden, Inc. v. Bakery & Confectionery Union & Indus. Int'l Pension*, 974 F.2d 528, 530 (4th Cir. 1992)). Under the MPPAA, "[a]n employer owes withdrawal liability when it makes a complete or partial withdrawal from a pension plan." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 440 (4th Cir. 2015) (citing 29 U.S.C. § 1381(a)). An employer makes a complete withdrawal when it "permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). The "plan sponsors," or designated administrators, assess withdrawal liability on employers at the end of each year. 29 U.S.C. § 1382. Under ERISA, any dispute concerning the plan sponsor's liability assessment is subject to arbitration. 29 U.S.C. § 1401(a).

Following WT's abrogation of a series of collective bargaining agreements (collectively, the "CBA") that required WT make contributions to the Fund, a dispute arose as to WT's withdrawal liability as assessed by the Fund based on WT's contention that MPPAA's construction exemption (29 U.S.C. §1383(b)) applies and the actuarial assumptions on which the Fund based its assessment. The MPPAA construction exemption modifies the requirements for effecting a complete withdrawal from a multiemployer plan for employers in the building and construction industry who meet certain conditions. In short, the construction exemption "impos[es] withdrawal liability only when a contractor's obligation to the fund ceased and the contractor continued doing covered work." *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for N. California*, 859 F.2d 808, 811 (9th Cir. 1988). The exemption recognizes that "the construction industry as a whole

does not necessarily shrink when a contributing contractor leaves the industry; employees are often dispatched to another contributing contractor . . . . Thus, these normal events do not pose an undue threat to plan as long as contributions are made for whatever work is done in the area." *Laborers'*
*Pension Fund v. W.R. Weis Co., Inc.*, 180 F. Supp. 3d 540, 549 (N.D. Ill. Apr. 15, 2016) (quoting
*H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for N. California*, 859 F.2d 808, 811 (9th
Cir.1988)).

Under the MPPAA construction exemption, if "substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry" and "the plan (i) primarily covers employees in the building and construction industry, or (ii) is amended to provide that this subsection applies to employers described in this paragraph," a complete withdrawal occurs if

> (A) an employer ceases to have an obligation to contribute under the plan, and
> (B) the employer--
> (i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or
> (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

29 U.S.C. § 1383(b)(1), (2). If an employer is deemed not to have withdrawn, *i.e.* if a construction employer does not meet the above conditions, they are not subject to withdrawal liability.

Here, prior to arbitration, the parties stipulated that "[s]ubstantially all the employees of Whiting-Turner with respect to whom the employer has an obligation to contribute under the Fund performed work in the building and construction industry" (ECF No. 22-1 ¶ 6) and "[t]he Fund primarily covers employees in the building and construction industry" (*id*. ¶ 4); WT abrogated the 2014 Collective Bargaining Agreement upon its expiration on May 31, 2017 – thus WT ceased to

have an obligation to contribute under the plan on that date (*id.* ¶ 35); and, "Whiting-Turner has

continued to perform construction services in the geographic jurisdiction of the 2014 CBA since

May 31, 2017" (*id.* ¶ 34).  Importantly, the parties do not dispute that, during the relevant period,

WT was a construction employer under the terms of the MPPAA construction exemption or that

WT ceased to have an obligation to contribute under the plan and continued to perform work in

the relevant geographical jurisdiction.  Their dispute centers on whether the work that WT

continued to perform was "of the type for which contributions were previously required."  *See*

ECF No. 1-1, Interim Award opinion at p. 61 (noting "The only question factually is whether [WT]

continued or resumed work in the jurisdiction of the collective bargaining agreement of the type

for which contributions were previously required . . . .").

The arbitrator ruled in favor of WT:

> The preponderance of the evidence established that Whiting-Turner
> Construction Company did not continue after May 31, 2017 to
> perform work in the jurisdiction of the 2014 Agreement of the type
> for which contributions were previously required.  The
> preponderance of the evidence further established that Whiting-
> Turner Construction Company did not resume work in the
> jurisdiction of the 2014 Agreement of the type for which
> contributions were previously required in the five-year period after
> May 31, 2017.

*Id.* at p. 74.  Therefore, by interim order, the arbitrator ordered the Fund to repay WT the

withdrawal liability it had collected subject to a bifurcated proceeding to determine the amount of

interest the Fund owed WT on the sums WT had previously paid toward its assessed withdrawal

liability.  *Id.* at pp. 74–75.

### B. Undisputed Factual Background

The court here includes a truncated version of the factual background in this case. A more fulsome recitation of the facts leading to arbitration is set forth in the arbitrator's opinion and interim award (ECF No. 1-1.)

On June 1, 2014, WT executed the CBA with the Laborers' District Council of D.C., and its successor, the Baltimore/Washington Laborers' District Council, and its Local 657 and Local 11 ("Laborers"). By its terms, the CBA was effective through May 31, 2017. (ECF No. 22-1 at ¶¶ 7, 9.) WT is a construction company and employed CBA covered Laborers in the building and construction industry. *Id.* ¶¶ 2, 6. The Fund was a third-party beneficiary under the CBA. *Id.* ¶ 8. The CBA defined the Laborers' geographic and trade work jurisdiction. *Id*. ¶¶ 11, 22.

By letter of January 15, 2017, WT notified the Laborers it would abrogate the CBA upon its expiration on May 31, 2017. *Id*. ¶ 35. On January 30, 2018, the Fund assessed withdrawal liability under 29 U.S.C. § 1399 in the amount of $4,129,147 based on WT's unfunded vested benefits liabilities as of December 31, 2016 (the end of the Plan year preceding the date of withdrawal). WT made installment payments toward satisfaction of the assessed withdrawal liability and requested review of (challenged) the assessment. Following the Fund's response to the request for review, Plaintiff proceeded to initiate arbitration. (ECF No. 22-1 at ¶¶ 45-50.)

The parties' dispute concerned whether WT was covered by the MPPAA construction exemption at 29 U.S.C. § 4203(b). (ECF No. 1-1 at p. 7.) The Fund maintained that WT continued to perform Laborer-type work after May 31, 2017, such that it was not protected by the exemption. WT maintained, to the contrary, because the "limited work performed by supervisory and/or managerial employees and . . . by subcontractors did not constitute work in the jurisdiction of the

[CBA]" or the type of work for which it was previously required, under the CBA, to make contributions to the Fund.  *Id*.

The parties engaged in arbitration hearings from April 11 through 14 and May 3, 2022. (ECF No. 1-1 at p. 2.)  As reflected above, on July 10, 2023, the arbitrator issued an interim award in favor of WT and directed the Fund to refund WT its withdrawal liability payments ($2,187,966.00) plus interest to be determined by a separate proceeding.  *Id*. at pp. 74–75. Thereafter, on July 3, 2024, the arbitrator issued a final award in favor of WT and directing the Fund to pay WT a total sum of $2,682,477.02 ($2,187,966.00 plus interest of $494,511.02).  (ECF No. 1-2 at pp. 2–3.)  The instant action followed.

I.    **LEGAL STANDARD**

   **A.  Review of Arbitration Award Under 29 U.S.C. § 1401(b)**

While styled as cross-motions for summary judgment, this action requires the court to review an arbitrator's award.  WT seeks to enforce the award while the Fund asks the court to vacate it.  Pursuant to 29 U.S.C. 1401(b), this court reviews the arbitrator's legal conclusions *de novo*.  *Penske Logistics LLC v. Freight Drivers and Helpers Local Union No. 557 Pension Fund,* 721 F. App'x 240, 244 (4th Cir. 2018) (citing 29 U.S.C. § 1401(c)).  As for the arbitrator's findings of fact, "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct."  29 U.S.C. § 1401(c).  "The same clear-error standard applies to the arbitrator's application of law to facts."  *Penske Logistics LLC v. Freight Drivers & Helpers Loc. Union No. 557 Pension Fund*, No. CV RDB-15-3277, 2019 WL 1081391, at *4 (D. Md. Mar. 7, 2019), *aff'd*, 820 F. App'x 179 (4th Cir. 2020).

Because the court's review of the arbitrator's award is by way of the instant cross-motions for summary judgment, the court evaluates the Motions through the lens of Rule 56.

7

**B.  Federal Rule of Civil Procedure 56**

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id*. at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted); *see Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that "plaintiffs need to present more than their own unsupported speculation and conclusory allegations to survive").  Further, "[u]nder this standard, 'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion." *Wai Man Tom v. Hospitality Ventures, LLC,* 980 F.2d 1027, 1037 (4th Cir. 2020) (quoting *Anderson*, 477 U.S. at 252).

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see*

*also Scott v. Harris*, 550 U.S. 372, 378 (2007).  The court "must not weigh evidence or make credibility determinations."  *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage).  Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted). In so doing, "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion."  *Id.* (citations omitted); *see Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 574 (D. Md. 2021) (same).

## II.    ANALYSIS

The arbitrator described the issues before him as follows:

> The only question factually is whether [WT] continued or resumed work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required such that the provisions of Section 4203(b)(2) permitted the Fund to have imposed withdrawal liability as a result of the cessation of the obligation to contribute. If a preponderance of the credible record evidence rebuts the determination of the Fund that [WT] continued to perform work in the jurisdiction of the type for which contributions were previously required or resumed such work within the five-year period beginning June 1, 2017, then the assessment in this case must be overturned as contrary to law

(ECF No. 1-1 at pp. 61–62.)

The parties' arguments on WT's request to enforce the award are indistinguishable from their arguments on the Fund's request for vacatur of same.  Over six briefs on the cross-motions, the parties effectively present argument about the same discrete matters as to whether the arbitrator did or did not correctly apply the law to the stipulated facts.  The court distills the Fund's grievances into the following topics: (A) creation of a *de minimis* exception to the construction exemption; (B) proper application of the MPPAA construction exemption factors; (C) the Fund's knowledge of WT supervisors' work; and (D) the arbitrator's assessment of witness credibility and treatment of what the Fund contends was WT's "false testimony."

### A.  The *De Minimis* Exception

The Fund argues that the arbitration award was based on a "wholly fabricated, unsupported, exception to the principles of withdrawal liability" that it calls the *"de minimis"* exception.  (ECF No. 21 at p. 25.)  According to the Fund, "in a complete lapse in judgment," the arbitrator, relying on *Laborers' Pension Fund v. W.R. Weis Co.*, 180 F. Supp. 3d 540 (N.D. Ill. 2016), *aff'd*, 879 F. 3d 760 (7th Cir. 2018), determined that "the work performed by WT employees in the jurisdiction of the CBA of the type for which contributions were requires [sic] was *'de minimis'* and did not abrogate the [MPPAA] construction industry exception."  (ECF No. 21 at p. 25.)   In other words, according to the Fund, the arbitrator found that WT was not obligated to pay the withdrawal assessment because any work that otherwise would have rendered WT liable (*i.e.,* not covered by the exemption) was so minimal in duration and/or importance that it did not amount to continuing to work in the jurisdiction of the CBA and was thus not of the type for which contributions were previously required.

Preliminarily, the court notes that *Weis* does not create a *de minimis* exception, as the Fund characterizes it.  Notably, the Fund fails to cite any specific portion of the arbitrators opinion at

ECF No. 1-1 where the arbitrator created or applied the purported exception.  Further, on review

by the court, the arbitrator does not describe a "*de minimis* exception" or the like, but rather

compares and contrasts *Weis* (and other cases) with the case before him.  The Fund has taken the

arbitrator's analysis and labeled it an improper/non-existent "*de minimis* exception."  For its part,

WT does not argue in favor of any such *de minimis* exception; rather, it asserts the Fund

misconstrues the arbitrator's reasoning and analysis.  *See* ECF No. 26 at p. 11 ("[WT] is not asking

for forgiveness of a liability or arguing that elimination of liability would only slightly erode the

fund.  There is no erosion of the Fund because it did not continue to perform work for which

contributions were previously required.")  For the following reasons, the court agrees with WT.

Specifically, on this issue and regarding application of *Weis* in particular, the arbitrator's

opinion provides as follows:

> The cases have recognized that, in determining whether work is of
> the type for which contributions were previously required,
> consideration must be given to the terms of the collective bargaining
> agreement itself and federal labor law. Trustees of the Plumbers and
> Pipefitters National Pension Fund v. Plumbing Services, Inc., 791
> F.3d 436, 445 (4th Cir. 2015) (granting summary judgment on claim
> for withdrawal liability due to a failure to have initiated review and
> arbitration in accordance with MPPAA Section 4221 requirements);
> Laborers' Pension Fund v. W.R. Weis Company, 180 F. Supp.3d
> 540, 554 (N.D. Ill. 2016), aff'd, 879 F.3d 760 (7th Cir. 2018)
> (finding no continuation of covered operations and finding Section
> 4203(b) applicable when marble finishers employed by Weis
> performed work previously performed by laborers prior to the
> elimination of all laborers and had contributions made on behalf of
> that work to a different pension plan; factually, the employer was
> found to never have had an obligation to contribute for work by non-
> laborers for whom contributions were made to another pension fund
> even though the finishers performed some work that were within the
> former general jurisdiction of the laborers' collective bargaining
> agreement; findings of the arbitrator, while brief, seemed to rely on
> the history, custom, and past practice to resolve the contractual
> ambiguity and supported the finding that the fund had not previously
> required the employer to make contributions for any work
> performed by bricklayers, marble setters, or finishers). The position

of [WT] is even stronger than that advanced by the employer in
<u>Weis</u>. In <u>Weis</u>, the laborers were actually replaced by other
employees of the employer. Here, by contrast, the Laborers were
replaced by outside contractors and supervisors performed only
minimal amounts of laborer work in amounts no different than had
been performed without objection prior to the withdrawal from the
Fund. Even Mr. Marchetti, who spent more time performing labor
work than other supervisors, testified that he only performed less
than 2 hours of laborer work at a time, with the largest amount of
time being spent hanging 8-10 fences requested by the client for
safety reasons, and on another occasion, assisted subcontractor
laborers move material, a job that he spent 45 minutes to an hour on
two consecutive days performing. The record established that [WT]
has not done any work since the Agreement expired on May 31,
2017 that would have required contributions to be made to the Fund
under the terms of that Agreement. [WT] has not hired any
employees to perform Laborer work. The limited performance of
work by supervisors was an established past practice and did not
violate any express contract language and has never been
understood to generate an obligation to make additional
contributions to the Fund. The identification of work to be
performed by Laborers under the Agreement was not exclusive and
could be performed both by employees in other trades if incidental
to the completion of their work and by subcontractors, both union
and non-union. The Fund has not asserted in this arbitration or in its
assessment that [WT's] subcontracting of Laborer work – which
was permitted by the Agreement – resulted in [WT] losing the
benefit of the building and construction industry exemption. Rather,
its sole claim related to the performance of minimal, incidental
laborer type work by supervisors – who are acknowledged by the
Fund not to be "employees" under the Plan and Trust and on whose
behalf the Fund would never have accepted contributions – and
which was something that was performed by those supervisors prior
to the expiration of the Agreement without any assertion that it
violated the terms of the Agreement or created any obligation to
make contributions to the Fund. That limited work cannot be found
to constitute a continuation or resumption of work of the type for
which contributions would have been required. <u>Carpenters Pension
Trust Fund for Northern California v. Underground Construction
Company, Inc</u>., 31 F.3d 776 (9th Cir. 1994) (finding that
contribution history of two joint ventures that included participation
by the employer could not be attributed to the employer when
calculating the employer's withdrawal liability upon a complete
withdrawal; finding that the question of whether the employer was
responsible for the contributions made by the joint ventures was a
matter of interpretation and application of the collective bargaining

agreement). The Agreement contains no language that prohibits or limits supervisors from performing any type of work. Further, the Trust Agreement limits an employer's liability to "payments required by law, by this Agreement and Declaration of Trust, by participation Agreements, or by the collective bargaining agreements with respect to his or its individual or joint venture operations." (Article VII, Section 4, Trust Agreement[.])

The subcontracting of work similarly cannot be found to be the performance of work of the type for which contributions would have been made. [(Citing PBGC Opinion Letter No. 85-5; <u>Sheet Metal Workers National Pension Fund v. Courtad Construction Systems, Inc.</u>, 439 F. Supp.2d 574 (E.D. Va. 2006); <u>H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for Northern California</u>, 859 F.2d 808 (9th Cir. 1988); <u>Oregon-Washington Carpenters-Employers Pension Trust Fund v. BQC Construction, Inc.</u>, 485 F. Supp.2d 1206 (D. Ore. 2007); and <u>Seaway Port Authority v. Duluth-Superior ILA Marine Association</u>, 920 F.3d 503 (8th Cir. 1990)]

(ECF No. 1-1 at pp. 41-44.)

In *Weis*, the Northern District of Illinois agreed with the arbitrator and found that an employer company had not continued performing work in the jurisdiction of the applicable CBA and of the type that generated its previous contribution obligation. The parties stipulated, and the arbitrator and court agreed, that the company had performed some tasks within the general jurisdiction of the governing CBA; the issue was whether contributions were previously required for that work. *Weis*, 180 F. Supp. 3d at 550.

To answer this question, the *Weis* court looked to the "work jurisdiction" in the CBA. *Id.* In *Weis*, the fund argued that a broad reading of the CBA mandated the company to make contributions for any employee regardless of type (Laborer, worker from a different union, or non-union worker) as long as that employee did work outlined by the CBA. *Id.* In response, the company argued that the correct reading of the CBA was that contributions were only required for Laborers. *Id.* The arbitrator, relying on the parties' history, custom, and past practice resolved the issue in favor of the company. *Id.* The court noted that "CBAs are contractually unique; unlike

private common law contracts, which are negotiated out of free choice, CBAs are based on pre-existing relationships not easily broken and remade." *Id.* (quotation omitted). The arbitrator looked to the prior course of dealing between the parties and determined that the fund had not previously required the company to make contributions for workers who were not Laborers. *Id.* at 552. The court confirmed the award on the applicable review standard. *Id.* (citing *United States v. Williams*, 198 F.3d 988, 992 (7th Cir. 1999) ("explaining that 'contract interpretation is a mixed question of law and fact' and that 'disputed terms . . . are matters of fact")).

The Fund endeavors to distinguish *Weis* on grounds that, in *Weis*, the parties were aware of "overlapping jurisdictions for certain work," whereas, here, the Fund was not aware that WT's supervisors performed work within the CBA geographical jurisdiction after May 31, 2017 (or, for that matter, before) and WT supervisors were not permitted to perform such work before or after the expiration of the CBA. (ECF No. 21 at p. 27.) This supposed distinction is unavailing. In *Weis*, the arbitrator properly looked to the text of the CBA and the parties' history, custom, and past practices. *Laborers' Pension Fund v. W.R. Weis Co.*, 180 F. Supp. 3d 540, 551 (N.D. Ill. 2016), *aff'd*, 879 F. 3d 760 (7th Cir. 2018). Considering these sources, the arbitrator found that the work performed was not of the type that previously required contributions because the fund had not previously required the company to make contributions for work performed by the other (non-Laborer) types of workers. *Id.* at 552.

In two other cases referenced by the parties (both of which the arbitrator addressed), *H.C. Elliott, Inc. v. Carpenters Pension Tr. Fund for N. California*, 859 F.2d 808 (9th Cir. 1988), and *Sofco Erectors, Inc. v. Trs. of Ohio, Operating Eng'rs, Pension Fund*, No. 2:19-CV-2238, 2020 WL 2541970 (S.D. Ohio May 19, 2020), *aff'd in part, vacated in part, rev'd in part*, 15 F.4th 407 (6th Cir. 2021), arbitrators and courts looked to the same sources – the text of the relevant CBAs

14

and the parties' past practices. *Elliott*, 859 F.2d at 813 (finding it "clear from the collective bargaining agreement to which Elliott was signatory that Elliott was responsible for payments to the pension fund for all work done either by its own employees or by its subcontractors' employees"); *Sofco*, 2020 WL 2541970, at *7 (explaining "forklift work is part of Local 18's jurisdiction under Article II Paragraph 10.4. Therefore, Sofco was obligated to make contributions to the Fund for the forklift work."). Here, the arbitrator similarly, and appropriately, examined the text of the CBA and the parties' past practices.

The arbitrator's analysis and resultant conclusion did not rest on a finding that WT's continued work in the jurisdiction of the type for which contributions were previously made was *de minimis*. In sum, the arbitrator did not create, or apply, a "*de minimis*" exception. Instead, based on the facts found and applicable relevant law, he concluded that WT employees performed "not a single second" of work of the type for which contributions were previously required. (ECF No. 1-1 at p. 36.) The arbitrator did not misinterpret or misapply case law on the construction exemption or the appropriate evidentiary sources for determining whether the work in question was of the type for which contributions were previously required.

The arbitrator at times described WT supervisors' work as "minor" and "occasional." (*e.g.,* ECF No. 1-1 at p. 38.) These observations, however, were not used to support a conclusion that the minimal nature of the described work rendered it not a continuation of work in the jurisdiction of the CBA and of the type for which contributions were previously required. Instead, the arbitrator, as in *Weis*, examined the text of the CBA and the parties' past practices and made the following findings.

> [T]he record established that salaried managers were performing the same occasional and limited "Laborer" work for years prior to June 1, 2017. This limited performance of Laborer-type work was performed openly and was never challenged by the Union or the

Fund as violative of the Agreement. The Agreement did not contain language that would have expressly precluded such work. Appendix A describes generally the work assigned to various categories of Laborers and addresses the pay rates applicable to such work. No provision of Appendix A or other language in the Agreement was shown to have obligated [WT] to have assigned the work described in Appendix A exclusively to bargaining unit Laborers, much less proscribe occasional incidental work of brief duration to address safety or other operational needs that could not easily be addressed by bargaining unit or contractor Laborers. Further, regardless of whether or not the performance of such limited Laborer-type work by non-bargaining unit managers was violative of the Agreement, there was no evidence that the Union or the Fund had ever claimed that [WT] was obligated to have made contributions to the Fund on behalf of such occasional and incidental work and no contract provision purported to require such contributions.

(ECF No. 1-1 at p. 67.)  The court is not persuaded that the arbitrator's fact findings and application of relevant law was error.  *See Penske*, 2019 WL 1081391, at *4 (noting the "clear-error standard generally applies to the arbitrator's application of law to facts").

As relayed above, upon review of the evidence presented, the arbitrator concluded, "[i]n this case, there was no showing that [WT] continued to perform work that previously was performed by bargaining unit Laborers, but which no longer generated contributions to the Fund" (ECF No. 1-1 at p. 41) and "[o]ut of a large number of videos taken, many of which were produced as exhibits, not a single second of those videos showed a non-supervisory employee of [WT] performing work of the type previously performed by bargaining unit Laborers" (*id*. at p. 36).  The arbitrator did not make his decision based upon any finding that, although supervisors performed work of the type for which contributions were previously required, the work was not enough to meet the requirements of the construction exemption.  In other words, the arbitrator neither created nor applied a "*de minimis*" exception.  Further, the arbitrator properly considered the text of the CBA and the parties' past practices.

16

### B.  Proper Application of the Construction Exemption

The Fund argues that the arbitrator misapplied the construction exemption, and it does not apply because stipulations, witness testimony, and video show that WT employees performed work in the jurisdiction of the CBA after their withdrawal from the plan.  (ECF No. 21 at p. 30–32; ECF No. 33 at p. 17.)  Again, the Fund insists that performance of even one second of jurisdictional work by a WT employee amounts to continuing to perform work in the CBA jurisdiction; but the Fund ignores the second requirement: that the work in question be of the type for which contributions were previously required.  29 U.S.C. § 1383(b).  The Fund obfuscates that the arbitrator's decision was not made based on the length of time of the supervisors' work performed, but rather upon evaluation of the types of work for which contributions were previously required.  For the reasons set forth in the preceding section, the court finds no clear error in the arbitrator's application of the facts to the MPPAA construction exemption.

The Fund also insists that allowing WT to evade withdrawal liability contravenes the purpose of the MPPAA.  To the contrary, the arbitrator explained that requiring WT to pay a withdrawal liability would offend the purpose of the MPPAA's construction exemption:

> The exemption was created because Congress recognized the nature of employment in the building and construction industry and determined to impose withdrawal liability only when the withdrawing employer is actually taking work out of the jurisdiction of the plan, thus adversely impacting the plan's contribution base. . . . In this case, there was no showing that [WT] continued to perform work that previously was performed by bargaining unit Laborers, but which no longer generated contributions to the Fund.

(ECF No. 1-1 at p. 41.)

Affording the arbitrator the clear-error standard of review as to his fact findings, and reviewing the legal analysis and conclusions *de novo*, the court again finds grounds to disturb the arbitrator's opinion and award on this issue.

### C.  The Fund's Knowledge of WT Supervisors' Work in the CBA Jurisdiction

The Fund avers that, "as a matter of fact and law, the Fund was *not* on notice of the work performed by WT non-bargaining unit [] supervisors [during the period of the CBA] until after the termination of the CBAs in violation of the CBAs, and as such, the work constitutes a complete withdrawal triggering withdrawal liability."  (ECF No. 21 at p. 34 (emphasis in original); *and see* ECF No. 25 at pp. 14–18.)

The Fund's knowledge or lack thereof of WT supervisors' work during the term of the CBA is not dispositive; nor did the arbitrator treat it as such.  The arbitrator did not impute knowledge to the Fund or the Union; instead, the arbitrator acknowledged that the record evidence showed that both before and after WT ceased to have an obligation to make contributions under the CBA, WT supervisors openly performed the same types of tasks within the CBA's geographical jurisdiction.  (ECF No. 1-1 at p. 67.)  The arbitrator further observed that the CBA did not contain language that "would have expressly precluded such work," WT never made contributions to the Fund for this work, and the Union never indicated or complained that WT was obligated to do so.  *Id.*

The Fund urges that because it did not know of the supervisors' work in the geographical jurisdiction before WT abrogated the CBA, there is no past practice of the Fund not requiring contributions for this work.  (ECF No. 33 at p. 10.)  In other words, the Fund argues, had it known about WT supervisors' work, it would have required contributions for same.  This argument, even accepted as true, provides no basis to disturb the award.  By arguing it did not know of this work and, had it known, it would have required contributions, the Fund effectively concedes (an otherwise undisputed point)—that WT did not previously make contributions for this work such that WT's cessation of contributions (upon abrogation) would diminish the plan.

As described above, the construction exemption "impos[es] withdrawal liability only when a contractor's obligation to the fund ceased and the contractor continued doing covered work." *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for N. California*, 859 F.2d 808, 811 (9th Cir. 1988). Or, as the arbitrator put it, under the exemption, the MPPAA "impose[s] withdrawal liability only when the withdrawing employer is actually taking work out of the jurisdiction of the plan, thus adversely impacting the plan's contribution base." (ECF No. 1-1 at p. 41.) Here, WT supervisors continued doing some measure of non-covered work; the work the supervisors continued was not of the type for which WT previously made contributions. This was not a situation where the previously contributed-for work continued but the contributions ceased to the detriment of the Fund's contribution base.

The Fund also argues that WT's failure to contribute for the supervisors' work constituted a breach of the CBA and allowing WT not to pay withdrawal liability allows it to benefit from its breach. (ECF No. 21 at p. 34–35.) The arbitrator determined that the work the supervisors performed was not prohibited by the CBA:

> The provisions of the Agreement clearly allowed [WT] to engage subcontractors, both Union and non-Union. Article XV, Subcontracting Notification, of the 2014-17 Agreement simply obligates [WT] to notify the Union of any subcontractors that employ members of LIUNA Local 11 or 657 so that all monies and payments due to the Funds are properly paid by the subcontractors for those contributions. There is no limitation on [WT's] right to subcontract and no restriction on its ability to employ non-union subcontractors to perform laborer work. This represented a significant change from the provisions of Article XV of the 2006-08 Agreement and Article XV of the 2011-14 Agreement, each of which limited [WT's] right to engage in subcontracting by imposing certain conditions that needed to be met.
>
> Nor did the Agreement prohibit [WT] supervisors from occasionally performing Laborer work.

(ECF No. 1-1 at pp. 37-38.)

The Fund allows that the CBA contained no provision prohibiting WT supervisors' work (ECF No. 25 at p. 14), but argues that no such contractual prohibition was necessary because the National Labor Relations Act ("NLRA") prohibits the WT supervisor work at issue. *Id*.; *see also* ECF No. 33 at p. 14. In support of this, the Fund argues that the NLRA prohibits supervisors from being part of a union. ECF No. 25 at p. 14–15.[1] But the Fund cites no provision of the NLRA that prohibits supervisors from performing tasks in the geographical location of, or of the same type as, labor performed by union employees; nor does it cite to any case interpreting the NLRA in this manner. This argument does not provide a basis to impugn the arbitrators' factual findings and related legal conclusion in favor of WT.

### D. The Arbitrator's Assessment of Witness Credibility and Treatment of "False Testimony"

The Fund argues that the arbitrator "ignore[d] WT's reversal of its position and the inconsistent sworn testimony of numerous WT witnesses" and improperly disregarded that WT witnesses were not credible. (ECF No. 25 at pp. 24–27; *and see* ECF No. 21 at pp. 36–38.) In support of this argument, the Fund draws a comparison between, on the one hand a) WT's original "Request for Review of Withdrawal Liability" that states "Whiting-Turner has not performed work in the jurisdiction of the applicable collective bargaining agreement after the expiration of that agreement" (ECF No. 22-6 at p. 2), and statements from various "WT executives" that "WT employees were not permitted to perform Laborers' work after the 2014 CBA expired" (ECF No. 21 at p. 36); and, on the other hand b) WT's more recent admissions that supervisors did perform

---

[1] Additionally, *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300 (D.C. Cir. 2003), cited by the Fund, is inapposite. There, the employer impermissibly transferred work away from bargaining unit employees to non-bargaining unit employees. *Id*. at 308. Here, there is no evidence of a similar transfer; instead, supervisors performed the same work both before and after abrogation. Additionally, the Fund asserts that the instant case is comparable to *Regal* as "[t]he non-bargaining unit (i.e. WT) took on the work that was designated under the CBA as work to be performed as the bargaining unit . . . ." (ECF No. 33 at p. 15.) As the arbitrator determined, however, and the Fund does not appear to dispute, that the CBA did not contain any express provision that designated the work WT supervisors' performed to the bargaining unit.

certain tasks within the CBA jurisdiction after its abrogation.  (ECF No. 21 at p. 36).  The Fund additionally urges that the arbitrator "ignore[d] the lack of credibility of witnesses that appear[ed] to have testified falsely under oath . . . ."(ECF No. 21 at p. 36.)

The parties stipulated that various WT supervisors performed work in the geographic jurisdiction of the CBA as well as the nature of this work.  (ECF No. 22-1 ¶¶ 11, 22, 51–73.)  The arbitrator, thus, considering the parties' stipulated facts, assessed whether the supervisors' work performed in the jurisdictional area after abrogation was of the type for which WT was required to make contributions prior to abrogation.  The arbitrator did not rely on the above-described representation made in WT's Request for Review of Withdrawal Liability.  To the extent the Fund argues that the arbitrator should have not allowed WT to change or clarify its position from the initial letter requesting arbitration or that it was clear error for the arbitrator to rely on the stipulated facts instead of this initial letter, such argument is unpersuasive.

The arbitrator specifically addressed WT employees' statements that they were not permitted to perform certain work after abrogation:

> [A]s previously noted, the clear preponderance of credible record evidence established that no contributions were required by the 2014 Agreement for any limited, occasional Laborer-type work performed [WT] salaried employees. The question of whether the work that was performed met or failed to meet the requirements of Section 4203(b)(2)(B) is independent of whether those managers believed that it was permissible to have performed the work or not. To the extent that their subjective understandings are material, all of the individuals testified both to the fact that they understood that they were precluded from performing even a second of Laborer work and also their understanding that minimal, incidental, and occasional manual work of the type that they performed was permissible.

(ECF No. 1-1 at p. 70.)  The arbitrator did not ignore testimony of WT employees regarding their understanding that their work was impermissible; rather, he explained why their testimony did not alter his analysis.  *Id*.

Finally, the Fund avers the arbitrator clearly erred by disregarding problems of witness credibility.  The Fund cites one instance (albeit with an "*e.g.*" cite, apparently suggesting other, unidentified instances) where the arbitrator explained he was not sure credibility was "necessarily relevant, never mind dispositive" with respect to a specific area.  (ECF No. 21 at p. 37 (citing ECF No. 22-4, Arbitration Tr. 1919:21–1920:2).)  The cited deposition excerpt does not amount to a total disregard for witness credibility.  Indeed, as quoted above, the arbitrator thoughtfully explained why the credibility of supervisors regarding their own opinions of whether they were allowed to perform Laborers' jurisdictional work was independent from whether the work actually satisfied the requirements of the construction exemption.  The Fund's arguments here basically amount to a disagreement with the arbitrator's assessment of credibility and weight afforded testimony.  "[I]t is not for this Court to reverse the Arbitrator's factual findings even if it would have weighed the evidence different."  *Penske Logistics LLC v. Freight Drivers & Helpers Loc. Union No. 557 Pension Fund*, No. CV RDB-15-3277, 2019 WL 1081391, at *5 (D. Md. Mar. 7, 2019), *aff'd*, 820 F. App'x 179 (4th Cir. 2020).  The court finds no clear error on the part of the arbitrator.

## **CONCLUSION**

For the reasons set forth above, the court discerns no clear error in the arbitrator's findings of fact.  Based on a *de novo* review of the foregoing questions of law, the court affirms the arbitrators conclusions of law.  Therefore, by separate order, the court will deny the Fund's Motion,

grant WT's Motion, and confirm the Interim Award and Final Award at ECF Nos. 1-1 and 1-2, respectively.

September 23, 2025

/S/
_____
Julie R. Rubin
United States District Judge